# EXHIBIT E

lent corporation, known as the Continental Trading Co., of Canada, had been organized for the purpose of using the profits of its business in the bribing of public officials of the United States and for other dishonest, dishonorable, and illegal purposes '—

" I am not asking you to subscribe to that, this is the description before.—

" Mr. STEWART. Thank you, Senator ; thank you.

" Senator WALSH (continuing). 'And whereas it was disclosed upon said trial that the profits of said corporation were invested in Liberty bonds of the United States and that only a portion of said Liberty bonds so invested had been definitely traced and accounted for and by the large amount of Liberty bonds coming into the hands of said fraudulent corporation and had been unaccounted for and unexplained : Therefore be it resolved '—

" Mr. STEWART. I have read that resolution, Senator.

" Senator WALSH. So that you understand that the questions of the chairman of the committee and of myself referred to those bonds?

" Mr. STEWART. Oh, I think so, Senator.

" Senator NYE. The Senate expects us to interrogate you with respect to whether or not you knew anything of this transaction in Liberty loan bonds. With that purpose in mind, I am going to repeat my question of yesterday : Do you know of anyone who received any of these Liberty bonds in which the Continental Trading Co. is represented to have dealt?

" Mr. STEWART. Senator, again, with the greatest reluctance and with great respect for the committee and for the reasons which I have already given in the course of my testimony and for other reasons which might appear later, I will have to respectfully decline to answer that question.

" Senator NYE. I shall also repeat that question of yesterday as to whether or not you have had any conversation with Mr. H. F. Sinclair with regard to this transaction in Liberty loan bonds or with regard to the Continental Trading Co.'s transactions?

" Mr. STEWART. For the same reason, sir, I shall have to decline to answer.

" Senator NYE. Have you had any conversation with Mr. O'Nell with regard to any of these transactions with the Continental Trading Co. in re these Liberty loan bonds?

" Mr. STEWART. Not to my best remembrance. I have not seen Mr. O'Nell in a great many years.

" Respectfully submitted.

" GERALD P. NYE,

" *Chairman Committee on Public Lands and Surveys.*"

Mr. WALSH of Montana. Mr. President, the words " by H. F. Sinclair " were omitted after the word " delivered " on the first page of the report. I ask to amend by inserting those words.

The VICE PRESIDENT. Without objection, the amendment will be made.

Mr. WALSH of Montana. Mr. President, I offer the following resolution.

The VICE PRESIDENT. The clerk will read.

The Chief Clerk read the resolution (S. Res. 132), as follows :

Whereas it appears from the report of the Committee on Public Lands and Surveys that a witness, Robert W. Stewart, called before the committee making inquiry as directed by the Senate by Senate resolution 101, declined to answer certain questions relative and pertinent to the matter then under inquiry :

*Resolved,* That the President of the Senate issue his warrant commanding the Sergeant at Arms or his deputy to take into custody the body of the said Robert W. Stewart, wherever found, and to bring the said Robert W. Stewart before the bar of the Senate, then and there or elsewhere, as it may direct, to answer such questions pertinent to the matter under inquiry as the Senate, through its said committee, or the President of the Senate, may propound, and to keep the said Robert W. Stewart in custody to await further order of the Senate.

Mr. WALSH of Montana. I ask unanimous consent for the present consideration of the resolution.

The VICE PRESIDENT. Is there objection?

There being no objection, the resolution was agreed to.

The preamble was agreed to.

INTERIOR DEPARTMENT APPROPRIATIONS

The Senate, as in Committee of the Whole, resumed the consideration of the bill (H. R. 9136) making appropriations for the Department of the Interior for the fiscal year ending June 30, 1929, and for other purposes.

Mr. SMOOT. I offer an amendment, which I send to the desk.

The VICE PRESIDENT. The Clerk will report the amendment.

The CHIEF CLERK. On page 58, after line 2, insert the following as a new paragraph :

For relief of distress among the native Indians of Turtle Mountain Band of North Dakota, $15,000.

The amendment was agreed to.

Mr. SMOOT. I also offer the amendment I send to the desk.

The VICE PRESIDENT. The clerk will read.

The CHIEF CLERK. On page 58, in line 14, after the numerals " $1,000," insert the words " to be immediately available."

The amendment was agreed to.

Mr. SMOOT. I offer also the following amendment, which I send to the desk.

The VICE PRESIDENT. The clerk will report.

The CHIEF CLERK. On page 113, after line 6, insert the following :

HOWARD UNIVERSITY

Salaries : For payment in full or in part of the salaries of the officers, professors, teachers, and other regular employees of the university, the balance to be paid from privately contributed funds, $160,000, of which sum not less than $2,200 shall be used for normal instruction ;

General expenses : For equipment, supplies, apparatus, furniture, cases and shelving, stationery, ice, repairs to buildings and grounds, and for other necessary expenses, including reimbursement to the appropriation for Freedmen's Hospital of actual cost of heat and light furnished, $80,000 ;

For the construction and equipment of a chemistry building, $150,000 ; and the Secretary of the Interior is authorized to enter into contract or contracts for such building and equipment at a cost not to exceed $390,000 ;

Total, Howard University, $390,000.

Mr. LA FOLLETTE. Mr. President, may I ask the Senator from Utah whether this is the same amount appropriated last year?

Mr. SMOOT. It is the same amount, practically, that was appropriated last year. It was submitted by the Bureau of the Budget and recommended by the department, but it went out in the House on a point of order, as it has done for many years.

Mr. OVERMAN. Pretty nearly 10 years.

Mr. LA FOLLETTE. Mr. President, I am in favor of the amendment, but I merely wished to make sure that it was at least equal to the amount appropriated last year.

Mr. SMOOT. It is practically the same amount we appropriated before.

Mr. NORRIS. Mr. President, may I interrupt the Senator?

Mr. SMOOT. Certainly.

Mr. NORRIS. I was out of the Chamber at the beginning of the reading of the bill. Am I correct in my understanding that a unanimous-consent agreement has been reached by which the power matter contained in the Flathead Reservation provision will not be taken up to-day?

Mr. SMOOT. It goes over until to-morrow.

Mr. OVERMAN. An item for the erection of buildings was included in last year's appropriation for Howard University, was it not?

Mr. SMOOT. There was an item for a medical department building.

Mr. OVERMAN. Is that a part of this appropriation?

Mr. SMOOT. No; this is for a new building. The amount is practically what was appropriated last year. We are not asking for any additional appropriation for the medical building. Does the Senator desire that the amendment shall go over?

Mr. OVERMAN. I would like to have it go over.

The VICE PRESIDENT. The amendment will go over.

RECESS

Mr. SMOOT. I move that the Senate take a recess until 12 o'clock to-morrow.

The motion was agreed to; and the Senate (at 5 o'clock and 3 minutes p. m.) took a recess until to-morrow, Saturday, February 4, 1928, at 12 o'clock meridian.

---

# HOUSE OF REPRESENTATIVES

FRIDAY, *February 3, 1928*

The House met at 12 o'clock noon.

The Chaplain, Rev. James Shera Montgomery, D. D., offered the following prayer:

Almighty God and our Heavenly Father, Thou who are infinite in love and wisdom, in the spirit of the Teacher of Galilee we would draw near to Thee; help us to do so. We come to receive that inspiration which shall enable us to go through the duties of this day with dignity, courage, and patience. As we discharge our obligations may we weave characters on the great loom of life's activities that shall be above reproach and can be spoken of without apology and above a whisper. Permit nothing to interfere with the direct study of the problems of our Republic. Arouse within us the unquenchable ambition, in public duty and in private life, to be led and directed by Thee, through Jesus Christ, our Lord. Amen.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

The Journal of the proceedings of yesterday was read and approved.

### MESSAGE FROM THE SENATE

A message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate had passed the bill (S. 2301), to create a commission to be known as the commission for the enlarging of the Capitol Grounds, and for other purposes, in which the concurrence of the House of Representatives was requested.

The message also announced that the Senate had passed without amendment a joint resolution of the followenig title:

H. J. Res. 112. Joint resolution to amend the act of May 29, 1884, as amended, the act of February 2, 1903, and the act of March 3, 1905, as amended, to include poultry within their provisions.

### SENATE BILLS REFERRED

A bill of the following title was taken from the Speaker's table and, under the rule, referred to the appropriate committee, as follows:

S. 2301. An act to create a commission to be known as the commission for the enlarging of the Capitol Grounds, and for other purposes; to the Committee on Public Buildings and Grounds.

### CHANGE OF REFERENCE

Mr. SNELL. Mr. Speaker, House Resolution 87, introduced by the gentleman from New York [Mr. DAVENPORT], was referred to the Rules Committee. The parliamentarian submitted the report to me, and I thought at the time it belonged to the Rules Committee. Since that time I have taken it up and submitted it to the committee, and we think it properly belongs to the Committee on Foreign Affairs. The Foreign Affairs Committee has asked for it. I ask unanimous consent that House Resolution 87 be rereferred from the Rules Committee to the Committee on Foreign Affairs.

The SPEAKER. The Clerk will report the resolution.

The Clerk read as follows:

#### House Resolution 87

Whereas the Department of State is the sole executive agency upon which the Government relies for the efficient conduct of its relations with other Governments and for the protection of American interests throughout the world; and

Whereas the international duties and responsibilities of the United States have greatly increased in recent years, thereby throwing large additional burdens upon the Department of State: Now therefore be it

Resolved, That the Committee on Foreign Affairs is authorized and requested to confer with the President of the United States and the Secretary of State and ascertain whether or not the Department of State is adequately equipped for the task which confronts it, both in its foreign and domestic services, in respect to funds, material equipment, personnel and organization, and other facilities, and whether or not it is handicapped by legislative or other limitations; and to report to the present Congress the committee's findings, together with recommendations for such action as may be deemed essential in the public interest.

The SPEAKER. The gentleman from New York asks unanimous consent that the resolution that has just been read be rereferred from the Committee on Rules to the Committee on Foreign Affairs. Is there objection?

Mr. MOORE of Virginia. Reserving the right to object, is this a resolution introduced by the gentleman from New York [Mr. DAVENPORT]?

Mr. SNELL. It is.

The SPEAKER. Is there objection?

There was no objection.

### WITHDRAWAL OF PAPERS

Mr. CHRISTOPHERSON. Mr. Speaker, I ask unanimous consent to withdraw from the files evidence submitted in support of H. R. 5605, Sixty-ninth Congress, for the relief of Sam H. Allen, no adverse report having been made thereon.

The SPEAKER. Is there objection to the request of the gentleman from South Dakota?

There was no objection.

### HOWARD UNIVERSITY

Mr. HOWARD of Oklahoma. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD on the appropriation for Howard University.

The SPEAKER. The gentleman from Oklahoma asks unanimous consent to extend his remarks in the RECORD in the manner indicated. Is there objection?

There was no objection.

Mr. HOWARD of Oklahoma. Mr. Speaker, under consent for extension of remarks granted me a few days ago, I desire to state that I favor the adoption of the conference report which recommends that the House concur in the Senate amendment to the Interior Department appropriation bill providing for an appropriation of $390,000 for the support of Howard University, and I voted for the amendment when it was before the House for vote.

I voted for this amendment for the reason that I am favorable to extending the opportunities of education to all people, regardless of race, color, or other conditions. It is my firm conviction that no public moneys expended bring greater results than those expended upon education, and it is also my firm conviction that Howard University, maintained for the higher education of men and women of the colored race, is and has been doing a great and beneficial work.

Mr. Speaker, in my own congressional district, and especially in the city of Tulsa, I have had occasion to observe some of the results of this university. I am personally acquainted with a considerable number of men and women of the colored race who have graduated at Howard University. Among them are ministers, doctors, lawyers, dentists, pharmacists, and teachers educated at this university. They have successfully practiced their professions among those of their own race, and by precept and example have made a substantial contribution to the health, industry, morality, temperance, and right living among the less fortunate of their own race. They and the others in other communities who have done likewise are to be congratulated, and in my opinion we are taking a step forward when we make this appropriation and encourage others of their race to follow their example.

The white people owe a duty to the black people. That duty is to do them no harm, to stimulate their industry, and encourage them to be temperate, sanitary, moral, honest, and useful; and to encourage them to be led by educated, honest, industrious, right-thinking, right-living, God-fearing men and women.

Mr. Speaker, the education of the colored people is not a question in which is solely involved what is best for the Negro race, but there is also involved the questions as to what is best for the white people. The negro people, numbering millions, are among us; they are a part of our country and are to remain a part of our permanent population, and I have no desire to see them or any other part of our population deprived of or denied any educational facilities. I think, on the contrary, that it is much better that we do things to bring not only the colored people but all others in any way that we can to a higher standard of citizenship. Nothing will tend to this more than extending opportunity for higher education.

Congress has been making this appropriation for nearly one-half of a century. The money granted is a small amount when consideration is given to the purpose for which it is appropriated.

All the States have not made adequate provision for the higher education of negroes, and in Howard University we have a first-class institution devoted exclusively to the better training of negroes in the trades and professions. Instead of requiring negroes, who are hungry for higher education and for instruction in the trades and professions, to get their training in second-class State institutions, why not maintain a first-class negro university which is capable of developing trained leaders for the Negro race and where the negroes can be educated among and by members of their own race?

I therefore voted to approve the report of the conference committee, which means that the pending bill, when it becomes a law, will carry an appropriation for the Howard University. The House having failed to grant this appropriation, the Senate added an amendment authorizing the appropriation. I favor this Senate amendment, and I am therefore voting to approve the conference report.

### WAR DEPARTMENT APPROPRIATION BILL

Mr. BARBOUR. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the further consideration of the bill H. R. 10286, the War Department appropriation bill.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union, with Mr. TILSON in the chair.

The CHAIRMAN. The House is in Committee of the Whole House on the state of the Union for the consideration of the bill H. R. 10286, which the Clerk will read by title.

The Clerk read the title, as follows:

A bill (H. R. 10286) making appropriations for the military and nonmilitary activities of the War Department for the fiscal year ending June 30, 1929, and for other purposes.

Mr. COLLINS. Mr. Speaker, I yield 20 minutes to the gentleman from Virginia [Mr. HARRISON].

Mr. HARRISON. Mr. Chairman and gentlemen of the committee, the very elaborate, full, and careful explanation of this bill made by the gentleman from California [Mr. BARBOUR], acting chairman of the subcommittee, will make it unnecessary for me to occupy the time of the House to any great extent.

Before making any reference to the bill I do not feel that I could preface my remarks to a better purpose than to express the regret I feel, with all his associates, that the gentleman from Kansas [Mr. ANTHONY], our chairman, has been unable to assist in the preparation of this bill on account of illness.

I deplore also his intention to retire from public life. I am sure all his colleagues on this floor, Democrats as well as Republicans, hope for his speedy restoration to health. His colleagues all hope that in the near future he may again give us the benefit of his services. [Applause.]

I have served with Mr. ANTHONY ever since I have been in Congress. I served with him on the Committee on Military Affairs and also on the Appropriations Committee, and I can bear testimony that no man in this House has rendered any more valuable service than has the gentleman from Kansas [Mr. ANTHONY]. [Applause.]

I served with him when he was on the minority side and I served with him when he was on the majority side; I served with him in the war time and I served with him in the peace time, and I have always found him the same patriotic public servant under all circumstances and under all conditions. [Applause.]

I am sure that I voice the sentiment of the Democratic side of the House when I say this much, and it gives me pleasure to make this sentiment a part of the records of this House.

I agree with the gentleman from New York [Mr. SNELL] and the gentleman from Illinois [Mr. MADDEN] when they say that the appropriations for our Military Establishment should be stabilized. I know that that has been the purpose of the subcommittee for the last several sessions. We have endeavored in each appropriation bill to create an appropriation that would stabilize the size and the condition of the Army. It is destructive of the morale of the Army to be constantly fluctuating in its support. It prevents continuity of development to be constantly changing our policy. I therefore thoroughly agree with the gentleman of New York and the gentleman of Illinois. In this matter we are obliged to be largely controlled by the Budget. The President of the United States is the Commander in Chief of both the Army and the Navy, and he speaks through the Budget. When he makes recommendations as to the necessity for appropriations along certain lines, it is natural that the committees of this House should follow as far as practical the suggestions that he has made; and when he recommends that certain other appropriations are necessary, we are forced to adopt his recommendations unless there is some very good reason why they should not be adopted. This bill is based on the recommendations of the Budget. I concur in almost all of the provisions. It is not the bill, possibly, that originally I would have drawn; but in all legislation there is necessarily a certain amount of give and take, and the compromise that is effected is generally the best legislation.

The grand total of the bill, both military and nonmilitary, reaches something like $400,000,000; and when we take that enormous sum in connection with the proposed appropriations for the Navy, carrying something like a billion dollars, we are carrying an enormous burden and the people have a right to know that it is necessary.

I do not believe that the people will begrudge the expenditure of this amount or any other amount that may be necessary to protect the vast wealth of this country and insure the liberties of the people of this country. All that they require is that the money should be carefully appropriated and that when appropriated it should be expended in the best and most economical manner.

The Army is composed of three parts, in general terms. We have the Regular Army, as it is called; we have the Organized Reserve; and we have the National Guard. Heretofore we have always provided for an Army of 118,750 men and 12,000 officers in the Regular Army. We have heretofore provided liberally for the Organized Reserve and for the National Guard. In this bill we continue this policy and we carry the appropriations which provide for a Regular Army of 12,000 officers and 118,000 men. In the Organized Reserve there are about 125,000 men. In the civil military training camps there are about 35,000 men, and in the National Guard there are close to 190,000 men, so that we have an Army of fair size, even for a population of 120,000,000 and for an empire, continental and insular, as vast as ours. The Regular Army is essential for purposes for which the National Guard and the Organized Reserve could not be used. The Regular Army is obliged to do the regular work of

the Army. They protect the sea-coast defenses and the foreign possessions, and it is essential that we should have a Regular Army of the size that we have fixed in this bill.

We must remember that the 12,000 officers which we provide are not utilized for the Regular Army alone. They form an essential part of the several hundred thousand citizen soldiers who are called into the service. They officer and train the National Guard of 190,000 men, and they train and officer the Organized Reserve and also the civil military camps. It is as essential to have trained officers for these purposes as it is to have trained officers with the Regular Army. Therefore, it is not a fair criticism to say that we have 12,000 officers for 118,000 men. We have these 12,000 officers to discharge important functions and duties with the men that we are training and preparing to render service in case of national emergency.

We have in some respects altered the Budget in regard to the strength of the Regular Army. There was what was known as a munitions battalion of 250 men trained in the colleges at a cost of $1,500 for each man. This is proposed to be increased from time to time until it reaches 400 men. These men discharge no sort of function for the Army. They are under no obligation whatever in regard to that. They come in and they go out as it suits their convenience or their interest, and it does seem to us to be a far-fetched idea that these men could serve any useful purpose by the mere fact that perhaps some of them in time of war would form a contact between the Army proper and the business organizations that we would need in our service. So that feature has been eliminated.

Another feature to which I direct attention is that we have counted as a part of the 118,000 men the 1,240 men who are to be selected as a part of the air increment. The provision in the law is that 1,240 men should be each year trained as a part of the Air Corps and that that number should be independent of the Regular Army. That would amount in the five years during which this increment was supposed to run to something like 6,000 men. I speak in the rough. Those men were to be independent of the number of Regular Army and not count as a part of the Regular Army, but the Budget has undertaken to make them a part of the 118,000 men, and, as I said, we have followed the Budget, on the ground that the President, for whom the Budget speaks, is best informed whether or not the Regular Army could absorb this number without injury to the regular service.

There is another feature in respect to the Regular Army to which I direct attention, and that is to the miserable housing that is provided for the men in the barracks. I know that many Members of the House have visited these camps, and I know that they will bear testimony to what I say, namely, that the housing conditions at the Army posts are simply shocking to the better sentiment of everyone familiar with them.

In many of the posts the men are housed in old shacks that were built hastily during the war. They were built in many instances for entirely different purposes from that for which they are now used. They are veritable fire traps. They have been denied the benefit of any improvements during all these years. They are rat traps. Again and again we find in the newspapers some notice concerning a destructive fire at one of these barracks. The money that was set specially aside for these posts has all been used. The fund I refer to is the fund arising from the sale of surplus property. · It was provided in the law that the proceeds from the sale of the surplus property should be dedicated to construction purposes at the posts. The last appropriation bill appropriated the last dollar that was in the Treasury for that purpose, and this bill therefore carries an independent appropriation of something like $7,000,000, in round numbers, for that purpose.

Mr. CLAGUE. Mr. Chairman, will the gentleman yield?

Mr. HARRISON. Yes.

Mr. CLAGUE. Is it not a fact that our subcommittee recommended all that we could under the authorization?

Mr. HARRISON. Yes. I am glad to be corrected on that point. The subcommittee recommended the $7,000,000, which was all that the Committee on Military Affairs had authorized to be expended along that line.

Mr. WAINWRIGHT. And the Committee on Military Affairs has authorized all that the War Department has asked for.

Mr. HARRISON. After this $7,000,000 has been expended that we appropriate for this bill, or after all the money has been applied that was in the Treasury to the credit of this special fund, there will at the end of the fiscal year remain unprovided for 3,750 officers, 3,058 noncommissioned officers, and 20,195 enlisted men, for whom no permanent housing has been provided.

Case 1:21-cr-00168-TSE   Document 25-5   Filed 09/07/21   Page 5 of 30 PageID# 332

Mr. BLAND. Mr. Chairman, will the gentleman yield there?

Mr. HARRISON. Yes.

Mr. BLAND. Referring to the statement that the Committee on Military Affairs has reported all that the War Department has asked for, we should remember that General Summerall, when he practically campaigned over the country last year in the interest of better housing for our Army, was suddenly recalled to Washington, and is it not a fair deduction to conclude that there is some pressure outside of the War Department that is limiting the recommendations that come from the War Department?

Mr. HARRISON. The record shows that we have expended all the money we are authorized to expend, according to the report of this committee, and still all these men are unprovided for, and it shows that there must be something wrong somewhere. If the administration had desired to make rectification of these conditions, General Summerall would not have been recalled from the Pacific coast. It is the false economy for which the administration stands that is back of the continuation of these conditions. A great expenditure will sooner or later be necessary, but then this administration will have passed out and the succeeding administration will be charged with the expenditures, which will be greatly increased by the delay in making.

Mr. MOORE of Virginia. Mr. Chairman, may I interrupt the gentleman?

Mr. HARRISON. Certainly.

Mr. MOORE of Virginia. I understand that the Committee on Military Affairs right now is giving careful and sympathetic consideration to proposed legislation that will authorize sufficient appropriations to take care of these men in proper housing conditions.

Mr. HARRISON. Yes; I understand the gentleman from Michigan [Mr. JAMES] made a visit to each of these camps with this purpose in view.

Mr. BLAND. My understanding is that a priority list has come from the War Department, and they are merely reporting particular provisions for each year. I want to call the attention of the gentleman to this fact, that in such a long-established place as Fortress Monroe, where there is an important military school, the officers attached to that school are living in war-time structures, whose roofs are not sufficient to protect them and their families from the rain.

Mr. HARRISON. Yes; furthermore, their families are living side by side in shacks without proper privacy. In one of the war-time buildings two or more families will be housed separated by partitions of pasteboard character. Family home life is practically destroyed.

Mr. BLAND. Yes. They are living in fire traps of war-time construction. The necessary funds should be given, whereas no dollar has been appropriated for that purpose.

Mr. JAMES. There is no priority list furnished by the department to the Committee on Military Affairs, and there is no priority list pending in the House Military Committee now. Down there at Fortress Monroe, so far as the conditions are concerned, I understand they are deplorable. Hereafter there will be substantial structures erected to take care of the commissioned officers at Langley Field. I visited Panama and Langley Field, and in the next few months I want to go down to Fortress Monroe. There are only a few places in the South and West that I have not yet seen. I want to repeat that there is no priority list sent to us by the War Department.

Mr. HARRISON. What were the conditions that the gentleman found at the various posts visited by him?

Mr. JAMES. There were some regiments in Panama that have nice quarters, and some regiments that have very poor quarters. The same applies to Camp Lewis. Of course, there were some places like Benning and Bragg in the new fields where the conditions were bad. So far as the Committee on Military Affairs is concerned, we shall have a very substantial bill for housing.

Mr. HARRISON. My impression is that at these posts the conditions are simply disgraceful.

Mr. BLACK of New York. Mr. Chairman, will the gentleman yield?

Mr. HARRISON. Yes.

Mr. BLACK of New York. I want to say that recently I visited a great number of the forts around New York, and in some of them the living conditions for the men and the noncommissioned officers are worse than the slums in New York City, and the officers entitled to decent quarters are getting the worst kind of accommodations. They are living there in these war-time shacks after having served for 20 years.

The CHAIRMAN. The time of the gentleman from Virginia has expired.

Mr. HARRISON. I would like to be notified after I have used 15 minutes more.

The CHAIRMAN. The Chair will notify the gentleman in 10 minutes.

Mrs. ROGERS. Mr. Chairman, will the gentleman yield?

Mr. HARRISON. Certainly.

Mrs. ROGERS. I want to state that the conditions in Camp Devens, in my district, are extremely bad, both for the enlisted men and officers. Every year there is a fire, and there is great fear that the quarters for the officers and the barracks for the men will be quite wiped out.

Mr. HARRISON. I thank the lady for that statement. I think that statement will be borne out by everyone who has visited these barracks.

We have provided in this bill an amount which I think is wholly inadequate and which is no economy whatever, because where we do not furnish quarters we must furnish commutation, and it is more expensive to furnish commutation than it is to pay for decent quarters. The soldiers in some cases have rectified conditions, where they were given the facilities so to do. However, in many cases they have not been furnished with paint, lumber, or the necessary materials which would be required to improve conditions. I may say that there has been a great deal of improvement by virtue of the money we appropriated last year, and I hope the money we appropriate this year will bring about a further improvement in these deplorable conditions.

Mr. JOHNSON of Texas. Will the gentleman yield?

Mr. HARRISON. Yes.

Mr. JOHNSON of Texas. Whose fault is it that these conditions exist, which the gentleman is describing and with which I agree? Is it the fault of the War Department or Congress?

Mr. HARRISON. I think it is the fault of the War Department; that is, I will excuse the War Department and say it is the fault of the administration. The Budget prescribes a limitation upon the appropriations, and the officers dare not tell the truth about the conditions, because under the very Budget law they are forbidden to speak in favor of any appropriation that has not been allowed by the Budget.

Mr. JOHNSON of Texas. General Summerall regretted that he spoke about the matter, did he not?

Mr. HARRISON. General Summerall spoke the sentiment of this country.

Mr. JOHNSON of Texas. Then the gentleman does not agree with the President's reprimand of General Summerall for telling the truth about the matter?

Mr. HARRISON. I do not. I think he should be given the congressional medal.

Mr. TABER. Will the gentleman yield?

Mr. HARRISON. Yes.

Mr. TABER. Is it not a fact that this committee has very generally throughout the hearings cross-questioned the officers who came before it as to the needs of the Army, regardless of what the Budget stated?

Mr. HARRISON. Yes; and we had to cross-question them, too. If we knew what to cross-question them on, we might get the information, but we are only volunteered such information as we can screw out of them by cross-examination. It is not their fault at all, because the law forbids it.

We have provided a certain sum of money for the purchase of furniture to go into these new buildings. There has been no appropriation made for the purchase of new furniture since 1922 or 1923. In this bill we have been liberal in the amount we have provided for the purchase of new furniture. I think it would be adding insult to injury to place these men in these shacks and not give them sufficient furniture with which to make these shacks habitable.

Now, in regard to the question of horses. We have cut down the Budget estimate and we keep some below, I believe, the 1928 amount. If that is not so, I will ask to be corrected.

Mr. TABER. The amount carried in this bill is the same as the amount carried in the 1928 bill.

Mr. HARRISON. Then we have made the same appropriation that we made in 1928. Some criticism seems to have been made in regard to Army officers having horses fed at public expense. I desire to say that is strictly in accordance with the law. I have the statute here, which provides that we are required to furnish sustenance to the horses of Army officers. I read the statute, as follows:

The number of horses for which forage, bedding, shoeing, shelter, and medicines may be allowed are as follows: To a major general, 3 horses; to a brigadier general, 3 horses; to a colonel, 2 horses; to a lieutenant colonel, 2 horses; to a major, 2 horses; to a captain (mounted), 2 horses; to a lieutenant (mounted), 2 horses; to an adjutant, 2 horses.

Case 1:21-cr-00168-TSE   Document 25-5   Filed 09/07/21   Page 6 of 30 PageID# 333

All officers below the rank of major must buy their own horses. In this bill we have made the usual provision and such provision has been carried in appropriation bills ever since I have been a member of the Military Affairs Committee and of the Appropriations Committee.

For the Air Corps we have made, in my judgment, ample provision. We have appropriated $24,000,000 for the Air Corps, and at the end of 1929 it is expected we shall have over 1,300 new planes in the field.

There has been a great deal of complaint about the uniforms. I have received a great many communications from colleges in regard to the uniforms. We provide every soldier in the ranks with his uniform and we have given the boys who are in the schools the same uniforms that we give our soldiers, but we have said that if they want any better we will give them the money that the uniform costs and they could provide it themselves. It seems to me that is absolutely fair and just. Why should we give the boys in colleges any better uniforms than we give the ordinary soldier, who is discharging his duty as a soldier?

In regard to military training, we have increased the number to be trained at civilian military training camps by 5,000. The Budget provided for 30,000, but we have increased the number to 35,000. It seems to me that is sufficient, especially in view of the fact that that is the policy we have adopted in the past, and, as was suggested on the floor yesterday, it is the policy we should maintain, a stabilized policy.

Mr. WAINWRIGHT. Will the gentleman yield?
Mr. HARRISON. Yes.
Mr. WAINWRIGHT. Is the gentleman now referring to the civilian military training camps?
Mr. HARRISON. Yes.
Mr. WAINWRIGHT. Of course, the gentleman does not mean to inform the committee that you have increased the number over those who have been trained this year?
Mr. HARRISON. We have increased it over the Budget.
Mr. WAINWRIGHT. But you have not increased it over the provision which was made last year.
Mr. HARRISON. I understand that; but the Budget comes here from the President and says that all we ought to train are 30,000, while we have provided for 35,000, which is the number settled upon as the proper number to be trained.
Mr. WAINWRIGHT. This is a pretty important proposition, and may I ask the gentleman if he thinks we should stop at 35,000? Why should 35,000 be the mystic figure when you consider that every year we have increased the number of youths trained in the civilian military training camps, and the project, as I understand it, was to increase it, or has been, unless the precedent is made now, year by year until we get up to at least 50,000; in fact, the previous project had been to increase step by step until we had 100,000 of these splendid boys under training.
Mr. HARRISON. Does not the gentleman think that the Budget, which speaks for the President, ought to come here and ask for it? Why should he put the burden on Congress?
Mr. WAINWRIGHT. Of course, it goes without saying that the Budget can place no limitation upon us.
Mr. HARRISON. I understand; but the Budget speaks for the President, and the President is the head of the Army and of the Navy. He speaks authoritatively on matters of that character and we have gone over the Budget number by 5,000 men. We could, of course, increase it indefinitely; and I will say to the gentleman we could not spend money better.
Mr. WAINWRIGHT. That is exactly what I wished to develop from the gentleman—we could not spend money better than in this form of training.
Mr. HARRISON. I agree with the gentleman.
Mr. WAINWRIGHT. The gentleman, of course, knows that 35,000 will be almost 5,000 less than we actually trained last year?
Mr. HARRISON. I understand there was some particular reason for that last year.
The CHAIRMAN. The time of the gentleman from Virginia has again expired.
Mr. COLLINS. Mr. Chairman, I yield the gentleman 10 additional minutes.
Mr. HARRISON. We have increased the appropriations for the Organized Reserves nearly $400,000. We have not given them all they asked. We could not do this, but we have given them nearly $400,000 in addition to what we gave them last year; and in our judgment about 16,000 men will be trained and this will probably be all that will apply for training.

In regard to the National Guard, we have increased this item over $1,000,000 and we hear no complaint.

Just one word on the subject of the rifle teams. We provided in the last appropriation bill that these rifle matches should

be held every two years. This is an off year. The cost of having one of these matches this year would have been $600,000. It does seem to us that the plan we adopted in the last appropriation bill of having them biennially will satisfy all the needs of the Government and the $600,000 can be applied better to other uses of the Army. We have therefore followed the policy which we adopted at the last session.

Mr. Chairman, this bill, as I have said, provides for what I think is a compact, serviceable army for the Organized Reserves, National Guard, and the Regular Army.

I do not believe it was ever the intention of the Congress to authorize the use of our military forces in any warlike demonstration without the authority of Congress. I think the gentleman from Missouri [Mr. COMBS] here on the floor eloquently expressed what is really in the hearts of the American people in regard to our proceedings in Nicaragua. There is no precedent in history for such a procedure.

It is true that President Wilson ordered General Pershing, with the consent of Mexico, to invade Mexican territory in pursuit of a bandit who had killed American citizens on American soil. There was no pretense, therefore, of anything involving the application of the Monroe doctrine, and when we had pursued them for a little distance into Mexican territory Mexico ordered the Army out of Mexico and we immediately obeyed and came back to this country. Again, at Vera Cruz, it was said that the Mexicans had insulted the flag and we sent the Navy to Vera Cruz and seized Vera Cruz with the purpose of compelling Mexico to apologize for the insult she had given the flag. When Mexico would not apologize, we came home. There was no pretense there of any application of the Monroe doctrine to that situation.

In the case of Venezuela, we never attempted to dictate to Venezuela anything with regard to her internal affairs, but Great Britain had undertaken to make certain claims against the territory of Venezuela and had refused to submit them to arbitration, and it was on that point, directly involving the Monroe doctrine, that President Cleveland protested and protested with effect. But I deny there has been any precedent whatever for this country going into any of these southern Republics and undertaking to settle their presidential contests. [Applause.]

What have we got to do with who is elected President of Nicaragua? It seems to me that, according to Latin America, the man who is in is President and the man who is out is a bandit; and when the bandit gets in he is the President, and the man who was in is a bandit. According to Mr. Will Rogers, a presidential election is rendered easy by shooting rival candidates. We have no more right to go into these territories and undertake to control their elections than they have the right to come into our territory and control our elections, and, for my part, as I have said before on this floor, I will gladly vote for any amendment providing that not a dollar of these appropriations shall be applied to the sending of troops into any foreign country to slaughter or be slaughtered unless such action is sanctioned by the Congress. I think this would be entirely within constitutional limits. Every day transports are bringing back our boys injured, and some of them to be buried, and every day we are spending thousands of dollars to clear, as it is said, Nicaraguan territory of bandits. Mr. Chairman, I desire to voice here my protest against such a procedure. [Applause.]

Mr. Chairman, I yield 30 minutes to the gentleman from Mississippi [Mr. COLLINS].

Mr. BYRNS. Mr. Chairman, the gentleman from Mississippi is about to make a very informative speech, one that I think the whole House ought to hear, and I make the point of no quorum.

The CHAIRMAN. The gentleman from Tennessee makes the point of no quorum. The Chair will count. [After counting.] Sixty Members present, not a quorum.

Mr. SNELL. Mr. Chairman, I move a call of the House.

A call of the House was ordered.

The doors were closed, the Sergeant at Arms ordered to notify absent Members, the Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 24]

| | | |
|---|---|---|
| Aldrich | Cooper, Ohio | Fitzgerald, Roy G. |
| Anthony | Crisp | Foss |
| Beck, Pa. | Cullen | French |
| Bohn | Curry | Fulbright |
| Boies | Davey | Gallivan |
| Boylan | Deal | Garber |
| Britten | Denison | Golder |
| Bushong | Dickstein | Graham |
| Carew | Douglas, Ariz. | Green, Iowa |
| Carley | Dowell | Hancock |
| Clancy | Doyle | Hardy |
| Clarke | Drane | Haugen |
| Connolly, Pa. | Driver | Hull, Morton D. |

| |
|---|
| Igoe |
| Jacobstein |
| Johnson, S. Dak. |
| Jones |
| Kendall |
| Ketcham |
| Kiess |
| Kindred |
| King |
| Kunz |
| Kvale |
| LaGuardia |
| Larsen |

| | | | |
|---|---|---|---|
| Leatherwood | Oliver, N. Y. | Sproul, Kans. | Underhill |
| Lindsay | Parks | Steagall | Updike |
| Linthicum | Quayle | Stedman | Weller |
| Lowrey | Reed, Ark. | Strong, Pa. | Welsh, Pa. |
| Lyon | Reed, N. Y. | Strother | Williams, Ill. |
| McMillan | Sabath | Sullivan | Williamson |
| Major, Mo. | Sanders, N. Y. | Swick | Wingo |
| Michaelson | Sears, Nebr. | Taylor, Colo. | Winter |
| Moore, N. J. | Simmons | Taylor, Tenn. | Wood |
| Nelson, Wis. | Sirovich | Temple | Woodrum |
| O'Connor, N. Y. | Sproul, Ill. | Tucker | Wyant |

The committee rose; and the Speaker having resumed the chair, Mr. TILSON, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee having under consideration the bill H. R. 10286, the War Department appropriation bill, and finding itself without a quorum, it caused the roll to be called, and 338 Members had answered to their names, and he reported the names of those absent, to be entered in the Journal and the RECORD.

The committee resumed its sitting.

The CHAIRMAN. The gentleman from Mississippi is recognized for 30 minutes.

Mr. COLLINS. Mr. Chairman, a seeker for information about the War Department will have to go to some other source than the bill under consideration to find it. It is too vague and indefinite for that. Of course, a reading of the 1,500 pages of the hearings would shed light on this department's activities, but this is a task that the average Member has not time to undertake. The report of the committee also sheds considerable light upon it. The able statement of Mr. BARBOUR, the chairman of this subcommittee, likewise is full of information. Still there are activities of our Military Establishment that are not set forth, and some of them I will present to you.

Our Army is generally spoken of as a small affair—a skeleton organization, if you please—one that could be easily built to in the time of national stress. This may have been true at one time, but it is not true now. The skeleton has lots of meat on its bones. In fact, it has become rather corpulent.

The Army can be well divided into six parts—the Regular Army, the federalized National Guard, the Organized Reserves, the Reserve Officers' Training Corps, the citizens' military training corps, and national rifles matches. The last five named of these are spoken of as civilian organizations. They are, however, promoted, controlled, and instructed by Regular Army officers and enlisted men—about 3,000 officers and about 25,000 enlisted men being directly or indirectly in charge of their military training and instruction. In the main, these so-called civilian organizations are well versed in the art of warfare. They constitute a fine lot of men. The Regular Army officers largely in charge of them know what they are after. They have worked up programs of enlargement ranging from 5 to 15 years, and all of these organizations are growing in size, power, and strength like weeds in a farmer's field. Their influence is extensive and their wishes are highly respected by public officials, and with continued growth and enlargement their influence will grow with their increased size.

The beginning of another unit was proposed in this bill; in fact, the unit has now the sanction of the law. It is called the munitions unit. Congress authorized it by an amendment to the national defense act, which was approved June 8, 1926. This subcommittee, however, saw fit to prevent its beginning. The purpose of this unit was to take young men after graduation from college and give them 3 months' training in the Regular Army, then send them to college for 9 months and after this to put them in the factories of the country for 6 months, giving in all 18 months' specialized training in factory work and management, and in the event of hostilities these men would become officers and would take charge of the factories of our country and operate them under the supervision of the Regular Army. It was proposed to begin with 250 such students and later to bring them up to 400 and thence to a larger figure. The law says that one-half of 1 per cent of the enlisted strength of the Army and 2 per cent of officers can be trained annually, and with our Regular Army establishment at its present size, this would provide approximately 840 students to be trained annually and with the retirement figure at 64 years, it would be possible to have about 34,500 such officers. Of course, this figure is the outstanding one and should be reduced by one-half on account of deaths, resignations, and other causes, but even with 17,250 such officers its size and expense would be enormous. This scheme has never been tried out. No country has it now or has undertaken it. The student trained may or may not follow the work for which he was specially trained. If he did not, his training was wasted. If he did pursue the work for which he was trained, it would be foolish to let him contract with himself in the purchase of supplies for the Government or to permit him to adopt work standards, with the War Department backing him in his every whim. Aside from this, it is a dangerous undertaking in a Republic to put its factories, including management and men, under the control of the Military Establishment.

The Regular Army has an enlisted strength of 118,750 men with 12,000 officers, and to the enlisted strength should be added the Philippine Scouts with 6,060 men. There are 1,215 warrant officers. There are also 165 retired officers on active duty. There are also thousands of civilians working for the Regular Army. Their number is becoming legion. Counting all officers, their number is 13,380, and the enlisted strength, including the Philippine Scouts, is 124,810. Of course, to the Regular Army goes the lion's share of the appropriation carried in this bill.

The actual enlisted strength of the Army is about 5,000 more than it was in 1926 and 1927. The officers are about the same. The actual increased size of the Army can easily absorb the 1,248 enlisted men that were added to the Air Corps in 1928 and the 1,248 added to the Air Corps in this bill. Personally I take it that the Air Corps increases the efficiency and effectiveness of the Army, and enlisted men who have been used in other ways have an increased value when they are transferred from a less effective service to one more modern and more serviceable in a military way. There is no loss, therefore, by the transfer, but a gain.

The federalized National Guard has grown by leaps and bounds since the war. In 1920 it had 1,939 officers and 47,019 enlisted men. On June 30, 1927, there were 12,010 officers and 182 warrant officers and 168,750 enlisted men, a total of 180,920 men. This bill carries an appropriation sufficient to increase this number to 188,000, of whom 13,630 are officers. Next year, according to General Summerall, 190,000 is the program. Gen. C. C. Hammond, Chief of the Militia Bureau, says that after that their immediate program will seek a total aggregate strength of 210,521 National Guard troops. The national defense act authorized a federalized National Guard strength of 435,000. I dare say that it will not be very long before this will be their goal.

The federalized guard is no small affair. It is a highly efficient organization. This bill provides for 48 drills a year and 15 days' intensive training at camps. Officers and men participating in these drills and taking this intensive training are paid for doing it. Quite a number of the members of the guard have yearly status and are paid accordingly. The guard is trained just the same as the Regular Army. It is organized along the same lines. It has an Air Corps, Tank Corps, engineers, field artillery, chemical warfare sections, observation sections, and so forth. Three hundred and ten of its officers and 125 enlisted men go to service schools and are there given special training. Three hundred and seventy-five thousand dollars is provided for this schooling. Guard affairs and the instruction of its officers and men are in the charge of Regular Army officers and enlisted men. One thousand and forty-four Regular Army officers and 1,316 enlisted men are specially detailed for this work. Of these specially detailed enlisted men 727 are sergeant instructors.

It has a Cavalry branch, and on March 1, 1927, had 10,420 horses. Nine thousand are federally owned and 1,400 are State owned. It has more now. It has 19 organized air squadrons, with 326 officers and 766 men. They each averaged 75 flying hours last year. Pilots in the Regular Army average around 200 hours a year. The guard acquired recently 46 primary training planes, 49 observation planes, and 22 special service or advance training planes; and this bill provides for the purchase of 15 service planes and 25 special service or advance training planes. It had on November 30, 1927, 1,266 Artillery units, of which 684 were motor drawn. These units include harbor defense, antiaircraft artillery; in fact, practically all kinds of modern artillery guns. They have ambulances, automobiles, tanks, tractors, trucks, searchlights, and motorized vehicles up to 12,666 in number as of December 31, 1927. In addition to these, the War Department has on hand 9,998 modern-drawn vehicles of various classes for free issue to the guard, and which will later be transferred to it.

The total cost to the federalized guard during the past four years has been around $52,000,000 per year. This bill carries $31,659,101, and with the State contributions and free issues the costs will be over $51,000,000. This does not mean that the appropriation is less—free issues are merely falling off.

The per capita cost of members of the guard to the Federal Government is $175.53 and to the States $77.15, or a total of $252.68. These figures do not include pay of Regular Army officers and enlisted men and many other items that could be properly charged for by the Government. Neither do they include free issues running into the millions. The federalized guard has on hand property of estimated value of $115,000,000, and most of this property is free issues. The real per capita cost of members of the guard is nearer $500 or more.

I believe I have already spoken long enough to convince the skeptical that the federalized National Guard is a highly efficient organization and growing more so daily. In some respects it is equally efficient with the Regular Army.

The Organized Reserves is largely an officer organization. It is an after-the-war thought. Its growth has also been rapid. On June 30, 1926, it had 68,232 officers and no enlisted men. On June 30, 1926, it had 103,829 officers and 5,775 enlisted men. On June 30, 1927, it had 110,014 officers and 5,735 enlisted men. Its officer strength increased 6,185 in that year, the last one for which available figures are possible.

Certain of these officers, to wit, 16,382, have been or will be given training out of funds appropriated in the 1928 bill, and of this number 627 will have more than 15 days' training. The bill now being considered is supposed to provide 15 days' training for 16,000 men and more than 15 days' training for 600 men. This committee increased the number to be trained over that recommended by the Budget by 875 officers. This bill also provides for the training of 110 Air Corps officers. They will receive one year's instruction. This number will soon increase, until the number of 330 is annually trained, and shortly afterwards the number will go to 550 annually. Reserve officers are also given correspondence courses. Under this practice up-to-date military instruction is provided to them.

These officers are likewise divided into various units, the same as the Regular Army and the federalized guard. They have Regular Army officers totaling 413 and 524 enlisted men assigned to their instruction and other activities. Of course, members of the Organized Reserves are officers to start with, and it is not necessary to furnish them with intensive training at all times.

This organization is likewise growing. In 1920 the number of officers was 68,000. It remained at this figure for two years. In 1923 it went to 76,000; 1924, 81,000; 1925, 95,000; 1926, 103,000; 1927, 110,000, in round numbers. The increase in 1927 over 1926 was 7,000, and these increases will continue at about the same rate until the goal of 125,000 is reached. This will all be done in spite of the fact that only 65,823 of these officers can possibly be used in the mobilization of three and a half million men. This is not my statement. It is the testimony of War Department officials. They are War Department studies and calculations.

The Reserve Officers' Training Corps are those young men going to college who are trained at college in the science of war under officers of the War Department. They are given four years of military training under officers and enlisted men of the Regular Army, and certain of the advanced students go to Regular Army camps, where they are given 15 days' intensive training. This bill provides for the summer training of 7,200 such advanced students.

There are now 125,141 young men who are in this Reserve Officers' Training Corps. This is an increase of 9,000 over 1928. These young men are given subsistence allowance at school and are also provided with uniforms. They are also divided into infantry, cavalry, field artillery, coast artillery, air corps, engineers, signal corps, and other corps units just the same as the Regular Army. They are young men well trained in the art of warfare by 685 Regular Army officers, 114 retired Regular Army officers, 20 warrant officers, 502 active noncommissioned officers, 26 retired noncommissioned officers, and 388 other enlisted men, all from the Regular Army.

No age limit is placed on these young men. Practically all of them are from 14 to 21 years of age.

This bill increases the uniform allowance to the advance classes. This is done to popularize military work in the schools and to induce the young college man to take the advance course and otherwise increase the number of these officer students and ultimately popularize the military idea.

Mr. SUMMERS of Washington. Will the gentleman yield?

Mr. COLLINS. Yes.

Mr. SUMMERS of Washington. What is the advance course?

Mr. COLLINS. The last two years.

General Summerall stated that it was his hope by doing this to—

stabilize the units and induce the young men to take the last two years * * * we want them to have something that will inculcate pride and make them proud to wear the uniform.

The citizens' military training camps are provided for the training of citizens generally. This activity is regarded by the War Department as the least vital from a standpoint of national defense. They are trained at Regular Army camps. Thirty-eight thousand five hundred and ninety-seven were trained in 1927. This bill provides for the training of 35,000, an increase of 5,000 over that recommended by the Budget.

An intensive campaign has to be carried on to secure the necessary number of trainees. Army officers and enlisted men are in charge of this training, all of which is paid for by the Government out of funds appropriated by Congress. One thousand three hundred and eighty-five Regular Army officers and 11,751 enlisted men have been used in connection with the yearly training of these citizens. They are likewise provided with hostesses to look after their social affairs and activities and as antidotes against homesickness. The citizens' military training corps likewise has an ambitious program. Captain Lord testifying stated that the plan is to ultimately provide for the training of 100,000 such citizens; that he hopes to reach 60,000 by 1930 or 1931.

Rifle matches are not included in this bill, but this activity will go on in 1930 and afterwards every two years under present War Department policies. However, a bill has recently passed the House providing for these matches every year. They will cost in the neighborhood of a million dollars. The number includes 34 civilian teams of 13 men each, or 442 men. All others that attend these matches belong to the Regular Army or some other citizen branch of it, or to the Navy. Some belonging to these citizens' rifle clubs range in age between 60 and 70 years. These civilian teams come from rifle clubs all over the country.

It will be seen from the statements that I have made that we train them almost from the cradle to the grave in military science and tactics. The total number in all of the establishments is over 600,000, an army very much larger in size and equipment than the popular notion. It must be conceded, however, that some in these War Department citizens' organizations are there purely for propaganda purposes. However, this does not matter. We are face to face with the fact that we have a Military Establishment of over 600,000 men, and its gain over 1928 will be in excess of 22,000 officers and men.

Mr. SPEAKS. Will the gentleman yield?

Mr. COLLINS. I will.

Mr. SPEAKS. How many officers are there in the Regular Establishment?

Mr. COLLINS. Thirteen thousand three hundred and eighty, all told.

Mr. SPEAKS. How many in the National Guard?

Mr. COLLINS. Thirteen thousand six hundred and thirty.

Mr. SPEAKS. One hundred and eighty-five thousand enlisted men and 13,000 officers in the National Guard?

Mr. COLLINS. No; 165,000 enlisted men and 13,630 officers; but you are taking only two branches.

Mr. SPEAKS. I understand that; but the primary reliance in our national defense system is the National Guard and the Regular Army?

Mr. COLLINS. And the gentleman thinks the others ought to be abolished?

Mr. SPEAKS. No; but the gentleman stated that the skeleton organization is the basis for an Army of three and a half million with about 90,000 officers.

Mr. COLLINS. No; I said that in the mobilization of three and a half million men the War Department would use only 65,000 of the 110,000 reserve officers. I do not know anything about the truthfulness of the statement. I do not know whether it is right or wrong, but I know that the War Department makes it.

Mr. SPEAKS. I want to get into the RECORD the actual facts. The gentleman says the War Department's estimate is that 65,000 reserve officers would be required in connection with 12,000 Regular Army officers and 13,000 National Guard officers to officer an Army of three and a half million men.

Mr. COLLINS. No. Personally I do not know what officers they are taking into consideration, except that they state that with the available officers we have in the Regular Army, the National Guard, and other branches, they would use only 65,000 of the 110,000 reserve officers.

Mr. SPEAKS. If that be true, then with your 65,000 and your 12,000—

Mr. COLLINS. If the gentleman has any quarrel with anyone, it is with the War Department and not with me.

Mr. SPEAKS. I merely want to get the facts. Sixty-five thousand officers from the reserves, with 13,000 from the National Guard and 12,000 from the Regular Army, would be 90,000 officers for an Army of 3,500,000 men, according to the gentleman's figures, which actually would be less than half the number required.

Mr. COLLINS. They are not my figures; they are the War Department figures. However, the gentleman does not mention all officers. There are 125,000 Reserve Officers' Training Corps students that would possibly become officers; also those that would come from training camps.

Mr. SPEAKS. According to the figures the gentleman is quoting.

Mr. COLLINS. They are War Department figures, taken from the hearings on this bill. I am assuming that the War Department knows how it would get its officers—where they would come from and how they would be secured, and that they know that only 65,000 of these reserve officers could be used.

Mr. MOORE of Virginia. Mr. Speaker, will the gentleman yield?

Mr. COLLINS. Yes.

Mr. MOORE of Virginia. The gentleman has indicated his opposition to the force that is being maintained, and which is to be provided for by this bill. I ask the gentleman whether the bill as it stands is as it is, as the result of differences in the subcommittee in its view upon this issue which he has stated, or is to be accounted for by the fact that it is based on existing legislation.

Mr. COLLINS. Principally on existing legislation. However, I do not agree with my colleagues on increases in the size of our Military Establishment, and I also differ with them in many other items carried throughout the bill.

Mr. MOORE of Virginia. Therefore the subcommittee simply felt obliged to accept the requirements of existing legislation.

Mr. COLLINS. In the main that was true. Much legislation, however, could not be followed without imposing onerous burdens on taxpayers and the Budget recognizes this and the Appropriations Committee does, too.

It is larger than I think we need. Much larger than I think is necessary. More than half of them are officers, and a large number of these officers would not and could not be used in the mobilization for war of three and a half million men. There are just too many of them. I ask the Congress what is the good sense of blindly carrying on with the present program? The public wants a Military Establishment of reasonable size, but why maintain a top-heavy organization that carries much unusable material? Why not eliminate these unnecessary expenses? Why not maintain a skeleton military organization as we pretend we do? If we are bent on building up the world's largest military establishment, let us admit it and not try to fool ourselves and the American people.

I can see the logic in the reasoning of men who want our country to possess the world's largest Navy. I do not agree with them, but they can justly argue that this is necessary in order to keep trade routes to the world open. I can not, however, see the necessity of vieing with Great Britain, France, Russia, and Italy in maintaining large military establishments. I can see the logic in the course of these nations. They feel that such organizations are necessary to their safety because they are surrounded with powerful possible enemies and that an army is therefore necessary to prevent invasion of their territory. But this necessity does not exist with us. We have an establishment—if the figures contained in the Statesmen's Yearbook for 1927 are true—that is larger than that of Great Britain and apparently larger than that of Italy and Russia. Only France's establishment seems to exceed our Army in size.

I hope Members of Congress will carefully consider these statements. I think it is necessary that they do so, otherwise a military sentiment will soon grow up in our Republic whose power and influence will be too large to cope with, a sentiment not in keeping with American traditions and ideals. [Applause.]

Mr. HARRISON. Mr. Chairman, I yield two minutes to the gentleman from Kentucky [Mr. KINCHELOE].

Mr. KINCHELOE. Mr. Chairman, on the 19th of January my colleague, the gentleman from Kentucky [Mr. VINSON] delivered a very instructive speech during the consideration of the independent offices appropriation bill. There appeared in the Lexington (Ky.) Herald an editorial in regard to it. It consists principally of excerpts from this speech and some complimentary allusions to it. In view of that fact, I ask unanimous consent to extend my remarks in the RECORD by printing this editorial.

The CHAIRMAN. The gentleman from Kentucky asks unanimous consent to extend his remarks in the RECORD in the manner indicated. Is there objection?

There was no objection.

Mr. KINCHELOE. Mr. Speaker, under leave granted to extend my remarks in the RECORD, I insert an editorial from the Lexington Herald, of date Tuesday, January 24, 1928, of which the Hon. Desha Breckinridge is editor, commenting on the speech made by Congressman FRED M. VINSON, on the independent offices appropriation bill on the 19th of January, 1928, which editorial is as follows:

Much is heard these days of bureaucracy. Bureaucratic tendencies of the Government are bewailed in some quarters. Yet as a practical prop-

osition it seems difficult to meet new governmental duties in a more effective way than by the creation of a commission to perform the duties necessary. It is well, however, that the American citizen interested in the affairs of his Nation should have some understanding of what the independent agencies of the Government are.

It is doubtful if there ever has been presented a fairer or more definite outline of what Federal commissions are doing than was presented in Congress recently by Congressman FRED M. VINSON, of the ninth Kentucky district. Mr. VINSON was selected as a member of the Appropriations Committee of the House of Representatives at the beginning of its session this year, and was assigned with four other members to the important subcommittee which conducted hearings and presented the measure known as the independent offices appropriation bill. This made appropriations for the use and maintenance of independent Government agencies, including such boards as the Interstate Commerce Commission, the Veterans' Bureau, the Tariff Commission, the Shipping Board, the Smithsonian Institution, the Radio Commission, Power Commission, the Federal Reserve Board, the Efficiency Bureau, the Federal Board for Vocational Education, the Employees' Compensation Commission, the Civil Service Commission, the Board of Tax Appeals, the Board of Mediation, the Alien Property Custodian, the Alaskan Relief Commission, the American Battle Monuments Commission, the Public Buildings and Public Parks Commission, the Geographical Board, the Housing Corporation, the Commission of Fine Arts, and other such agencies.

There are 26 independent boards listed in the measure as requiring funds for their own maintenance and for carrying out the purposes for which they were created.

Mr. VINSON's presentation gave a thorough, though necessarily brief, review of the work, the needs and the programs of these commissions. He saw fit to let the facts speak for themselves and his report is of such graphic nature that elaboration would have been unnecessary. While a complete summary of the report made need not be attempted here, there are a number of phases in the address of Mr. VINSON which challenge more than cursory attention.

In the first place, it is pointed out that the appropriation dealing with the maintenance of the Executive Offices is reduced to $91,280 less than that of last year. Ninety thousand dollars of this went during the past year to defray the expenses of litigation in the cancellation of oil leases. For the maintenance of the Executive Mansion and grounds the measure carries a slight increase, and there is a slight increase in the salaries for the Executive personnel. There is a decrease of $2,000 in the heating system, but it is explained by Mr. VINSON that the heat for the Executive Mansion is to be obtained from the State, War, and Navy Building. Of course, this saves the Treasury nothing, but, as Mr. VINSON says, "it is merely a matter of bookkeeping."

The American Battle Monuments Commission has been empowered by Congress to construct fitting memorials in Europe in honor of the soldier dead now sleeping on foreign soil and to commemorate their sacrifices for their country. The authorization for this work is $3,000,000. For the Arlington Memorial Bridge $2,300,000 is appropriated. The United States Board of Mediation shows decided reduction in salaries, but Mr. VINSON points out that this board is now paying $13,800 for rent, or at a rate of $1.94 per square foot for the space they occupy in a Washington office building. The Civil Service Commission pays $22,992 rent and the Board of Tax Appeals $57,000. This is suggestive and, although unacquainted with the situation, it would seem at this distance that if governmental agencies are paying such high rent as this the Government might profitably provide quarters for its own commissions and thereby make a saving.

Such commissions as the Civil Service Commission, the Radio Commission, the Federal Trade Commission, the Power Commission, and the Employees' Compensation Commission certainly do necessary work, and the appropriations recommended for them do not seem to be exorbitant.

In his discussion of the appropriation of $754,000 for the Tariff Commission, Mr. VINSON introduced a table showing the reports of the Tariff Commission to the President and the action of the President thereon. In presenting this table he merely explained, "I thought it might be interesting." It certainly is most interesting to the average believer in a tariff principally for revenue that the President has seen fit to make but very few reductions under the flexible tariff act. The tariff act gives to the President the right to make reductions for the good of the country. It was believed by many of the opponents of high protection that this authority would be used by the President to reduce some of the extravagant features of the Fordney-McCumber Tariff Act. It is found, however, that the only articles upon which the President has reduced tariff duties have been paint-brush handles, bobwhite quail, and phenol.

On the matter of the Interstate Commerce Commission there seems to be a desire that sufficient funds be appropriated for this commission to carry forward its work of valuation, and there also is a decided desire that the commission may not be hampered so as to delay its decision upon the important question of freight rates now before it. Kentucky certainly is interested in seeing the freight-rate problem handled with dispatch.

2448 CONGRESSIONAL RECORD—HOUSE FEBRUARY 3

In regard to the appropriation for the Veterans' Bureau, Mr. VINSON points out that while there is expected to be a reduction in the tubercular cases handled under the Veterans' Bureau, and there is a belief that the tubercular load has reached its peak, the neuropsychiatric load has not reached its peak. He, therefore, favors the appropriation for funds which will permit the immediate carrying forward of a hospitalization program. He points out that Kentucky is the center of a very large area that has no neuropsychiatric hospital facilities. Twice the World War Veterans' Committee has reported to the House a bill which would relieve this area. Once a separate bill for a Kentucky hospital was presented, and at the last session in the blanket bill there was provision for a $1,000,000 250-bed neuropsychiatric hospitalization in Kentucky. Mr. VINSON contends that if a neuropsychiatric veteran has a service-connected case he has been entitled to hospitalization all these years and is entitled to hospitalization now, and ought not to have to wait for two years or later for facilities. In Kentucky the need for such a hospital is known, and Congress certainly should not delay in meeting this need.

Mr. VINSON, honored as a young Member of Congress through appointment to the important Appropriations Committee, and further honored by appointment upon the subcommittee and through selection to present the report upon the activities of Federal boards, has rendered a national service in the clear and complete way in which he has presented the facts in so few words. The problems connected with these many governmental agencies must be considered in a practical way and from a businesslike standpoint.

Mr. BARBOUR. Mr. Chairman, I yield 10 minutes to the gentleman from New York [Mr. TABER].

Mr. TABER. Mr. Chairman and gentlemen of the committee, I shall take only a moment or two in respect to the building-program situation. We did not have any building program until 1926. After the war our Army was a great deal larger than it had been before the war, and, of course, we did not have housing enough to take care of that. At one time in 1919 we had over 300,000 troops, and we were housing them in the same inefficient housing that they were being housed in before the housing program of $20,000,000, which was put through by the House Military Affairs Committee, was started. In 1920, on June 30, we had 184,000 men, and on June 30, 1921, we had 213,000 men. It took some time, along with the establishment of this increased Army, to get to the point where we would know what we needed to do and what we needed to build. Just as soon as we got to that point our House Committee on Military Affairs took that in charge and brought in a bill which called for an appropriation of $20,000,000. We have done that in three years, and, with the experience that the War Department had at that time, we have gone ahead as fast as was practical, and as fast as we could put up the buildings in a successful way, so that they would be permanent. On top of that we have reduced the housing shortage by transferring troops to barracks which already existed, which were satisfactory in the last year, almost as much as we have increased the housing capacity of our barracks by reason of the housing program. I just wanted to call these facts to the attention of the House and to say that I believe that the program of the House Military Affairs Committee calls for providing additional housing just as soon as they can determine after this bill is passed and know just what more is needed to complete that program and to put us in shape where we are able to take care of our Army.

Mr. BARBOUR. Mr. Chairman, I yield five minutes to the gentleman from Massachusetts [Mr. DALLINGER].

Mr. DALLINGER. Mr. Chairman, I ask unanimous consent to extend and revise my remarks in the RECORD.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. DALLINGER. Mr. Chairman, the other day when the independent offices appropriation bill was under consideration in the House, I offered an amendment striking out the annual appropriation for the Government hotels, so called, calling the attention of the House to the fact that the property between here and the station was acquired a good many years ago by eminent domain, and brick buildings were torn down for the purpose of beautifying the Nation's Capital and in order that we might have a decent approach from the Union Station to the Capitol Building and the Capitol Grounds.

No sooner had that land been cleared and the grading commenced when the war broke out, and these Government hotels, so called, were erected, which never furnished accommodations to more than 1,800 women out of 40,000 women employed. It was stated at that time that it was only a temporary matter and that the buildings would last only three years. Now 10 years have elapsed since the armistice, and every year we have an appropriation for the continuance of these Government hotels

on property that was acquired for the purpose of affording a decent approach from the Union Station to the Capitol.

The chairman of the subcommittee asked me if I wanted to turn these girls out on the streets to-morrow. I stated no; the bill did not go into effect until the 1st of July. I then asked him why the buildings were not torn down in accordance with the repeated promises of the Committee on Appropriations, and he stated that the reason was that the Government did not own the land on which some of the buildings stood, and that that matter was still in litigation.

On the strength of that information I withdrew my amendment. I have since found out that the information was erroneous, and I shall insert as part of my remarks a letter from Assistant Attorney General Farnum and two letters from the Architect of the Capitol, Mr. Lynn, in which it is stated that the Government has for almost a year owned all the land upon which these Government hotels stand and that there is no litigation in progress.

Mr. BLANTON. Mr. Chairman, will the gentleman yield on that point?

Mr. DALLINGER. Certainly.

Mr. BLANTON. That land-ownership question is not what is the matter. It is just fear of these good women down there who now occupy these Government hotels—fear that if Congress does not provide housing for them by the Government they may attack Members politically. That is what is keeping Congress from tearing down these Government hotels and going out of the business.

Mr. DALLINGER. Mr. Chairman, I trust that in the future the Committee on Appropriations will get more accurate information. I trust that we shall not continue to repeat what has been a disgrace to the National Capital in the case of these Government hotels and in the procedure that has been followed with respect to the property owned by the Government south of Pennsylvania Avenue. Twenty years ago the Government acquired by eminent domain the square occupied by Poli's Theater and the four adjoining squares between that square and the Mall. That particular square was never intended for the erection of Government buildings, but was intended to be used as a park, so that the White House could be seen as the visitor goes along Pennsylvania Avenue from the Capitol to the Treasury. And yet the disreputable looking buildings on that property still remain standing, disfiguring what ought to be the most beautiful avenue of our National Capital, simply because the Government is deriving some revenue from the tenants of the buildings in question.

Now, the people of the United States through their Representatives in Congress never authorized the taking of the property between here and the Union Station and the property south of Pennsylvania Avenue for the purpose of engaging in the hotel business or of obtaining a little revenue from the miserable buildings that encumber the land. That land was taken over for the sole purpose of beautifying the city of Washington, and it seems to me that the Committee on Appropriations should not continue this practice of blocking the beautification of the National Capital on the flimsy excuse that these temporary buildings are bringing some little revenue into the Treasury and that therefore these temporary buildings should not be torn down. The other excuse that the Government has not yet acquired complete title to the land on which the buildings stand being clearly shown to be without the slightest foundation.

Following are the letters referred to:

DEPARTMENT OF JUSTICE,
Washington, D. C., January 25, 1928.

Hon. FREDERICK W. DALLINGER,
House of Representatives, Washington, D. C.

MY DEAR CONGRESSMAN: Pursuant to your inquiry whether there remains outstanding within the Capitol Plaza area any land to which the United States has not acquired the title, I caused an investigation to be made which discloses that the United States has possession of all the land except the following, the title to which is outstanding in the District of Columbia:

Lots 51, 52, 53, 67, 68, 69, 70, 71, 72, 73, and 74, in square 633. These premises are occupied by the Arthur Public School Building.

Parts of lots 13, 14, 39, 40, and 43 in square 722.

A small triangular strip at the northeast corner of square 682.

A triangular parcel lying south of square 721, all as shown on the accompanying white—or key print—and upon blue-print maps of said squares 633, 682, 721, and 722, and blue-print map of the United States Capitol Grounds, all of which were submitted for my examination by Mr. August Eccard, civil engineer, Architect's Office, United States Capitol, who is prepared, on request, to call upon and to furnish you such other or additional information as you may desire.

An examination of the files of the department in this case disclosed that the Plaza Commission, created for the purpose of acquiring said property, negotiated a settlement with the Commissioners of the District, who executed a deed of sundry real estate properties within the so-called Plaza area for the agreed consideration of $43,120. Their authority in the premises, however, was by the commission referred to the Attorney General for an opinion. Under date of July 17, 1916, the commission was advised "that the said commissioners are without authority to execute the deed in question, and the requisite authority to execute such a conveyance and to determine whether the consideration shall be accepted must be sought from the Congress."

The department has no information regarding the occasion for the delay which has transpired in this matter.

Respectfully,

For the Attorney General:

GEORGE R. FARNUM,
*Assistant Attorney General.*

---

ARCHITECT OF THE CAPITOL,
*Washington, D. C., January 26, 1928.*

Hon. FREDERICK W. DALLINGER,
*House of Representatives, Washington, D. C.*

MY DEAR CONGRESSMAN: In response to your inquiry relating to the condition of the ground purchased for the enlargement of the Capitol grounds, I wish to say that the Government owns all of the area to the north of the Capitol originally contemplated in the acts providing for its purchase, with the following exceptions thereto:

Lots 51, 52, 53, 67, 68, 69, 70, 71, 72, 73, and 74 in square 633. These premises are occupied by the Arthur Public School Building.

Parts of lots 13, 14, 39, 40, and 43 in square 722.

A small triangular strip at the northeast corner of square 682.

A triangular parcel lying south of square 721.

These parcels are the property of the District of Columbia. None of the Government hotels are located upon any of the parcels of ground above referred to. All of the Government hotels are upon ground owned by the Government.

Respectfully,

DAVID LYNN,
*Architect of the Capitol.*

---

ARCHITECT OF THE CAPITOL,
*Washington, D. C., January 27, 1928.*

Hon. FREDERICK W. DALLINGER,
*House of Representatives, Washington, D. C.*

MY DEAR CONGRESSMAN: It has occurred to me that in the letter sent you yesterday, it might have been better if I had stated the date when the last payment was made through the commission formed to complete the purchase of the land for the enlargement of the Capitol grounds. The last payment was made August 12, 1927, and the voucher drawn on that occasion was for $67,965.92.

Respectfully,

DAVID LYNN,
*Architect of the Capitol.*

Mr. HARRISON. Mr. Chairman, I yield eight minutes to the gentleman from Texas [Mr. BLANTON].

The CHAIRMAN. The gentleman from Texas is recognized for eight minutes.

Mr. BLANTON. Mr. Chairman, the Government of the United States has no business to be in the hotel business. It has no business to be renting apartment houses to anybody, and running restaurants and dining rooms for anybody. Until the recent war the Government never thought of doing anything like that. Until the recent war there was no Member of either House or Senate so bolshevistic as to propose anything of the kind. But expediency during the war caused the Government to do that thing. And Congress has not yet been brave enough to stop it. Instead of having 37,000 employees, as we did before the war here in Washington, we got up to over 100,000 employees. The new influx into the city caused housing conditions to become acute, and it was hard for our employees to find proper housing. Then Congress built these Government hotels.

I predicted at that time that we would be years in getting rid of them, and I predicted at that time that you would have to go up against the influence of the occupants of those hotels before you could ever restore that property. That is what you are meeting every year, the influence of these thousand women who occupy these hotels. It is political cowardice that keeps those hotels from being torn down. You may put it on the question of sentimentalism or humanitarianism, but if you want that property to be vacated you need not turn those women out in the cold, for they can find ample accommodations now. If you will make a survey of this District, such as I have made within the last 12 months, you will find that the housing conditions right now are better than they have been at any time within the last 12 years. You will find more desirable apartments vacant and offered for rent right now than there have been at any time in the last 12 years. You will find many desirable private resi-

dences that have been vacant for 12 months and occupants can not be found for them.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. BLANTON. Not now. I have but eight minutes.

I have just as much sympathy for the Government employees as anybody. I want to do justice to them. But there is no duty resting upon this Government to furnish Government hotels for them when housing conditions are not acute at this time.

I will tell you what we ought to do. We ought to serve notice on these good ladies who are in these buildings that at a certain time we will tear them down, and let them make preparations to find lodgings elsewhere. They have found lodgings heretofore, Mr. Chairman, during the history of this Government, during the development of the city of Washington, during the upbuilding of the Capital established here. They have found lodging places otherwise than in Government-owned hotels, and they should do it again. I will tell you what has happened here. If you will investigate it, you will find many $1,500 employees in big jobs and drawing big salaries up to $4,000 and $5,000 in this housing corporation, and they do not want to give up their fat jobs, and such has been the case ever since we started it.

I agree with the gentleman from Massachusetts [Mr. DALLINGER] that it ought to stop. I do not accuse the chairman of the Committee on Appropriations [Mr. MADDEN] of being afraid, because he is one of the bravest men we have here. He was brave Wednesday when he came in here and helped to defeat that infamous bill the Federal reserve system was trying to cram down the throats of the American people, a bill which would have placed high-salaried members on retired pensions at $9,000 a year for life. He was brave enough to come in here and keep us defeat it. But he does let these women kind of get around him. He is not afraid of men, but he is afraid of women. [Laughter.]

Mr. SCHAFER. Will the Senator, the gentleman from Texas, yield?

Mr. BLANTON. Senator is right; I yield.

Mr. SCHAFER. Does the gentleman think that the women who are staying in these hotels can afford to pay the rent charged for the private apartments and dwellings that are now vacant in the District?

Mr. BLANTON. They would have to pay no more than thousands of other Government employees here. The gentleman from Wisconsin has lots of people on Wisconsin farms and in Wisconsin cities who get less salary, and who do not get 30 days' vacation on full pay each year; they do not get 30 days' extra sick leave, on doctors' certificates, at full pay; they do not get all the holidays that so numerously occur in Washington; they do not get to live here in the Nation's Capital, the most beautiful city in the world; they do not get all of the advantages the people here in Washington get, and if the gentleman will go home to Wisconsin he will find that his people back home are not half so well looked after as these selfsame ladies in these Government hotels.

Mr. SCHAFER. I will say to the gentleman that looking at the Capitol and having 30 days' leave, and so forth, does not fill empty stomachs on salaries of $1,200 and $1,400 a year.

Mr. BLANTON. I want to say this to my friend from Wisconsin: I will guarantee that if he will investigate it he will find that these good women living in these Government hotels get more food in one day for half the price than some of his people in Wisconsin get in a week. [Laughter.] Now, investigate it. Talk about full stomachs. Just investigate that situation and you will find they are better off than the people in the State of Wisconsin.

I am not thinking so much about just one particular handful of people of the United States. I am thinking about the 110,000,000 people who ought to have an equal partnership in the Government of the United States and ought to have an equal interest in everything it does. If we are going to give housing in Government hotels to some of them, we ought to give such housing to all of them. I dare say you will find some people in the State of Wisconsin living in houses where the roofs leak, with the wind howling through the door cracks and window cracks, and with not half so many of the comforts and conveniences that these salaried people have here in Washington. And you are going to just let it continue on. I am afraid that my friend from Wisconsin is a little too much influenced by this bunch of women. [Laughter.]

Mr. SCHAFER. None of these women have "contacted" with the gentleman from Wisconsin.

Mr. BLANTON. They may not have "contacted" with him personally, but they have through the mails and the newspapers.

The CHAIRMAN. The time of the gentleman from Texas has expired.

The CHAIRMAN. All time has expired, and the Clerk will read.

The Clerk read as follows:

### FINANCE DEPARTMENT

#### PAY, ETC., OF THE ARMY

For pay of officers of the line and staff, $31,168,426; pay of officers, National Guard, $100; pay of warrant officers, $2,156,880; aviation increase to commissioned and warrant officers of the Army, $1,571,326; additional pay to officers for length of service, $7,778,208; pay of enlisted men of the line and staff, not including the Philippine Scouts, $51,022,306; pay of enlisted men of National Guard, $100; aviation increase to enlisted men of the Army, $460,723; pay of enlisted men of the Philippine Scouts, $976,854; additional pay for length of service to enlisted men, $3,286,620; pay of the officers on the retired list, $7,349,729; increased pay to retired officers on active duty, $216,638; pay of retired enlisted men, $10,631,858; increased pay and allowances of retired enlisted men on active duty $9,878; pay of retired pay clerks, $6,750; pay of retired veterinarians, $3,570; pay of not to exceed 65 civil-service messengers at $1,080 each at headquarters of the several Territorial departments, corps areas, Army and corps headquarters, Territorial districts, tactical divisions and brigades, service schools, camps, and ports of embarkation and debarkation, $70,200; pay and allowances of contract surgeons, $44,556; pay of nurses, $823,780; pay of hospital matrons, $600; rental allowances, including allowances for quarters for enlisted men on duty where public quarters are not available, $6,547,016; subsistence allowances, $5,855,602; interest on soldiers' deposits, $75,000; payment of exchange by officers serving in foreign countries, and when specially authorized by the Secretary of War, by officers disbursing funds pertaining to the War Department, when serving in Alaska, and all foreign money received shall be charged to and paid out by disbursing officers of the Army at the legal valuation fixed by the Secretary of the Treasury, $1,000; additional pay to officers below the grade of major required to be mounted and who furnish their own mounts, $225,000; in all, $130,282,810; and the money herein appropriated for "Pay, etc., of the Army" shall be accounted for as one fund.

Mr. COLLINS. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. COLLINS: On page 11, in line 12, after the comma following the word "mounts," insert "not to exceed."

Mr. COLLINS. Mr. Chairman, the purpose of the amendment is to fix it so that not to exceed $225,000 will be expended to provide for the employment of men to look after the private mounts of Army officers below the grade of major.

Mr. BARBOUR. Will the gentleman yield?

Mr. COLLINS. Yes.

Mr. BARBOUR. Does the gentleman think there would be more than $225,000 spent for that purpose when that amount is mentioned in the bill.

Mr. COLLINS. I was told by finance officers of the War Department that if it was left as it is now it would mean they could spend whatever this might amount to.

Mr. BARBOUR. More than the $225,000?

Mr. COLLINS. Yes.

Mr. BARBOUR. Mr. Chairman, I will accept the amendment.

The CHAIRMAN. The question is on agreeing to the amendment offered by the gentleman from Mississippi.

The amendment was agreed to.

The Clerk read down to and including line 6 on page 18.

Mr. BARBOUR. Mr. Chairman, on page 16, in line 24, I ask unanimous consent that the spelling of the third word in the line be corrected, changing the word from "officers" to "offices."

Mr. GARRETT of Tennessee. In line 24 of page 16?

Mr. BARBOUR. Yes.

Mr. GARRETT of Tennessee. Should the word be changed? It reads now "enlisted men and officers."

Mr. BARBOUR. The language should be "for ice issued to organizations of enlisted men and offices at such places as the Secretary of War may determine." It is not for the issue of ice to "officers" but to "offices." It is a misspelling, I will say to the gentleman from Tennessee.

The CHAIRMAN. Without objection, the correction will be made.

There was no objection.

The Clerk read down to and including line 15 on page 19.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent to correct the spelling of the next to the last word in line 19, page 18 of the bill. Instead of "storing" it should be "sorting." It is merely a transposition of one of the letters.

The CHAIRMAN. Without objection, the Clerk will correct the spelling of the word as indicated by the gentleman from California.

There was no objection.

The Clerk read as follows:

Army transportation: For transportation of the Army and its supplies, including retired enlisted men when ordered to active duty; of authorized baggage, including that of retired officers, warrant officers, and enlisted men when ordered to active duty and upon relief therefrom, and including packing and crating; of recruits and recruiting parties; of applicants for enlistment between recruiting stations and recruiting depots; of necessary agents and other employees, including their traveling expenses; of dependents of officers and enlisted men as provided by law; of discharged prisoners, and persons discharged from St. Elizabeths Hospital after transfer thereto from the military service, to their homes (or elsewhere as they may elect) : Provided, That the cost in each case shall not be greater than to the place of last enlistment; of horse equipment; and of funds for the Army; for the purchase or construction, not exceeding $62,000, alteration, operation, and repair of boats and other vessels; for wharfage, tolls, and ferriages; for drayage and cartage; for the purchase, manufacture (including both material and labor), maintenance, hire, and repair of pack saddles and harness; for the purchase, hire, operation, maintenance, and repair of wagons, carts, drays, other vehicles, and horse-drawn and motor-propelled passenger-carrying vehicles required for the transportation of troops and supplies and for official military garrison purposes; for purchase and hire of draft and pack animals, including replacement of unserviceable animals; for travel allowances to officers and enlisted men on discharge; to officers of National Guard on discharge from Federal service as prescribed in the act of March 2, 1901; to enlisted men of National Guard on discharge from Federal service, as prescribed in amendatory act of September 22, 1922; and to members of the National Guard who have been mustered into Federal service and discharged on account of physical disability; in all, $17,417,701, of which amount not exceeding $2,000,000 shall be available immediately for the procurement and transportation of fuel for the service of the fiscal year 1929.

Mr. COLLINS. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will read as follows:

Amendment offered by Mr. COLLINS: On page 21, lines 8 and 9, strike out "for purchase and hire of draft and pack animals, including replacement of unserviceable animals."

Mr. COLLINS. Mr. Chairman, we have now in the Army 24,900 horses—or, at least, we had that number on hand as of July 1, 1927—24,900 horses and 14,000 mules. In the 1928 bill 2,150 additional horses was provided for and 1,450 mules. This bill carries an additional number of horses to the extent of 2,150 and 1,450 additional mules.

In the Regular Army we have 8,591 men in the Cavalry and 9,190 horses, not including mules. This statement appears on page 304 of the hearings.

In addition to the number of horses that we have on hand there are a large number of privately owned horses—fed, sheltered, bedded, and cared for out of Government funds; in fact, this bill carries an item of $225,000 for the pay of persons to take care of privately owned horses of Army officers below the grade of major. It is to be used exclusively for pay of men to look out for the horses' general welfare. Each officer draws $150 if he owns only one horse and $200 if he owns two horses. In addition to this the privately owned horses are furnished with forage, bedding, shoeing, and everything else that might be necessary.

The testimony of Army officers that have appeared before the committee, summed up, is that the motor-drawn vehicle is supplanting the horse in warfare. General Fries testified that a human being could protect himself by a gas mask against a gas attack, and that his clothing could be so saturated with some sort of material that the gas could not touch his body for a long length of time; but this is not so with a horse. There is no gas mask or clothing that can be put on a horse. A horse's usefulness in modern warfare is over. He is obsolete.

A motor-drawn vehicle these days is infinitely superior, and in the event of a gas attack can be used; a horse can not. Furthermore, airplanes have taken the place of the horses in scouting work or for reaching a spot quickly. And an airplane drops gas, too. One officer said:

If you want to find out whether a horse is useful, look outdoors and see how many you see. The motor-drawn vehicle has taken his place.

Aside from all this we have more horses and mules in the Army now than we need. We have more horses in the Cavalry

than we have men, quite a large number more counting the privately owned horses. In addition, there is testimony that a motor-drawn vehicle is a cheaper implement of warfare than the horse. The upkeep is considerably less. So I do not see the necessity of carrying on a large horse-buying program.

The CHAIRMAN. The time of the gentleman from Mississippi has expired.

Mr. COLLINS. Mr. Chairman, I ask unanimous consent that I may have five minutes more.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. COLLINS. I do not see the necessity of carrying on this buying campaign when practically all of the testimony was to the effect that the horse is out of date in warfare.

Mr. HUDSON. Will the gentleman yield right there?

Mr. COLLINS. Yes.

Mr. HUDSON. And was it not also brought out before the committee that motor transportation is constantly increasing in the Army?

Mr. COLLINS. Sure.

Mr. HUDSON. And they are asking a larger item for motor transportation?

Mr. COLLINS. Sure. We have more horses and mules now than we need. There are other items that increase the number of motor-drawn vehicles. The number of new cars to be purchased is 450, and then there are 200 G. M. C. trucks that are to be provided with bodies. Also motor vehicles will be purchased. It is a waste of the people's money to expend this sum in the purchase of horses and mules. It should be expended for some useful purpose.

Mr. BARBOUR. I do not think anyone will contend that at this time the horses and mules should be discontinued in the Army. The Budget recommended 2,400 horses and 1,981 mules. The committee cut the appropriations down to 2,150 horses and 1,450 mules, the same number that were provided in the 1928 bill. This will not meet the requirements of the Army. It will not take care of the losses during the fiscal year 1929. We had on July 1, 1927, 38,900 horses and mules. If purchases are made according to the amount which we propose to appropriate in this bill, we will have on hand July 1, 1929, at the end of the fiscal year, 33,410 horses and mules, a loss of over 5,000, even with the number that will be bought with this appropriation. I do not think it is safe, I do not think anybody will feel that it is safe in the next fiscal year to reduce in the number of horses and mules that we have in the Army more than we will under this appropriation. There are places where a motor can not go.

Mr. HUDSON. Nicaragua, for instance?

Mr. BARBOUR. Yes; I do not suppose the best automobile manufactured in the gentleman's State could climb to the top of the mountain where our marines recently went.

Mr. HUDSON. Not even a Ford?

Mr. BARBOUR. Not even the new Ford. I have not had an opportunity to ride in one yet.

Mr. HUDSON. The gentleman would enjoy it.

Mr. BARBOUR. I am sure I would. I do not think, Mr. Chairman, that it would be safe to reduce this appropriation at this time.

Mr. HUDSON. Will the gentleman yield?

Mr. BARBOUR. I will.

Mr. HUDSON. In relation to the reduction that has been made in the last few years as to the number of horses and mules the gentleman says that there would be a decrease of 5,000 in here?

Mr. BARBOUR. By July 1, 1929, even with this appropriation.

Mr. HUDSON. And without the appropriation what would the decrease be?

Mr. BARBOUR. I imagine it would be about 3,600 more.

Mr. HUDSON. The committee has appropriated for increase in the motor vehicles?

Mr. BARBOUR. Yes; we have taken care of the automobiles.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Mississippi [Mr. COLLINS].

The question was taken, and the amendment was rejected.

The Clerk read as follows:

BARRACKS AND QUARTERS AND OTHER BUILDINGS AND UTILITIES

For all expenses incident to the construction, installation, operation, and maintenance of buildings, utilities, appurtenances, and accessories necessary for the shelter, protection, and accommodation of the Army and its personnel and property, where not specifically provided for in other appropriations, including personal services, purchase and repair of furniture for officers' quarters and officers' messes and wall lockers and refrigerators for Government-owned buildings as may be approved by the Secretary of War, care and improvement of grounds, flooring and framing for tents, rental of buildings and grounds for military purposes and lodgings for recruits and applicants for enlistment, water supply, sewer and fire-alarm systems, fire apparatus, roads, walks, wharves, drainage, dredging channels, purchase of water, and disposal of sewage, $12,668,944: *Provided*, That this appropriation shall be available for the rental of offices, garages, and stables for military attachés: *Provided further*, That not exceeding $100,000 shall be available immediately for the procurement of fuel for the service of the fiscal year 1929 and not exceeding $80,000 shall be available immediately for making alterations to the barge-office slip, New York City, on Governors Island Ferry: *Provided further*, That not exceeding $15,000 of this appropriation shall be expended for completing work incident to and of repairing the old building known as the "Castle" at Fort Niagara, N. Y. In addition to this amount, the Secretary of War is authorized to expend such sums as may be contributed from private sources for the rehabilitation of such old building.

Mr. RAMSEYER. Mr. Chairman, I move to strike out the last word in order to ask a few questions of the gentleman from California in charge of the bill. I desire to call attention to the references to previous statutory enactments on page 24 of the bill.

On top of page 24 you refer to the act of March 3, 1927, and on the previous page you give the title of that act. That act consists of a little pamphlet which contains only one enactment. Of course, that is the law, but that same enactment appears in the Statutes at Large for the last Congress. That Statutes at Large is an official document and what it contains is the statute laws without question. I would like to know why the Appropriations Committee follows the practice of referring to acts contained in little pamphlets that are in the possession of practically nobody except the Secretary of State, and do not set out the Statutes at Large, which are in the possession of every Member of Congress, every court, and every department and bureau, and in the hands of many lawyers?

Mr. BARBOUR. I presume it is matter of custom. Provisions of that kind have been carried in appropriation bills "from the time the memory of man runneth not to the contrary."

Mr. RAMSEYER. In 1925 we adopted a code of law which is supposed to contain all the Federal statutes in force on December 7, 1925, and whatever is in there is presumed to be the law. Enactments subsequent to December 7, 1925, we have in the Statutes at Large for the last Congress.

Mr. BARBOUR. This particular citation is of an act approved March, 1927.

Mr. RAMSEYER. Yes; that is in the Statutes at Large for the last Congress, the Sixty-ninth Congress.

Mr. BARBOUR. But it would not be in the code.

Mr. RAMSEYER. I understand that; but is in the Statutes at Large. Why does not the committee cite that which is in the possession of every Congressman and many lawyers and all the courts, so that any one interested in knowing what the law is, upon which this item of appropriation is based, can refer to a volume in his possession instead of hunting up a little pamphlet that is in the possession of very few people?

Mr. BARBOUR. That is not only perfectly agreeable to me, but I think the suggestion is a good one.

Mr. RAMSEYER. I called this to the attention of the House last week. At that time no appropriation bill was under consideration. The Members present at that time all agreed that our practice in the past in not referring to the United States Code (1925) was bad and should be corrected.

Mr. BARBOUR. If we can do that, I think it would simplify matters and furnish all the information desirable in regard to them. If that can be done it should be done. I think it would be an improvement to cite these acts as the gentleman says.

Mr. RAMSEYER. My inquiry to this point has been directed to references to enactments subsequent to the enactment of the Code, which contains all the statute laws up to December 7, 1925, and the gentleman agrees with me that, rather than to cite the date of the act, it would be better practice to cite the Statutes at Large and the place where the act can be found therein.

Mr. BARBOUR. I think so, because the date itself does not mean anything to one reading this bill.

Mr. RAMSEYER. Now, in regard to the next line, there are cited the sections of the Revised Statutes. To be sure the gentleman understands that the Revised Statutes are a codification of the United States Statutes made in 1878, and contain the enactments of Congress up to 1873. From 1878 to 1925 there was no codification of the United States Statutes. We now have this new codification of 1925. These sections, 1136 and 3734, of the Revised Statutes, referred to on page 24 of the bill, can be found in the United States Code of Laws. I know that there is some objection to making reference only to

the Code of Laws, because the enacting clause of the code recites:

The matter set forth in the code * * * shall establish prima facie the laws of the United States * * * in force on the 7th day of December, 1925.

Personally I am inclined to the opinion that it would be entirely safe to cite only the sections of the United States Code. It is very important that we should refer to the Code of Laws, because, as I stated before, this code is in the possession of every Member of Congress, the heads of the departments, the chiefs of bureaus, the courts, and in addition to that, something like seven or eight thousand copies have been sold to attorneys all over the United States. The point I have been attempting to make is that when it is necessary to refer to enactments prior to December 7, 1925, without taking any chances whatever, you can make reference to the Revised Statutes or the Statutes at Large or act of a certain date and then in parenthesis or in brackets right after the words "Revised Statutes," or "Statutes at Large" or act of a certain date you could insert "U. S. C.," the initials standing for United States Code, and the title so-and-so and the section so-and-so, so that anybody who wants to look up the statute to which reference is made and see what you have done can use the code and see exactly the statutory law on which a particular item of appropriation is based.

Mr. MADDEN. Mr. Chairman, will the gentleman yield?

Mr. RAMSEYER. Yes.

Mr. MADDEN. It is all very well to refer to the code, but we find that the code does not state the true condition in several cases where we have referred to it, that it is not the law. If we refer to the code in the act making the appropriations, then we say that that is the law. If we repeat the code and the act itself and the number of the Statutes at Large, of course, that is going to make a lot of work, with more or less cost, and the question is, Should we do it until we know definitely what the cost is?

Mr. RAMSEYER. My suggestion would not involve taking any chances, so far as the legality of the act is concerned.

Mr. MADDEN. I am afraid it would.

Mr. RAMSEYER. For instance, in the case here, in lines 1 and 2, on page 24, reference is made to section 1136 and section 3734 of the Revised Statutes. My suggestion is to let that stand and then in brackets, which would not take over an inch of space, refer to the United States Code and the title and the section, the reference could be abbreviated; and then the courts and the heads of departments and the chiefs of bureaus and the Members of Congress and all of the lawyers who have the code can easily find it.

Mr. MADDEN. If you refer to the code, we have to keep the Statutes at Large also as a reference, have we not?

Mr. RAMSEYER. No. The reference to the Statutes at Large would only be necessary to acts since December 7, 1925.

Mr. MADDEN. I mean the Revised Statutes. Are you going to ask the committee to put this in this bill as we go along now? I hope the gentleman will not do that. Suppose he gives us a chance to get ourselves adjusted to it, and let us put it in next year.

Mr. RAMSEYER. I am not going to hold up proceedings here to offer amendments. I know that it would entail a little work, but it would be work that a clerk could easily do.

Mr. MADDEN. We could do this as we are making up the bill, but it would be hard work for us to do it on this bill now.

Mr. RAMSEYER. I hope the next bill that the gentleman brings in will have it so arranged.

Mr. MADDEN. We can not do that because the bill is already made up.

Mr. RAMSEYER. Then in the next bill after that. Will the gentleman consider it at all, without making any definite promise?

Mr. MADDEN. We will consider it very carefully, and we will come and consult with the gentleman.

Mr. RAMSEYER. What would be the objection to getting unanimous consent to permit the clerk of the House, after the citations in this bill, to include in the engrossed copy of the bill the references to the United States Code whenever that is possible?

Mr. MADDEN. We would not want to take the chances on the clerk doing that. We want to know definitely what we are doing, if it ought to be done.

Mr. RAMSEYER. Then why not let one of the gentleman's own clerks do it; one in whom he has confidence?

Mr. MADDEN. I will say to the gentleman that we will study it seriously and in a friendly way.

Mr. RAMSEYER. I assure the gentleman that I am offering the suggestion in a perfectly friendly way.

Mr. MADDEN. We will study the meeting of the minds.

Mr. RAMSEYER. During most of the period between the year 1873 and the year 1925 chaos prevailed with respect to our United States statutes. You could not find without an infinite amount of work what the statute laws of the United States were. Now, we have made a start to bring about some order. If Congress does not pay any respect to its own work we will soon have the same chaos that we have had heretofore for nearly a 50-year period.

Mr. MADDEN. We might select a special committee and put the gentleman from Iowa upon it, and see what can be done in the matter.

Mr. RAMSEYER. You have had two years in which to do it.

Mr. MADDEN. We have not thought about it.

The CHAIRMAN. The time of the gentleman from Iowa has again expired.

Mr. COLLINS. Mr. Chairman, before the amendment is reported I want to call attention to line 21, page 24, to the words "purchase and." This is the first time that these words have appeared in this bill. They constitute legislation upon the bill. Hence I make a point of order against them.

Mr. BARBOUR. May I suggest that the point of order has come too late? The paragraph has already been discussed. There has already been debate on it.

The CHAIRMAN. The gentleman slept on his rights.

Mr. COLLINS. I merely yielded.

The CHAIRMAN. The debate, if on any subject, has been on the subject of this paragraph. Therefore the gentleman's point comes too late.

Mr. COLLINS. Mr. Chairman, I offer an amendment.

The CHAIRMAN. The gentleman from Mississippi offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. COLLINS: Page 24, lines 21 and 22, strike out the words "furniture for officers' quarters and officers' messes and."

Mr. COLLINS. Mr. Chairman and gentlemen of the House, what I am after is to prevent an expenditure for the first time since 1923 for furniture for officers' quarters, and then only during the war period. We are beginning a program of furnishing the homes of Army officers with furniture. There is no law for it. It is the first time regular household furniture has ever been furnished for Army officers. This is an opening wedge. It is $326,000 now. It will be more next year. If the House wants to adopt this policy it is their affair. I am calling your attention to it. I do not think it ought to be begun.

It is said that it might save us money in hauling charges. We know that that is not going to be the case. We also know that expensive furniture of all kinds in time is going to be bought; perhaps not now, but in time it will be bought; and there is no limitation whatever on the amount that can be expended for furniture. The hearings say it is to be heavy furniture—406 sets; but there is no limitation on the amount that can be expended for each article or set of furniture, and we know the kinds that will be purchased in time.

Mr. MADDEN. Does the gentleman's amendment provide that we could not buy furniture for the barracks that we are building?

Mr. COLLINS. Yes.

Mr. MADDEN. What are we going to do for furniture for the men?

Mr. COLLINS. It has never been customary to furnish quarters for Army officers.

Mr. MADDEN. I was wondering whether the building program would go that far.

Mr. BARBOUR. It will permit furniture for noncommissioned officers' quarters to be purchased.

Mr. MADDEN. Will it furnish the new quarters that we are building for the Army?

Mr. BARBOUR. Yes.

Mr. MADDEN. I think it ought to be seriously thought out.

Mr. COLLINS. I think the chairman of the subcommittee is in error. The language of the bill says, "Purchase and repair of furniture for officers' quarters and officers' messes."

Mr. MADDEN. That is different.

Mr. COLLINS. This is to be expended solely in the furnishing of officers' homes, according to the language of the bill.

Mr. BARBOUR. I submit to the gentleman from Mississippi that it includes noncommissioned officers' quarters as well as commissioned officers' quarters. We are building in our housing program a considerable number of noncommissioned officers'

Case 1:21-cr-00168-TSE   Document 25-5   Filed 09/07/21   Page 15 of 30 PageID# 342

quarters. Does the gentleman want those noncommissioned officers to furnish their own quarters?

Mr. COLLINS. I am taking the statement in the bill. This is to be expended in connection with the officers' quarters.

Mr. BARBOUR. You say that certain statements are in the hearings. Can you show us where they are?

Mr. COLLINS. Let us see—on page 1001 is the estimate of $326,400 for the purchase of 9,546 pieces. I think this is 408 sets.

The CHAIRMAN. The time of the gentleman from Mississippi has expired.

Mr. COLLINS. Mr. Chairman, I ask for five minutes more.

The CHAIRMAN. Is there objection to the request of the gentleman from Mississippi?

There was no objection.

Mr. COLLINS. The heading of the paragraph is "Purchase of furniture for officers' quarters, and so forth."

Mr. BARBOUR. "And so forth." There you have it.

Mr. COLLINS. No; that refers to refrigerators.

Mr. BARBOUR. A noncommissioned congression is an officer in the contemplation of the language of the bill.

Mr. COLLINS. The point I make is that none of it will be spent in furnishing noncommissioned officers' quarters.

Mr. BANKHEAD. If that construction of the language of the bill is correct, as given by the chairman of the subcommittee, would he have any objection to an amendment providing that this appropriation can only be made for the purchase of furniture for noncommissioned officers.

Mr. BARBOUR. Certainly I would have an objection.

Mr. BANKHEAD. Then that verifies the position of the gentleman from Mississippi.

Mr. BARBOUR. I do not think it affects his position at all.

Mr. COLLINS. The Secretary said, "There is quite a serious lack now, and it is a hardship to the officers."

If it were ever contemplated to furnish noncommissioned officers' quarters, he would have said so.

Mr. BARBOUR. When he says officers that includes commissioned and noncommissioned officers. I am waiting for the gentleman to point out in the hearings where it is shown that this is all to be used for commissioned officers' quarters.

Mr. McDUFFIE. As a matter of fact, is a noncommissioned officer an officer and is he treated as an officer in the Army? Do they not speak of commissioned officers as being officers in the military service?

Mr. BARBOUR. A noncommissioned officer is treated as an officer just the same as the commissioned officer in the matter of supplying furniture for quarters. We are building quarters for noncommissioned officers and commissioned officers. This is to purchase furniture for officers' quarters, and it includes noncommissioned officers just as well as commissioned officers. That is my recollection of the testimony that was given; and I am still waiting for the gentleman from Mississippi to show me that I am wrong.

Mr. McDUFFIE. I simply asked the question for information, because I have always understood that an officer in the military service was generally regarded as a commissioned officer, and that noncommissioned officers, corporals and sergeants, were treated as enlisted men.

Mr. CLAGUE. Here is what General Summerall stated before our committee. On page 23 of the hearings General Summerall testified as follows:

It furnishes 408 sets of furniture for the families of officers and married noncommissioned officers.

Mr. BARBOUR. That was my recollection of the testimony. It is clear that furniture will be furnished to noncommissioned officers who are married.

Mr. SPEAKS. Will the gentleman yield?

Mr. COLLINS. Yes.

Mr. SPEAKS. For the benefit of the gentleman from Alabama, who asked the question as to whether a corporal or sergeant is an officer or enlisted man, I will state that a corporal and sergeant are enlisted men. There is no question about it.

Mr. McDUFFIE. Not at all. A corporal and a sergeant are not officers. They are enlisted men.

Mr. COLLINS. I will admit that General Summerall stated what has been read, but at the same time I will state that everywhere else in the hearings the word "officer" has been mentioned and the word "noncommissioned" has not been mentioned. And I feel quite certain that this furniture will go into officers' homes.

Mr. BANKHEAD. Mr. Chairman, I offer a substitute for the amendment offered by the gentleman from Mississippi.

The CHAIRMAN. The gentleman from Alabama offers an amendment by way of substitute, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. BANKHEAD as a substitute for the amendment offered by Mr. COLLINS: Page 24, line 21, after the word "for," add "noncommissioned," and after the word "and" add "noncommissioned."

Mr. BARBOUR. Mr. Chairman, I make a point of order against the substitute, or at least I reserve a point of order against it.

Mr. BANKHEAD. If the point of order is a good one, I wish the gentleman would state it.

Mr. BARBOUR. I withdraw the point of order, Mr. Chairman.

Mr. BANKHEAD. Mr. Chairman, I have very few words to add to what the amendment itself expresses. It has been clearly developed here, not only by the statement of the chairman of the subcommittee, but by some other gentleman just a moment ago, who read from the testimony, that it was the purpose of this language specifically and solely to provide for the purchase of furniture for the messes and quarters of noncommissioned officers.

Mr. BARBOUR. Oh, no.

Mr. BANKHEAD. That is what I understood the gentleman to read from the hearings.

Mr. BARBOUR. No.

Mr. BANKHEAD. And that has been the argument, as I understood it, that was made in justification of the appropriation. I do not know what the practice has been heretofore, but if the gentleman from Mississippi accurately stated the situation it is an absolute innovation upon legislation, in providing for the conveniences of commissioned officers, to buy furniture for their homes. If that has been the practice heretofore I would raise no objection to it, but it seems from his statement that we are now proposing to embark upon the proposition of the Government just going in and furnishing the homes and messes of commissioned officers. I am not familiar with the hearings and I do not know what was contemplated by the appropriation, but it seems to me that if the purpose of this appropriation is the one that has been stated, as evidenced by a reading of the hearings, the gentleman ought to accept the amendment.

Mr. BARBOUR. Will the gentleman permit an interruption?

Mr. BANKHEAD. Yes.

Mr. BARBOUR. The question we were discussing was whether or not any money would be spent for the purchase of furniture for noncommissioned officers' quarters. It was stated there would not be any spent for noncommissioned officers' quarters. But the gentleman from Minnesota [Mr. CLAGUE] read from the hearings a statement by General Summerall to the effect that a certain amount of the money would be spent for furnishing the quarters of noncommissioned officers.

Mr. BANKHEAD. Does the gentleman propose to embark upon a new program here and furnish money for the homes of commissioned officers?

Mr. BARBOUR. It is not a new idea, I will say to the gentleman from Alabama. That has been done almost throughout the history of the country.

Mr. BANKHEAD. I was assuming that the statement made by my colleague from Mississippi accurately stated the facts and precedents, and I stated that if this has been the appropriation recognized and authorized heretofore I should not have made the suggestion in my amendment, and I was assuming that the gentleman from Mississippi, when he said that since 1923 no such appropriation had been made, was accurately stating the record.

Mr. BARBOUR. Not since 1923, but prior to that there were such appropriations.

Mr. COLLINS. The Secretary of War says:

As I recall the figures, they call for 408 sets of heavy furniture. No heavy furniture has been purchased since 1923.

And not only that, if the gentleman will permit one further statement, the language of the law has been changed in order to permit the purchase of this furniture. The word "purchase" has been written into the bill for the first time.

Mr. BANKHEAD. The law has not been changed, but it is being interpreted differently in the bill as it stands now.

Mr. COLLINS. The word "purchase" has been added to the language of the bill so as to permit this procedure.

Mr. SPEAKS. Will the gentleman yield?

Mr. BANKHEAD. Yes; I yield to the gentleman from Ohio.

Mr. SPEAKS. I think the purpose is to avoid the payment of freight charges which sometimes equal the cost of the furni-

ture. For instance, an officer may be ordered from California to New York. The Government is under the necessity of transporting his furniture. The gentleman can readily see that the freight charges might be equal to the cost of the furniture. So the purpose is to establish in the new quarters certain heavy furniture and avoid excessive freight charges. Suppose an officer is transferred from California to New York and six months later ordered from New York to Panama. The gentleman from Alabama will note that the Government is transporting a lot of heavy furniture clear across the country, then beyond the limits of the United States, and it is obvious that the freight charges might be more than the original cost of the furniture. Having this heavy furniture installed in quarters is undoubtedly a convenience and a very decided economy.

Mr. BANKHEAD. I will ask the gentleman if there is not a limitation upon the amount of freight paid on furniture in such a transfer?

Mr. SPEAKS. Yes; there is a limitation on the amount of household effects and baggage an officer can transport at public expense.

Mr. BANKHEAD. That is my information.

Mr. McDUFFIE. Mr. Chairman, I move to strike out the last word, and I would like to have the attention of the gentleman from Ohio [Mr. SPEAKS]. The gentleman has had a lot of military service and understands military terms. I call the gentleman's attention to the language here, "furniture for officers' quarters and officers' messes." Does the gentleman think that includes noncommissioned officers?

Mr. SPEAKS. It does not.

Mr. McDUFFIE. That is the point the gentleman from Mississippi [Mr. COLLINS] has been trying to make, that the noncommissioned officer is an enlisted man and will not benefit by this legislation.

Mr. BARBOUR. But the testimony shows he will, and it is so intended.

Mr. McDUFFIE. But the law shows he will not because it says "officers," and that means commissioned officers.

Mr. BARBOUR. It means commissioned officers and noncommissioned officers.

Mr. McDUFFIE. Then it should say "noncommissioned officers." I will say to the gentleman, if it means that. Here is an expert on military matters [Mr. SPEAKS] who bears out the suggestion that it means commissioned officers.

Mr. BARBOUR. I would refer the gentleman to Noah Webster.

Mr. McDUFFIE. Well, I refer the gentleman to the common practice in military circles, as testified to by General SPEAKS, the gentleman from Ohio. When you speak of an officer in the Army, you mean a commissioned officer and not an enlisted man.

Mr. CHINDBLOM. Will the gentleman yield?

Mr. McDUFFIE. Yes.

Mr. CHINDBLOM. I suggest the gentleman refer it to the Comptroller General; he will decide it eventually.

Mr. McDUFFIE. Probably so. I am trying to get some information as to the distinction between officers and noncommissioned officers from somebody, but nobody seems to be able to give it except the gentleman from Ohio.

Mr. SPEAKS. The military grades or distinctions are officer, noncommissioned officer, and private or enlisted man, and the gentleman knows the story of the wide gulf separating the officer from the enlisted man. Sergeant and corporal are merely grades of enlisted men and are not officers.

Mr. McDUFFIE. This language does not say noncommissioned officer, but simply says officers, and under the language as written in the bill it means commissioned officers.

Mr. HOWARD of Nebraska. Will the gentleman yield to me for a question?

Mr. McDUFFIE. Certainly.

Mr. HOWARD of Nebraska. Mr. Chairman, I think we can arrive at a conclusion in this matter very quickly if some military gentleman here will tell us whether or not—suppose a charge were leveled against a noncommissioned officer for an offense committed; would that charge wind up with the conclusion that he had acted out of harmony with the principles of an officer and a gentleman?

Mr. BARBOUR. Of whom are you asking that question?

Mr. HOWARD of Nebraska. Anybody who knows. That ought to settle it very clearly. Mr. Chairman, because there is the evidence of the Army officer himself, and in making a charge against a noncommissioned officer they do not charge him with having violated the precepts which ought to move and animate an officer and a gentleman. Therefore, in the eye of the Army officer, the noncommissioned man is not an officer. He might be the other thing but he is not an officer.

Mr. BARBOUR. The gentleman from Nebraska has answered his own question.

Mr. HOWARD of Nebraska. I think so.

Mr. BARBOUR. To the gentleman's satisfaction?

Mr. HOWARD of Nebraska. Entirely. [Laughter.]

Mr. CHINDBLOM. I understand no one speaks in response to the gentleman's inquiry.

Mr. HOWARD of Nebraska. Nobody answers. They stand mute.

Mr. BULWINKLE. Will the gentleman permit an interruption along the line of what the gentleman has just said?

Mr. HOWARD of Nebraska. Yes.

Mr. BULWINKLE. The manual of court-martial procedure provides for the preferring of charges against enlisted men and officers, and you would not try an enlisted man on a charge involving any one of those Articles of War.

Mr. HOWARD of Nebraska. Certainly not. That is the evidence which I sought, and there you have it, gentlemen. [Laughter.]

The CHAIRMAN. The question is on agreeing to the substitute amendment offered by the gentleman from Alabama [Mr. BANKHEAD].

The question was taken; and on a division (demanded by Mr. BANKHEAD) there were—ayes 19, noes 48.

So the substitute amendment was rejected.

The CHAIRMAN. The question now recurs on the amendment of the gentleman from Mississippi [Mr. COLLINS].

The amendment was rejected.

The Clerk read as follows:

Panama Canal: Signal Corps, $34,120; Corps of Engineers, $609,350; Ordnance Department, $329,000; Chief of Coast Artillery, $133,847; in all, $4,038,716.

Mr. COCHRAN of Missouri. Mr. Chairman, I ask unanimous consent to proceed for 10 minutes out of order in reference to a law administered by the War Department.

The CHAIRMAN. The gentleman from Missouri asks unanimous consent to speak for 10 minutes out of order. Is there objection?

There was no objection.

Mr. COCHRAN of Missouri. Mr. Chairman, I would not interrupt the reading of the bill at this time if it were not for the fact that my attention has been called to a situation which I think you will be pleased to know of. I especially ask the attention of members of the Committee on Interstate and Foreign Commerce who may be present.

We are passing monthly scores of bills by unanimous consent which permit the building of bridges over navigable streams, and a large number of such bridges have already been or will be constructed in my State. As a result of the hearings before the Senate on what is called the Walsh resolution, newspapers of St. Louis made inquiry of the Missouri public service commission and the State finance department as to whether they had any control over the holding companies for public utilities. The answer was they had absolutely no control.

Therefore, the situation that presents itself is this: You can grant the consent of Congress to build a bridge over a river, so far as my State is concerned, and that bridge might be erected for $1,000,000, but there is no provision whereby the Government or the State has any jurisdiction over the amount of bonds that may be issued to complete that project.

Now, the gentleman from Illinois [Mr. DENISON], as he usually does, gave us a detailed explanation as to the policy of Congress in reference to the building of bridges and how they protected the public from excessive tolls, and so forth. But upon this phase he did not touch.

Now, gentlemen, I serve notice, unless I am convinced that there is some protection to the people of my State and to the country, that there is a limitation somewhere upon the amount of bonds that can be issued for building bridges, I propose to object to the consideration of any bill which grants the consent of Congress to private individuals to construct a bridge. I shall object unless there is a paragraph inserted which will give the War Department or some other Government agency control over the situation.

I telephoned Major Daly, of the Engineer Corps of the War Department, and he tells me that so far as he knows there is nothing in the law which would give the War Department any power in the matter whatever.

I have had cases called to my attention whereby individuals have made a great deal of money out of the right granted them to construct bridges, and I understand other than promoting the projects do nothing. They assign their rights to others before actual construction commences. Some of the promoters live in States hundreds of miles from the location of the bridge. They are interested from a monetary standpoint only, not being

citizens of the community where the bridge is to be constructed. There is now no check on their financial operations so far as placing a limitation on the amount of bonds that can be issued. Surely, now that I call it to your attention, the Congress will not approve. You should be willing to extend some safeguard to the people who buy the bonds.

It was not so very long ago—I remember it myself—when this Congress was passing legislation by unanimous consent which extended the right to build dams over rivers for the purpose of generating electricity. The gentleman from Illinois [Mr. RAINEY] and the late Doctor Foster, from Illinois, put a stop to it, and as a result you have the Water Power Commission to-day.

I want the people of my State to be protected, especially when men from other States come there to sell securities for projects not only in Missouri but throughout the country. Part of the money to construct toll bridges in Indiana, Ohio, and other States is secured by selling bonds to the people of St. Louis. I want to see the Congress do something to protect not only the people of St. Louis but throughout the country from being sold securities for a project for which securities twice the amount of the actual cost of construction have been issued for it means eventually the promoters will default in the payment of interest and the value of the securities will fall far below the price actually paid by the public. Remember, gentlemen, there is no law which prevents a promoter from issuing $4,000,000 in securities for a $2,000,000 project either in my State or in the Federal Statutes.

Mr. NEWTON. Will the gentleman yield?

Mr. COCHRAN of Missouri. I will.

Mr. NEWTON. Does the gentleman appreciate that in bridge bills, in numerous instances, the request for the bridge comes from a municipality, a county, and sometimes the State. Does the gentleman think that under those circumstances Congress ought to pass on the question of the issue of bonds?

Mr. COCHRAN of Missouri. I eliminate such projects, but when it comes to the individuals I think the public ought to be protected. I have no objection to the building of the bridges, provided the Representative in Congress says they are necessary. A gentleman came to my city the other day and offered to construct a bridge. He was looking for the cooperation of the people in that part of the city. He said there was a certain firm in New York, White & Co., I think, that had decided to set aside $25,000,000 or $50,000,000 for the purpose of building bridges, and was backing him. I have no objection to their doing the work at a reasonable figure if the people are protected in the issue of securities. It is up to the purchasers of the securities to investigate whether they are putting their money in a proposition that will pay. What I want to do is to insist that the securities issued will not exceed the cost of construction, plus a maximum of, say, 10 per cent.

I insist as the bills read now these individuals are not limited in the amount of securities they can issue in connection with their project. If I am wrong, I will yield to any gentleman for information.

Mr. NEWTON. The gentleman does not refer to these municipally constructed bridges?

Mr. COCHRAN of Missouri. No.

Mr. NEWTON. Of course, as to these other bridges no bill is introduced unless it comes from the Member from the district where the bridge is to be constructed.

Mr. COCHRAN of Missouri. Let me illustrate that. Several friends of the gentleman, we will say, from his district send him a letter and tell him that Mr. Jones has decided to construct a bridge over a river in that district. Mr. Jones is given a letter of introduction to the gentleman from Minnesota and comes down here.

The people who write the gentleman are responsible citizens, friends of the gentleman. Would the gentleman from Minnesota introduce that bill for Mr. Jones? I admit that if the request came from my district, under similar circumstances, I would introduce it, if two responsible citizens, friends of mine, requested me to do so, and I think every other Member of the House would do the same. It has been the policy to do it. Members introduce bills for people they have never met, people who do not even live in their district or community.

Mr. NEWTON. Does not the gentleman think that the individual Member introducing a bill, who sponsors it before the committee and on the floor of the House, is going to inform himself as to whether or not the community involved wants the bridge?

Mr. COCHRAN of Missouri. I venture to say that not 1 Member in 10 does. It has not been the policy. I hope the gentleman gets my point—that there is no protection as to the amount of bonds that might be issued, no matter what the Member might do before the committee or on the floor, after the

promoter has the consent of Congress to go ahead with the work. The Member then has no control over the individual and neither has the Government.

Mr. NEWTON. Does the gentleman refer only to the toll highway bridges?

Mr. COCHRAN of Missouri. Yes. As far as the railroad bridges are concerned, I understand that the Interstate Commerce Commission has control.

Mr. NEWTON. Yes. So that it is only toll highway bridges the gentleman has in mind?

Mr. COCHRAN of Missouri. Yes. I am giving information to the House. The gentleman is a member of the Committee on Interstate and Foreign Commerce.

If the gentleman thinks there is merit in my suggestion, I hope that his committee will consider it. Until I am convinced, as I said before, that there is going to be some provision in the bills to protect my people and the gentleman's people—and they sell these securities all over the United States—from inflation I propose to object to the consideration of bridge bills granting the consent of Congress to individuals to construct bridges. If you pass them you will do so over my objection, and, as you know, I spend my time on the floor while the House is in session.

Mr. NEWTON. The gentleman understands, of course, that it is the practice of the committee before favorable action is taken upon a toll bridge to not only have a written statement from the Member from the district in which the bridge is to be constructed but to be advised that the State highway commission or some other State or municipal body approves of the proposition. That is the care that the committee takes in order to keep in touch with local sentiment.

The CHAIRMAN. The time of the gentleman from Missouri has expired.

Mr. COCHRAN of Missouri. Mr. Chairman, I ask unanimous consent to proceed for one minute more.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. COCHRAN of Missouri. I might say for the benefit of the gentleman that I have personally prepared bills—not since I have been a Member of Congress but prior thereto, when acting as secretary for Representatives and Senators—and that at no time has the committee ever asked for a written expression of any kind in connection with any one of the bills I prepared, and not one of the bills I prepared ever failed to pass under the unanimous-consent agreement.

Mr. NEWTON. Is the gentleman now referring to the ordinary bridge bill, or is he referring to the toll highway bridge bill?

Mr. COCHRAN of Missouri. The toll highway bridge bill.

Mr. NEWTON. I wish to say to the gentleman that that practice has been put into effect by the committee during the present Congress.

Mr. COCHRAN of Missouri. The committee has at all times impressed me with its willingness to do everything in its power to protect the municipality or the State or the county and the Government in so far as excessive tolls are concerned, but I am calling attention to a condition in reference to the issuing of securities. The gentleman from Illinois [Mr. DENISON] has introduced a so-called blue sky bill, and if it is not in conflict with the Constitution—and I have a great deal of respect for his ability as a lawyer—I expect to vote for it, if it ever gets before this House. I feel sure that the gentleman from Illinois [Mr. DENISON] will look into the subject I advance before he calls up any more such bills.

Let me call your attention to an editorial appearing in the St. Louis Post-Dispatch, January 28, which I referred to at the outset. It follows:

MISSOURI, A HELPLESS SPECTATOR

The Jefferson City correspondent of the Post-Dispatch has been authoritatively informed that "holding companies for public utilities * * * only are beyond the control of both the Missouri Public Service Commission and the State 'blue-sky' department."

The head of our "blue-sky" department, Securities Commissioner F. T. Stockard, says that because of legal exemptions he has no means of controlling the sale of securities in holding companies.

A great many of our public utilities are now the wards of holding companies. All our Bell telephone companies are in that position. So is the Laclede Gas Co. J. K. Newman, of New York, and his local associates are eager to put our street railway company under the control of their holding company. Samuel Insull, of Chicago, famous as a contributor to political campaign funds, has been gathering up public utilities in Missouri and tucking them under the wing of his holding companies.

None of these holding companies—in fact, no holding company—has ever applied to the Missouri Public Service Commission for permission to issue securities, for the excellent reason it does not have to ask or obtain such permission.

Again, no holding company has ever asked our "blue-sky" department for permission to sell its securities in Missouri. And, again, the reason is the same—it does not need that permission.

So, as regards the activities of holding companies, the State of Missouri is a helpless spectator. So, too, is every other State.

We speculated the other day on the "legal residence, if any," of holding companies. Is a holding company, we asked, "a fabled creature dwelling in a zone of economic neutrality in which it enjoys all the financing prerogatives and legal immunities that conduce to a happy, prosperous, and, as in the case of Mr. Munroe, of Laclede Gas Light celebrity, a get-rich-quick life?"

Pretty soft for the holding company, if that is it. And, according to our officials at Jefferson City, that is just about it.

The other editorial was from the St. Louis Star, and was published on the same day. It follows:

### WHY A BLUE SKY LAW?

The board of governors of the Investment Bankers' Association has recently gone on record against the blue sky laws as the sole means of preventing the sale of worthless securities. The board is not convinced there is a "legislative panacea" to assure sound management of any investment trust. Fraud acts with broad powers, it believes, would be more effective.

The blue sky laws in Missouri and other States were passed when it was apparent that fraud acts already on the statute books afforded little or no protection to the investor, and after the sellers of sound securities had failed to drive the sellers of fake securities out of business. Nobody familiar with administration of these blue sky laws would presume to say these laws are a "panacea." There is no panacea for fraud. The blue sky laws often fail to prevent the sale of fake stocks and bonds because the attention of administrators of these laws is not called to the sales until many persons already have been swindled. But these laws afford a measure of protection to the public, and a measure of protection is better than no protection at all.

The cure for this evil is not by repealing the blue sky laws, which the board of governors does not suggest, or in depending upon the general law-enforcement machinery and fraud acts, but in the cooperation of organizations like the Investment Bankers' Association with the blue sky law departments and prosecuting officers. All of these agencies, working together, can keep the selling of worthless stocks to the public at a minimum, even if they can not wholly suppress such sales. The blue sky law in Missouri is far from perfect, but it justifies itself every time some inexperienced and incautious citizen with a few dollars saved is kept from wasting his money on lithographed trash.

I understand the House will not be in session to-morrow. It will give me time to confer with the gentleman from Illinois [Mr. DENISON], chairman of the subcommittee on bridges of the Committee on Interstate and Foreign Commerce, and I hope to reach an agreement with him whereby he will submit an amendment to each bill to be called up Monday where consent of Congress is granted to an individual or individuals, other than the class of bridges I enumerated, to meet my views on this subject. I do not desire to obstruct legislation, but I will be forced on Monday to offer objections to every bridge bill of this class unless such an amendment is proposed.

I will submit to the gentleman from Illinois a suggestive amendment reading as follows:

*Provided,* That bonds or other securities issued against or based on the construction and revenues of said bridge and approaches shall not exceed the actual cost of such construction and operation, economically made, plus a maximum of 10 per cent added thereto; and it shall be the duty of the Secretary of War prior to the issue of any such bonds or other securities to determine the total thereof which may thus be issued.

The gentleman from Illinois [Mr. DENISON] has always shown a desire to protect the municipalities, counties, and States in connection with toll bridges, and I feel that had he known the States did not have the power to control the situation he long since would have made provisions along this line. Until a few days ago I entertained the opinion this matter was under the control of the various States, but it develops they are without power to protect the public in this connection, nor have they any control over holding companies for public utilities.

I have not examined the calendar, but I am informed close to 100 bridge bills are ready for consideration Monday. This is a most important matter, and I hope every Member of the House will be on the floor Monday, so we will be assured of a thorough discussion of the question, agree upon a proper amendment for the protection of the public, and make it unnecessary to object to the bills, which I know so many Members are very anxious to have passed.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent to return to line 10, page 27 of the bill, in order to correct the spelling of a word.

The CHAIRMAN. Is there objection?

There was no objection.

Mr. BARBOUR. Mr. Chairman, I ask unanimous consent that the word "at" be changed to "as," in line 10, page 27.

The CHAIRMAN. Without objection, the correction of the spelling will be made.

There was no objection.

The Clerk read as follows:

### ORDNANCE DEPARTMENT

#### ORDNANCE SERVICE

For the current expenses of the Ordnance Department in connection with purchasing, receiving, storing, and issuing ordnance and ordnance stores, comprising police and office duties, rents, tolls, fuel, light, water, and advertising, stationery, typewriting and adding machines, including their exchange, and office furniture, tools, and instruments of service; for incidental expenses of the ordnance service and those attending practical trials and tests of ordnance small arms, and other ordnance stores; for publications for libraries of the Ordnance Department, including the ordnance office; subscriptions to periodicals, which may be paid for in advance; and payment for mechanical labor in the office of the Chief of Ordnance; and for maintenance, repair, and operation of motor-propelled or horse-drawn passenger-carrying vehicles, $1,010,430 : *Provided,* That the Ordnance Department is hereby authorized to employ, under its various appropriations, not exceeding four consulting engineers as the Secretary of War may deem necessary at rates of pay to be fixed by him not to exceed $50 a day for not exceeding 50 days each and necessary traveling expenses.

Mr. SPEAKS. Mr. Chairman, I regret to do so at this hour, but I feel compelled to make a point of no quorum. I shall at this point make a proposal that will interest many Members and in addition a large number of people in every State in the Union. I have promised many Members to notify them when the subject I propose is being discussed, so I make the point of no quorum.

Mr. BARBOUR. May I inquire of the gentleman what the subject is?

Mr. SPEAKS. I will be frank with the agreeable chairman of the subcommittee. I am going to propose an amendment to the item on page 42, providing $4,000,000 for the purchase of ammunition and various other articles. I propose to offer an amendment reducing that sum by $550,000, and if successful in the effort, I will then propose that the $550,000 be utilized for the national matches authorized by law and which are compulsory. Now, I do not care to make my preliminary statement relative to the matches until the Members especially interested are present.

Mr. BARBOUR. Mr. Chairman, will the gentleman yield?

Mr. SPEAKS. Yes.

Mr. BARBOUR. Would it be agreeable to the gentleman to pass over that section for the present?

Mr. SPEAKS. I will be pleased to do so, if I can have assurances that my rights and privileges will be properly protected.

Mr. BARBOUR. It will be done without prejudice. Then when we come to the national rifle practice item we can take up the two subjects together, the gentleman can offer his amendment, and we can have a proper discussion under that item.

Mr. SPEAKS. I will be very glad to do that. I withdraw my point of order that there is no quorum present, in view of the statement of the chairman of the subcommittee.

Mr. BARBOUR. Then, Mr. Chairman, I ask unanimous consent that the paragraph on page 42, "Ordnance stores, ammunition," be passed over at the present time, and that it be taken up for purpose of amendment when we reach the item regarding national rifle practice. Will that be agreeable to the gentleman?

Mr. SPEAKS. It will be.

The CHAIRMAN. The gentleman from California asks unanimous consent to pass over the first paragraph on page 42, ending with line 8, to be returned to later. Is there objection?

There was no objection.

The CHAIRMAN. The Clerk will resume the reading of the bill for amendment.

The Clerk read as follows:

#### MOLINE-ROCK ISLAND BRIDGE

For repairs and alterations, including construction of a draw or lift span in the aid of navigation, of the bridge connecting the city of Moline, Ill., with Rock Island, Ill., to be available immediately, $50,000.

Mr. LETTS. Mr. Chairman, I make a point of order against the paragraph. It is legislation on an appropriation bill, and it is out of order.

The CHAIRMAN. The gentleman from Iowa makes a point of order against the paragraph. Does the gentleman from California [Mr. BARBOUR] wish to be heard?

Mr. BARBOUR. This item provides—

For repairs and alterations, including construction of a draw or lift span in the aid of navigation, of the bridge connecting the city of Moline, Ill., with Rock Island, Ill., to be available immediately, $50,000.

This bridge has been in existence for some time, and this item is merely for repairs and alterations. It is a Government-built bridge, a Government-owned bridge. It was built by the United States in 1870-1873, and undoubtedly it was authorized by law at that time.

Mr. LETTS. Mr. Chairman, the committee without question has been informed that this is in the interest of navigation, and if it were, and the project had been authorized, the appropriation would be proper. But this is an appropriation for an unauthorized project. It has never received the consideration of the Committee on Rivers and Harbors, and there has never been general legislation with respect to this matter.

The bridge in question is at the lower end of what is called Moline pool. Moline pool, in its northern part, is a part of the authorized waterway, but the waterway at this point diverges to the right, to the Iowa side, and the boats pass through the locks at the head of the island. Now, if anyone wanted to drive a boat through this bridge they would immediately have to turn around and come right back and then out through the locks.

In my judgment there can be no question about this thing. When we look at the hearings that were held before the gentleman's committee we find that the only witnesses who appeared were asked to say what the repairs would reasonably cost, and they said $50,000, including the erection of this drawbridge; and then when they were asked what the cost of the drawbridge would be, they said that would be $50,000. I think that exactly states the truth of the matter. The only repair contemplated here is the conversion of this bridge into a drawbridge, and it is for the sole benefit of one concern, the John Deere Plow Co.

In that connection I would have this to say: If it were proper in the aid of navigation I would have no objection whatever, but for a number of years there has been a constant movement on the part of certain interests in Moline, by persuasion or otherwise, to induce a change of the watercourse through the Mississippi River at this point.

A number of years ago they started by extending a dam from the head of Rock Island up the middle of the stream, about 3 miles, and then little by little they have built from that dam toward the Iowa shore, and from the Iowa shore toward the dam, until a few years ago the citizens around there waked up to the fact that there was then only a small gap of about 400 feet between the ends of these dams, and that certain boats that were loaded with rock and other materials were ready to be dropped into this gap and effectively, without the authorization of Congress, to dam the Mississippi River; to throw the water over into the Moline pool and thereby give them such a depth of water as to compel all navigation to go that way.

Mr. BARBOUR. Will the gentleman yield?

Mr. LETTS. Yes.

Mr. BARBOUR. Is there not a dam on the Moline side of the river just below this bridge and connecting the mainland with Rock Island?

Mr. LETTS. Yes.

Mr. BARBOUR. That would prevent navigation from going down on the Illinois side?

Mr. LETTS. No; not in my judgment; because if the purposes of these gentlemen can be effectuated they will tear that dam out in 20 minutes.

I will say to the gentleman that there are two power dams in the Moline slough. One of them belongs to the United States Government and is a part of the United States arsenal at that point, and there we produce power for the use of the arsenal, and we sell the excess that is produced.

At this point I ought to say an investigation should be instituted in that regard, because we are almost giving that power away.

In addition to this power dam there is the power dam of the Moline Power Co., and it has been the boast of some gentlemen connected with that concern that sooner or later they are going to throw the main channel of the Mississippi River down the Illinois side of Rock Island rather than on the Iowa side, as it now is.

Mr. TABER. That would be a lawless procedure, would it not?

Mr. LETTS. It would not be a lawless procedure if they are able to proceed step by step, as they have done.

Mr. TABER. They would have to secure legislation to permit them to do it.

Mr. LETTS. Certainly, and this is one of the steps by which they are seeking that legislation. They know they could not come here and get a program of that kind through Congress. They realize that the only way they can effectuate their purpose is to come down and, step by step, put Congress and the Government in a position where the only logical thing to do is to go through with it, finish it up, and dredge it. Necessarily the next step would be that the bridge which now exists from the lower point of the island to the city of Rock Island would require reconstruction to be made into a drawbridge and then the Government will be called upon to do necessary dredging in that slough.

It is not an impossible thing in any sense. It is a very feasible plan, because with the dam which extends upstream at the upper end of the island and the dams on the Iowa side most of the water of the river is now thrown into the Moline pool. If these power dams were destroyed they could throw that water all down on the Illinois side.

A year ago, when this matter was in the river and harbor bill, I reached an agreement with that committee whereby they agreed to put in their bill a stipulation that no additional power wheels should be placed on the dams at the lower end of the pool. That was in order to safeguard the people of Davenport with respect to their water rights and to permit only such water to pass over the dams as was then being passed through the wheels now in use. The Davenport people and the Bettendorf people get all of their water for the purpose of the city out of the center of the stream on the other side of the island. Even now, when the water is low there is at times great uncertainty as to whether or not the intake will be sufficiently below the water to supply the people of that community with the water that is necessary. If any more water is diverted to the Moline side of the Rock Island Arsenal the people of Davenport are going to suffer very seriously through a lack of water suitable for ordinary purposes and fire protection. The island itself is sizable, being about 999 acres and being about 2½ miles long. The channel is naturally on the Iowa side. This movement is only in line with other steps that have been taken by which it is hoped eventually to throw the waters of the Mississippi over to the Illinois side. This is not a part of the waterway project that has been adopted by Congress.

It is only true that the Moline pool is a part of the waterway in so far as it permits boats to come down through the pool and then out at the upper end of the island through the Government locks and down on the Iowa side. This bridge is below that point, and just below that are the two dams of which I have spoken, and also the plant of the John Deere Plow Co., which is the only concern that would benefit by this improvement.

I may say that it appears in the hearings that gentlemen of the committee were told that the John Deere Plow Co. was the only concern that would benefit. When asked why that company did not load above the bridge, the answer was that they would have to buy additional ground. If they did that, no other difficulty seemed to present itself, so far as navigation is concerned.

I am very serious about this thing. I wish the chairman of the subcommittee might consent that this matter should go out of the bill for the time being; that a thorough examination of this condition be made, and if it is found that navigation requires it and it is a proper matter, I at a future time would have no objection to it.

Mr. CHINDBLOM. Mr. Chairman, on the point of order, I respectfully submit that the argument which the gentleman from Iowa [Mr. LETTS] has made is almost exclusively confined to the merits of the question.

The CHAIRMAN. The Chair heard the gentleman from Iowa [Mr. LETTS], because it seemed helpful to the Chair to have the facts as far as possible on which the law or the question of order is determined, but the Chair will now hear the gentleman from Illinois on the point of order.

Mr. CHINDBLOM. Mr. Chairman, the item in question reads:

For repairs and alterations, including construction of a draw or lift span in the aid of navigation, of the bridge connecting the city of Moline, Ill., with Rock Island, Ill., to be available immediately, $50,000.

The Chair, as, of course, the present distinguished occupant of the Chair is well aware, can go no further than the language of the provision or paragraph or section to which the point of order is made. The point of order, if valid at all, must be directed to section 2 of rule 21, and I have here the manual, referring to page 364, of the edition of 1925, in which the Chair will find the following language with reference to the construction of the terms, work in progress or the continuation of work already done under authority of law, and near the middle of the page I read the following:

2458            CONGRESSIONAL RECORD—HOUSE          FEBRUARY 3

But appropriations for rent and repairs of buildings or Government roads and bridges have been admitted as in continuation of a work, although it is not in order as such to provide for a new building in place of one destroyed.

Mr. BLAND. Will the gentleman yield?

Mr. CHINDBLOM. I would like to finish what I have to say on the question of the point of order and then I will be pleased to yield.

Mr. BLAND. This is on the point of order. I want to direct the gentleman's attention to the language, "including construction of a draw or lift span," which is a new feature, as appears from the gentleman's statement, and differs from the authority which the gentleman has presented.

Mr. CHINDBLOM. The gentleman, of course, will have an opportunity to make a reply to my feeble effort to try to show that this paragraph is in order.

The manual refers specifically to volume 4 of Hinds' Precedents, on page 538 of the current edition, paragraph 3803, from which I read:

An appropriation to repair a bridge built by the Government was held in order as for continuation of a public work. On January 28, 1897, the Indian appropriation bill was under consideration in Committee of the Whole House on the state of the Union, when Mr. Frank W. Mondell, of Wyoming, moved an amendment making an appropriation for the repair of the bridge across Big Wind River, on the Shoshone Reservation in Wyoming.

Mr. Joseph G. Cannon having made a point of order against the amendment, on the ground that it was not such a public work as was contemplated by the rule, Mr. Mondell stated that the bridge was originally built by the Government.

The Chairman overruled the point of order.

It will be noted that the point of order was made by the distinguished parliamentarian, who for many years, probably subsequent to this time, was the Speaker of the House, Hon. Joseph G. Cannon. The chair was occupied at the time by another distinguished Member of the House from Illinois, the Hon. Albert J. Hopkins, who had a reputation as one of the leading parliamentarians of this House as well.

The gentleman from Virginia has suggested that the construction of the draw or lift span in aid of navigation is new work. It is part of the bridge. That is simply a detail with reference to the kind of repairs and alterations that are to be made upon the bridge.

Mr. LETTS. Will the gentleman yield?

Mr. CHINDBLOM. Yes.

Mr. LETTS. How, is it a repair of that which they have had when it is supplying something entirely different and for a different purpose?

Mr. CHINDBLOM. It appears this bridge has become, at least in the opinion of the Bureau of the Budget, I will say, an obstruction to navigation.

Mr. LETTS. Will the gentleman yield again?

Mr. CHINDBLOM. And there is legislation on the statute books which prohibits all constructions in rivers and upon waters under the control of the United States to operate as obstructions to navigation.

Mr. LETTS. Will the gentleman yield?

Mr. CHINDBLOM. I yield.

Mr. LETTS. Does the gentleman contend that it gives authority to tear down and build a different kind of bridge?

Mr. CHINDBLOM. There is no showing in the language of this provision that it is proposed to tear down anything. The language is for repairs and alterations, including the construction of a draw or lift span in the aid of navigation. The bridge is there.

Mr. LETTS. Will the gentleman yield further?

Mr. CHINDBLOM. Yes.

Mr. LETTS. Will the gentleman point out any legislation that has held that this has any relation whatever to navigation in that part of the stream?

Mr. CHINDBLOM. The gentleman misapprehends the purpose of my argument. I am not arguing on the facts. I have called the attention of the Chair to what is stated in the paragraph itself. It is proposed as a part of the repairs and alterations to include the construction of a draw or lift span in the aid of navigation. It is not new construction but is a part of the bridge.

Mr. LETTS. Will the gentleman yield again at this point?

Mr. CHINDBLOM. Yes.

Mr. LETTS. Are we going to legislate, now that this is necessary, for navigation or are we going to let the proper committee deal with the subject?

Mr. CHINDBLOM. Whether it is necessary or not at this time and in this bill to make appropriations for the object in question goes to the merits. I say that it appears, from the language of the paragraph, that this draw or lift span is a part of the repairs and alterations of this bridge. This bridge was constructed by the Federal Government. It is at the location of the Rock Island Arsenal, a part of the establishment of the War Department, and most certainly Congress in passing an appropriation bill can provide for repairs and alterations made necessary by whatever cause. Something has perhaps occurred. It is suggested in the language of the provision that it is proposed that it may have become necessary in aid of navigation.

That only adds to the necessity for the work. I respectfully submit that it is not proposed here to build a new bridge, it is not proposed to erect new construction, there is nothing destroyed to be replaced, but it is for the purpose of making repairs and alterations in the present structure.

The CHAIRMAN. Can the gentleman from Illinois state to the Chair the original authority by which the bridge was built?

Mr. CHINDBLOM. Mr. Chairman, my attention has been called to the memorandum sent by the Bureau of the Budget. It is as follows:

The bridge at Moline, Ill., a Government-owned structure, crosses the south branch of the Mississippi River and connects the city of Moline, Ill., with Rock Island, upon which is located the Rock Island Arsenal of the Ordnance Department of the Army. The bridge is a fixed structure, built by the United States in 1870–1873, and has a vertical clearance of 15.5 feet at low water. The demands of present and prospective commerce render such clearance inadequate and the bridge for this reason has been decreed by the Chief of Engineers of the Army to be obstruction to navigation. The purpose of this estimate is to enable the War Department to make such changes in the bridge as will permit free and unobstructed navigation thereunder.

It appears that the Chief of Engineers has decreed that the bridge in its present shape and condition is an obstruction to navigation, and there remains nothing for the War Department to do but to blow up the bridge and remove it or come to Congress for an appropriation for the necessary alterations and repair. No private corporation, and not even the Government itself, may maintain a bridge which in its original construction or by reason of subsequent conditions becomes an obstruction to navigation. Now, you can not have a bridge without some span.

Mr. LETTS. This bridge was built as a war measure. There is no connection with the erection of this bridge and the convenience of the public. No one at that time had any idea about navigation, because there was no water over there sufficient to float any kind of a boat until the other works of which I spoke were constructed—the building of the dams. So the gentleman is mistaken when he assumes that the reconstruction of a bridge by putting in a draw has any relation to its original purpose.

Mr. CHINDBLOM. May I add, Mr. Chairman, that it is suggested that there must be a span. There is a span there now. This simply alters the span—it is an alteration and not a building of a new span. It would not be a bridge at all without a span. This is to make alterations which the War Department has found necessary under existing conditions, and it seems to me that it is clear that there is a sufficient authorization.

Mr. LETTS. I again draw attention to the fact that this is a new project with relation to the waterway of the Mississippi River at that point, and has never received the consideration of the Committee on Rivers and Harbors. There has been no legislation for it at all. If there is any authority for the appropriation as in the interest of navigation it will be because of the legislation in this provision to which I object.

Mr. ALLEN. Mr. Chairman——

The CHAIRMAN. The Chair will hear the gentleman from Illinois on the point of order.

Mr. ALLEN. I may drift away a little from the point of order, but I hope the Chair will bear with me, because the item refers to a bridge in my district. I have been surprised at Judge LETTS's remarks in regard to the feeling that prevails there. I never heard of it. This provision, as I understand it, is for the alteration and repair of a bridge that has the indorsement of the engineers and the Bureau of the Budget, and I fail to see, in my district or in Moline, where there is any disposition to take away any rights on the Iowa side. It is true that we have vast interests on the Illinois side; with these barge lines that have been started we look for wonderful results. It is true Moline will be one of the great shipping points on the Mississippi River. The John Deere Plow Co., one of the leading manufacturers of agricultural implements of the country, will furnish alone 500,000 tons. Moline has many other large industries and will be one of the largest and busiest ports on the Mississippi River.

This bridge is an obstruction to navigation, and at a point very vital to the success of the shipping on the river. I do not know that I can say anything to this committee better than what has been said by the Budget and by the Army engineers. I might read one extract from the hearing from Major Lewis:

Mr. BARBOUR. You have another bridge, have you not?

Major LEWIS. Yes, sir. There is one going to Davenport, and also a bridge over to the city of Rock Island.

The Government is in the position of owning a bridge which is obstructing navigation on the river. If that were a privately owned bridge, under the river and harbor act the Secretary of War would, when it was complained about, call a public meeting to determine whether or not it was a fact that navigation was being obstructed, and if so, under this act of Congress he would be authorized to direct the owner of the bridge to open it for navigation. We are in the position now of owning the bridge ourselves. It is a five-span bridge, and the simplest and cheapest plan is to take the island end span and make a vertical lift or draw out of it.

In conclusion, this is a step forward in the development of the Middle West. It so happens that in my district Moline and Rock Island are growing, thriving, manufacturing cities. For God's sake, let us not cripple them. Let us give them the help that seems to be due them at this time. I leave that with you, gentlemen.

Mr. LETTS. Mr. Chairman, will the gentleman yield?

Mr. ALLEN. Yes.

Mr. LETTS. Is the gentleman informed of the fact that during this last winter, because of these dams that have been built around Davenport and Bettendorf, throwing the water into the Moline pool, the manufacturing concerns at Bettendorf and Davenport had to close up because of lack of water?

Mr. ALLEN. I do not so understand it; and I say to the gentleman from Iowa that I think he has a wonderful city over there. I think that he is more scared than hurt. I think that those three cities are all going right ahead.

Mr. LETTS. The gentleman knows that when the matter was under consideration before the Committee on Rivers and Harbors last year Davenport and Bettendorf sent down a large delegation, including the mayors and some of the most prominent men there, and those interested in the water company, and that Moline sent down the strongest delegation it could get up, and I ask the gentleman whether in his heart he believes that this is just a flitter, if there is not some substance to this, and if the people on the Iowa side are not endangered in their water supply?

Mr. ALLEN. I have never been asked by any organization or by any individual in the city of Moline about this, with one exception, and that was to call attention to the opposition that the gentleman was likely to bring on the floor here, following up with the following part of this telegram, which I shall read, and that is all I have.

The telegram is to the effect that the John Deere Plow Co. expect to construct at their own expense docks and shipping facilities to connect their factories with the barge terminals, the cost of which will be at least $50,000 and probably more. That is the sort of company that is interested in the development of this barge line, but they have to have this lift in the bridge to get the barges around to their shipping point. We are going to make your city a good city too, Judge LETTS.

Mr. LETTS. When this matter was under consideration in the subcommittee, I think it was the gentleman from California [Mr. BARBOUR] himself who inquired about the authority of law for this appropriation, and the answer was that it was contained in the river and harbor act of March 3, 1899. I have asked the gentleman from Illinois and all those concerned to point out any law that is authorization for this appropriation. I have carefully read the act which was given as the authority of law, and I fail to find one word relating to the subject in the whole of the law.

Mr. ALLEN. Is the gentleman aware that the island between Moline and Davenport is the property of the United States; that the bridge connecting the island with Moline is the property of the United States; that the construction of the proposed lift is for the purpose, and the sole purpose, of aiding navigation on a navigable river of the United States? In other words, the construction of the proposed lift by the United States on a bridge owned by it and located on its property, in order to aid the navigation of its river, is questioned by the gentleman, if I understand him, on the sole ground that the United States lack power in the premises.

The products of the farms and factories of the Mississippi Valley are in immediate and pressing need of river transportation. Every hour of delay in providing that transportation means loss to the farmers and manufacturers and workmen, as well as to the merchants and other men engaged in commerce

and business in that section. The situation is not one to be solved by technical quibbles but by practical sense and effort.

Mr. CHINDBLOM. Mr. Chairman, it was my purpose to call attention to the act of March 3, 1899. I have just sent for it, but I have not had time to examine it. I shall read to the Chair the language of Colonel Robbins, before the Subcommittee on Appropriations, as it appears in the hearings. The question was raised whether the Moline Power Co. or anybody else had any rights in this matter. Mr. Robbins replied and said:

They have some rights under the river and harbor act of March 3, 1899, which authorizes the Secretary of War to order a bridge altered when it interferes with navigation.

In this case the bridge happens to be owned by the Government, and they would claim the right of every other American citizen under that law, and say that because the bridge is owned by the Government does not alter the basic principle of that law.

As I say, I have not had time to examine the act of March 3, 1899.

Mr. LETTS. Mr. Chairman, I have carefully examined that act, and there is not a word in that that can be regarded as authority for an appropriation of this kind.

The CHAIRMAN. The Chair would like to know by what authority this bridge was originally built. If this bridge was built under authority of law and is a Government bridge, the question is quite different from what it would be if it were built without authority of law.

Mr. CHINDBLOM. The memorandum from the Budget states that it was built by the War Department, as part of the War Establishment. There has been no dispute of that statement.

The CHAIRMAN. Assuming that this bridge was built in accordance with law, then much of the argument made by the gentleman from Iowa [Mr. LETTS], and to some extent that made by the gentleman from Illinois [Mr. ALLEN], goes entirely to the merits of the question and not to the point of order.

Mr. BARBOUR rose.

The CHAIRMAN. Does the gentleman from California wish to be heard on the point of order?

Mr. BARBOUR. Mr. Chairman, I think it advisable to look into this matter further. In order to afford time for that purpose, I move that the committee do now rise.

The CHAIRMAN. The Chair would be glad to have until the House meets again for the consideration of this bill in order to find what authority was originally given for the construction of this bridge.

The gentleman from California moves that the committee do now rise.

The motion was agreed to.

Accordingly the committee rose; and the Speaker having resumed the chair, Mr. TILSON, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration the bill H. R. 10286, the War Department appropriation bill, and had come to no resolution thereon.

ADJOURNMENT OVER UNTIL MONDAY

Mr. TILSON. Mr. Speaker, the Committee of the Whole has made very substantial progress on the War Department appropriation bill to-day. It would seem now that we shall probably finish it in one more day. In view of the state of the business of the House and the fact that many of the committees are working very hard on their bills, I think that we shall lose no time, and perhaps gain in the end, if we adjourn over until next Monday. Therefore, I ask unanimous consent that when the House adjourns to-day it adjourn to meet on Monday next.

The SPEAKER. The gentleman from Connecticut asks unanimous consent that when the House adjourns to-day it adjourn to meet on Monday next. Is there objection?

Mr. WILLIAMSON. Will this bill be in order on Monday?

Mr. TILSON. No. Monday will be Consent Calendar day. We have a very long Consent Calendar, so that it will probably take all day. This bill will be taken up again on Tuesday next.

The SPEAKER. Is there objection?

There was no objection.

PERMISSION TO ADDRESS THE HOUSE

Mr. VESTAL. Mr. Speaker, I ask unanimous consent that on Tuesday morning, after the reading of the Journal and the disposition of papers on the Speaker's desk, I may be permitted to address the House for 35 minutes.

The SPEAKER. The gentleman from Indiana asks unanimous consent that on Tuesday morning, after the reading of the Journal and the disposal of business on the Speaker's table, he may be permitted to address the House for 35 minutes. Is there objection?

There was no objection.

### TENNESSEE WATER POWER AND MUSCLE SHOALS

Mr. GARRETT of Tennessee. Mr. Speaker, some days ago the House gave me permission to extend my remarks in the RECORD by inserting a communication from the public utilities commission of my State bearing on the water resources of Tennessee and Muscle Shoals. I have received a letter from former Senator Shields bearing on the same subject, on a live legislative matter, and I would like to insert that, too.

The SPEAKER. The gentleman from Tennessee asks unanimous consent to extend his remarks by inserting a letter from former Senator Shields, of Tennessee, in regard to the matter which the gentleman from Tennessee was privileged to extend on a former occasion. Is there objection?

There was no objection.

Mr. GARRETT of Tennessee. Mr. Speaker, under the leave to extend my remarks in the RECORD I include the following letter from former United States Senator John K. Shields upon the subject of Tennessee water-power resources and Muscle Shoals:

KNOXVILLE, TENN., *January 25*, 1928.

Hon. FINIS J. GARRETT,
  *Washington, D. C.*

MY DEAR SIR: When we discussed the Madden bill (H. R. 8305), and especially the provisions providing for the construction of dams on the Clinch River, some days ago, I had not read the bill and was unable to express any opinion of how these provisions affected the sovereign and property rights of the State and people of Tennessee, but have since carefully considered the copy you gave me and come to a definite opinion in regard to these matters.

I have also carefully read the letter concerning the same matters which you received from the railroad and Public Utilities Commission of Tennessee, in which the commission ably presents the sovereign powers, rights, and interests of the State and the people in streams, in which I agree with them in the abstract, but I do not think that the opinions expressed and authorities referred to are applicable to dams constructed or authorized to be constructed by the Congress for the improvement of navigation and the national defense.

The object of the Madden bill is to authorize and direct the Secretary of War, for the United States, to execute to the Air Nitrates Corporation and American Cyanamid Co. a lease of property of the United States known as the Muscle Shoals development at Muscle Shoals on the Tennessee River, Ala., to be operated and maintained primarily for the purpose of generating and manufacturing air nitrates to be used for the national defense and agricultural fertilizers, the lessees obligating themselves to manufacture, distribute, and sell fertilizers, and for the improvement of navigation. These were the purposes for which the Muscle Shoals development was constructed by the United States.

It has been ascertained since the construction of the Wilson Dam that in dry seasons there was not sufficient water to assure the production of sufficient power and that the construction of other dams in the Tennessee River and its tributaries is necessary.

The Clinch River has been surveyed under the direction of the Secretary of War and navigation dams and storage reservoirs located which when constructed will improve navigation upon that river as well as upon the entire Tennessee River, and supply the necessary water power at Muscle Shoals in dry seasons, and therefore the United States contracts in the lease to construct the Cove Creek Dam and authorizes the Air Nitrates Corporation and American Cyanamid Co., through a subsidiary corporation, to construct three navigation dams upon this river, the power produced by the Cove Creek Dam to be covered by the lease and that produced by the other three dams to be used, owned, and enjoyed by the lessee. These four dams are all to be constructed for improvement of navigation, the national defense, and incidental power production.

The three dams below Clinton: Congress has the unquestioned power to authorize the construction of these dams for the improvement of navigation and incidental power production by persons or corporations at their own expense. This power has been frequently exercised for many years and never challenged. The Kalsa Bar Dam in the Tennessee River, the Keokuk Dam in the Mississippi River, Dam No. 12 in the Coosa River, and many other large dams have been constructed under acts similar to the provisions granting the lessee licenses to construct these dams. It has been a favored way of improving navigation of streams as well as developing water-power resources without cost to the United States. The permits and licenses granted under the provisions of the Madden bill are to be governed by the provisions of the Federal water power act in all things, but the lessees are to have preference over all applicants to the Federal Water Power Commission for licenses to construct them.

The incidental power generated by these dams, its distribution and sale, however, will be subject to the laws and constituted authorities of Tennessee, no question of interstate commerce being involved in the generation, use, and sale of hydroelectric power. This is conceded by the provision in the bill that the lessee shall "construct, operate, and maintain such dam or dams subject to the applicable State and Federal laws."

Section 9 of the Federal water power act under which they are to be constructed provides, in section (b), that each applicant for a license hereunder shall submit to the commission—

"(b) Satisfactory evidence that the applicant has complied with the requirements of the laws of the State or States within which the proposed project is to be located with respect to bed and banks and to the appropriation, diversion, and use of water for power purposes and with respect to the right to engage in the business of developing, transmitting, and distributing power, and in any other business necessary to effect the purposes of a license under this act."

The Madden bill does not undertake to enable the licensees at these dams to override the authority of the State but merely provides that after the lessee has complied with the laws of the State, then, so far as the Federal Government is concerned, he shall have his preliminary permit and consequent license if desired. The time allowed the lessees to construct the dams is less than that which the Water Power Commission is authorized to allow power companies applying to it for permits and licenses.

The Cove Creek Dam: Congress has the power to construct dams for navigation improvement and the national defense as here contracted and to lease the waterpower produced. This has been done in a number of cases. The act of Congress providing for the construction of the Sault Ste. Marie navigation improvement by the United States authorized the waterpower incidently produced to be leased or disposed of, and it was sustained by the Supreme Court of the United States in the case of the United States *v.* Chandler, Dunbar Co. (229 U. S. 53).

The pertinent provisions of the contract of the United States to construct the Cove Creek Dam are as follows: The lessor, for the purpose of navigation improvement, national defense, incidental flood control, and to secure the maximum production of fertilizers at Muscle Shoals in time of peace, covenants and agrees to acquire and construct with reasonable promptness Cove Creek Dam on Clinch River approximately 8 miles north of Clinton; the lessor covenants and agrees to acquire by good and marketable title, free from all defects and encumbrances, all such lands, rights, easements, and servitudes as may be necessary for the construction, operation, and maintenance of said dam, and to complete the construction thereof in good faith, and with reasonable diligence, the property when completed to become a part of the properties leased.

The power produced, its distribution and sale by the lessees, is subject to the control and regulation of the laws and constituted authorities of Tennessee as in all other cases, which I think is admitted by the provisions of the lease.

With these views of the meaning and proper construction of the provisions of the proposed lease concerning dams on the Clinch River, I am of the opinion that they do not violate any of the sovereign powers, rights, and interests of the State and people of Tennessee and are constitutional and valid. If you have any doubt of this, you could offer an amendment to the bill that no provision of the lease shall violate any of the sovereign rights of the State, which will doubtless be accepted, because if it is done they will be void.

The lease contains a contract by the United States that it will not construct or allow to be constructed a dam on the Tennessee River or its tributaries that will materially impair the full enjoyment by the lessees of the property leased, which is objectionable and should be stricken out. Congress had no power to make such a contract, because it does not relate to or affect navigation, but solely to the private business of the lessees. However, it is void, meaningless, and harmless, and entitled to no serious consideration.

The chief objection, it is understood, to the Madden bill comes from the power companies, and especially those that have made application to the Federal Water Power Commission, but not to the Railroad and Public Utilities Commission of Tennessee, for permits and licenses to construct the dams on the Clinch River, as well as dams on other rivers in Tennessee, which will doubtless be granted by the Federal Water Power Commission if the Madden bill is not enacted granting such licenses to the Air Nitrates Corporation and American Cyanamid Co. by the United States.

In other words, the contest is between the United States in its effort to improve navigation and provide for the manufacture of fertilizers for the use of farmers and nitrates for national defense, and the Cyanamid Co., which owns the process for the manufacture of nitrates on the one part, and the power companies which desire by their application more than 20 dams on the Tennessee River and its tributaries in east Tennessee for power purposes, the granting of which will give them power to dispose of the hydroelectricity produced and transmitted to other States almost in their absolute discretion.

The water-power companies have long opposed the generation and sale of hydroelectricity by others than themselves. They opposed the completion of the Wilson Dam; they opposed and by delay defeated the proposition of Henry Ford to lease the Muscle Shoals development, and it is said the Fertilizer Trust joined them in this fight. The 13 associated power companies opposed a similar bill to the present one and had a bill introduced granting them a lease, although they owned no processes for the manufacture of air nitrates and their proposition

to do so was of doubtful construction. They have introduced no bill to the present Congress, doubtless because of the Walsh resolution pending in the Senate for the investigation of the power companies; but there are two bills for Government operation or lease, and it is probable that they will gain control of the electric power under these if the Madden bill is not enacted. It is also quite certain if the Madden bill is not passed in the present Congress there will be no proposition from a company manufacturing fertilizers in the future, and the Muscle Shoals power will all pass into the hands of the power companies and be lost to the agricultural interests of the country.

There is another point I would call your attention to: The Air Nitrates Corporation and the American Cyanamid Co. are chemical manufacturing companies and not water-power companies. The construction of the dams on the Clinch River will assure ample power at Muscle Shoals all the year to conduct their business to produce the maximum amount of fertilizers provided for in the lease. They must dispose of the power produced by the dams on the Clinch River, and it will be more profitable for them to sell it to manufacturing companies located near the dams, which will be of very great advantage to Tennessee in the increase of population and taxable property. They in all probability will have no expensive distribution lines to transmit it a distance or out of the State.

I do not wish anything I have said in this letter to be construed as a criticism upon the members of the Railroad and Public Utilities Commission of Tennessee, for they are all gentlemen of integrity and ability and are patriotically asserting and defending the sovereign rights of Tennessee and the people in the water power resources of Tennessee and are not and can not in any way be influenced in the discharge of their duties contrary to the interests of the people of the State by anyone. I favor and approve their assertion of the State's rights which the power companies have ignored and are now attacking by a bill in the chancery court of Nashville.

I have written you quite at length about this matter because I am deeply interested in the manufacture of cheap fertilizer at Muscle Shoals, the provisions for the national defense, and the development of the water-power resources of the Tennessee River for the benefit of the people of Tennessee.

Yours truly,

JOHN K. SHIELDS.

## PERMISSION TO ADDRESS THE HOUSE

Mr. CASEY. Mr. Speaker, I ask unanimous consent that, following the special order just made, I may address the House for one hour on Tuesday on the coal-strike situation.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Tuesday, following the address of the gentleman from Indiana [Mr. VESTAL], he may address the House for one hour on the coal-strike situation. Is there objection?

Mr. BARBOUR. Reserving the right to object, Mr. Speaker, would not some other day be just as convenient to the gentleman from Pennsylvania?

Mr. CASEY. I will say to the gentleman that I had an allotment of time in the general debate on this bill, but I was compelled to postpone speaking on account of attendance on a hearing on another appropriation bill.

Mr. BARBOUR. I do not want to object to the gentleman's request, but I am very anxious to dispose of this appropriation bill at the next session of the House, and if an hour were allowed to the gentleman on Tuesday that could not be done.

Mr. TILSON. I doubt if next Calendar Wednesday will be crowded. Perhaps the gentleman might get time on Calendar Wednesday. He can get it by unanimous consent.

Mr. CASEY. Then I modify my request, Mr. Speaker, to the extent that I be given one hour on Calendar Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table, he may address the House for one hour. Is there objection?

There was no objection.

## IMMIGRATION AND THE CRIME WAVE

Mr. LANKFORD. Mr. Speaker, on January 27, 1928, my colleague, Hon. ROBERT ALEXIS GREEN, of Florida, delivered an address over the radio on the subject of "Immigration and the crime wave," which address I ask may be inserted in the RECORD by unanimous consent.

The SPEAKER. The gentleman from Georgia asks unanimous consent to extend his remarks in the RECORD by inserting an address recently delivered over the radio by the gentleman from Florida [Mr. GREEN]. Is there objection?

There was no objection.

Mr. LANKFORD. Mr. Speaker, under leave granted me to-day, I herewith insert in the RECORD an eloquent and patriotic address delivered by the Hon. ROBERT ALEXIS GREEN, Representative of the second congressional district of Florida, over the radio on January 27, 1928, discussing the subject Immigration and the Crime Wave. The address is instructive, entertaining, and worthy of the careful consideration of the Nation.

The address is as follows:

Friends and citizens of America, the subject of immigration is so wide in its scope that it will be impossible for me to give a detailed discussion of it in the short time which I will talk to you this evening; however, it is one of the most important subjects now affecting the citizenship of our great Nation. A high order of citizenship is vital to any nation. A nation's strength in itself and its power and position in the affairs of other nations is established and maintained solely by the stable type of citizenship comprising it.

Our Constitution vested in the Congress the power to regulate and control immigration. However, the subject of immigration was vainly attempted to be regulated by treaty up until about the year 1882, when the American Government tried to settle the Chinese question by a treaty in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the Chinese millions and the United States. Thus it was found imperative that the United States should pass her first immigration law. The influx of aliens grew steadily until by the year 1907 the high peak was reached with the admission of 1,285,349 persons.

This alarming situation brought about the passage of the illiteracy test act in 1917, which only retarded slightly the great influx of foreign hordes. In 1910, 1,041,570; in 1913, 7,197,892; and in 1914, 1,218,480 entered. The abnormal conditions during the World War period, of course, directed the attention of the world in channels other than that of immigration, but soon after the World War—during the reconstruction period—again immigrants by the hundreds of thousands turned their eyes and hopes toward the United States, causing the necessity of the 1921 numerical control act. This act was found inadequate to cope with the situation, and on May 26, 1924, Congress made its third effort to limit the annual influx of aliens. The immigration department of our Government is now working rather effectively under the provisions of this and subsequent acts of Congress, but in spite of all efforts of Congress and the diligence of immigration officials there are to-day in the United States probably 16,000,000 persons of foreign birth, 7,000,000 of whom are not American citizens. Thus you will see the necessity of all efforts at the restriction of immigration.

### NEED MORE HELP

The immigration department employs about 2,700 persons. Of this number, nearly 800 are immigrant inspectors and more than 700 are border patrolmen. It can readily be seen that this number is inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol.

If the border to be patroled could be averaged among the few patrolmen on the 8-hour basis, making allowance for sick leave and other possible absentees, it would be reasonable to approximate 25 miles of border per day to be inspected by one patrolman. Then when we consider that the quota law does not apply to Canada, Mexico, Central America, South America, and some of the islands, it is very easy to see the weakest place of our present immigration laws and their enforcement. Hundreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States. Millions of aliens come into this country either by land or sea annually; the admissibility of these people has to be passed upon by our Bureau of Immigration. Of course, this number includes tourists, students, and aliens of all classes. I merely mention this to show how impossible it is for the limited personnel of our department to cope with this tremendous situation.

### GIGANTIC TASK

Our country has a total population of more than 100,000,000, 15 per cent or possibly 20 per cent of which is foreign born, and in almost every case speaking a language foreign to ours. It is readily seen that we have a great task to Americanize, assimilate, and amalgamate these foreigners. These 15,000,000 or possibly 20,000,000 persons of foreign birth, 7,000,000 of whom are aliens, are indeed a heavy burden for American society and for American institutions to carry. These foreigners, in general, exact a tremendous toll from our civilization. In January, 1927, 113,105 aliens were inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses. The economic loss represented by these figures is appalling. Each of these aliens, considered economically, is less than zero; he is a distinct liability. The amount of money expended annually to support these aliens would, within a few years, build hard roads enough to "checker-board" the United States from the Atlantic to the Pacific and from the Rio Grande to Canada. I know of no good reason why the United States should be so foolish as to permit these conditions to continue.

There are many suggestions to the Congress which would strengthen our National immigration and deportation laws. Recently the House Committee on Immigration, of which I am a member, approved a depor-

CONGRESSIONAL RECORD—HOUSE

tation law which, if passed, will help a great deal; however, my feeling in the matter is that any and all aliens in the United States who are found guilty of violating any law whatsoever of the United States or of any State of the Union, should be, without delay, deported. Aliens who are found guilty of operating gambling houses, "gun-toting," violating in any manner State or Federal prohibition laws, or any other infraction of our minor laws, should be instantly deported the same as if he had committed a graver offense. Probably 80 per cent of those who violate the laws are "repeaters." You can examine the statistics of almost any penal institution and find that a high percentage, in some cases more than 80 per cent, of those who are in prison have been convicted of offenses other than the one for which they are serving.

### ALIENS SHOULD BE REGISTERED

In my opinion all aliens, by law and practice, should be compelled to register upon entering the United States and should be compelled to carry on their person such certificate of registration. I believe further that omission of or refusal of any alien to avail himself of the United States laws of naturalization should be grounds for his deportation at the discretion of the trial court. No alien should be permitted to stay in the United States more than five years without becoming a naturalized citizen. To-day there are hundreds of thousands of foreigners in the United States who have been here for years and years, have never declared their intention of becoming citizens of the United States, do not desire to be citizens of the United States; but on the other hand many of them are ready, waiting, and willing at all times to foment trouble and disloyalty to the United States Constitution, laws, and institutions.

A few months ago the United States was brought face to face with the underhanded bolshevistic and communistic working of undesirable aliens. This was brought to a climax during and just after the notorious Sacco-Vanzetti trial. These two depraved and abhorrent murderers committed their acts some seven years before justice was administered to them. A perverted sympathizer of Sacco and Vanzetti, named Edward H. James, a socialist or Red, referring to the trial said:

"You had a crazy judge and jury in Plymouth. You had the same crazy judge and jury in Dedham. You had a crazy Supreme Court of Massachusetts sitting in the courthouse in Boston, saying it was right. The trial of these men was an infamy that cries to Heaven. Take them out from prison. Then punish those who committed the infamy. I am not telling you what to do. I am interpreting history for you. * * * Justice is terrible when it strikes. Revolutions are not made to order. Either we break the Government or the Government breaks us."

These statements of his were taken up by sympathizers of Sacco and Vanzetti and so radical did their minds incline until the courthouse, the court, and other officials had to be guarded and protected from unlawful attacks. Even the homes of the judge and attorney had to be protected by armed guards. After the conviction of these men their friends perpetrated a series of outrages all over the world, exploding bombs and blowing up buildings. So vicious were their designs until when the veterans of the Allied Armies of the World War made a pilgrimage back to Paris and other scenes of their great deeds of heroism, it was necessary for these exponents of humanity and democracy to have guards against the inroads of these numerous Reds.

A leader in the movement to set free these two murderers was Felix Frankfurter, who worked for the defense of Mooney and Billings, red murderers. Notable among this array of reds may be mentioned Charlotte A. Whitney, who was convicted of criminal syndicalism in California for advocating the overthrow of the State by force, and who was not long ago pardoned by the Governor of California. A petition purporting to contain almost half a million signatures protested the execution of Sacco and Vanzetti; thus we see there are hundreds of thousands of these reds, communists, bolshevists who are here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our schools, our homes.

It is time that the United States should have a general awakening and educate her citizens to the needs of the hour; educate them to pure Americanism and the protection of our Nation and her institutions. It is time that our immigration and deportation laws have teeth put into them whereby the courts and other officials of our country can instantly ascertain the activity of aliens in crime, lawlessness, and red propaganda and promptly deport them.

### CRIME WAVE

The crime wave is engulfing America. Almost every newspaper you pick up has a startling headline like the following: "Fireburg sets seven fires;" "Paroled moron sought as girl's slayer;" "Lost girl sought on Island;" "Hickman, fiendish slayer, captured;" "Fox (Hickman) wins plea for new judge;" "Hotelling confesses attacking and slaying 5-year-old girl;" "Hickman seeks highbrow jury;" "Remus declared insane." This, my friends, is evidence that the crime wave is sweeping the United States because the red-blooded American citizens are apparently becoming careless relative to the enforcement of the laws of the country and apparently careless relative to properly educating the rising generation.

It is time we were instilling in the youth of our land their duties as courts, as peace officers, jurors, and law-abiding citizens. The youth

of to-day will fill these places to-morrow. It is time the citizens of the United States should look with disgust and contempt upon the violation of laws and discontinue signing requests for pardons, paroles, and other impediments to the justice of the law. It is time that Americans should look upon real American laws and institutions as theirs and endeavor to protect them instead of taking the side of and protecting and shielding criminals, law violators, and enemies of society. It is time the country should denounce so-called alienists along with other deterrents to law enforcement, justice, and civilization. Often the origin of these ills can be traced to undesirable immigrants. I do not mean to say that all aliens are undesirable; some are high type, splendid people, and make good citizens.

### ACROSS THE BORDERS

From south of the Rio Grande hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers of large industrial enterprises. These who would decoy to our lands and then employ undesirable alien labor in competition with the splendid American laborer surely should be stopped. Cheap labor to-day may be an expensive liability to-morrow, and surely in the Mexican peon laborer this condition has obtained. The American laborer resides among us, pays taxes, contributes to the welfare and upbuilding of society and really stands at the helm of the ship of state of our mighty Nation. On the contrary, foreign labor drifts into our country, obtains what it can for its hire, gives as little return as possible, in most cases, and then invariably thrusts itself for a charitable existence upon society, in the founding of which it has not assisted.

Another reason why the quota should apply to the country south of the Rio Grande and the islands is because their population in the main is composed of mixtured blood of white, Indian, and negro. This makes their blood a very great penalty upon the society which assimilates it. The United States already has sufficient race and blood troubles.

Influx of all types of undesirable aliens and their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization; and instead of our Nation then being the mistress of the world, leading in art, science, invention, finance, statesmanship, culture, and general civilized development, would it not be reasonable to believe that we would assume a secondary place as compared to those nations which have kept their blood white and purely Caucasian? I do not tell you that these things will come to pass, but I do say we already have enough Japanese, Chinese, Italians, Negroes, and other foreign strains. It is time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores.

### PERMISSION TO ADDRESS THE HOUSE

Mr. MORIN. Mr. Speaker, I ask unanimous consent that the gentleman from New York [Mr. LaGUARDIA], who is now in the coal districts investigating the conditions there, be permitted to address the House for half an hour on Monday. I do that in pursuance of a request by wire that I have just received.

Mr. GARRETT of Tennessee. The gentleman says he is in the coal districts?

Mr. MORIN. Yes. I have just received a wire from him. I did not know before that he was there.

Mr. GARRETT of Tennessee. That is the same subject that the gentleman from Pennsylvania [Mr. CASEY] wishes to speak about?

Mr. MORIN. Yes.

The SPEAKER. The Chair will endeavor to discourage unanimous consent for talking on Monday, which is set aside for the Consent Calendar.

Mr. MORIN. Then I make it Wednesday.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, at the conclusion of the speech of the gentleman from Pennsylvania [Mr. CASEY], the gentleman from New York [Mr. LaGUARDIA] may be permitted to address the House for half an hour. Is there objection?

There was no objection.

### AMENDMENT OF THE HOUSE RULES

Mr. SNELL. Mr. Speaker, I submit a privileged report from the Committee on Rules.

The SPEAKER. The gentleman from New York presents a privileged report from the Committee on Rules, which the Clerk will report.

The Clerk read as follows:

Report to accompany House Resolution 107, amending paragraph 34 of Rule XI of the Rules of the House of Representatives.

The SPEAKER. Ordered printed.

### CHANGE OF REFERENCE

Mr. ARENTZ. Mr. Speaker, I have here a bill (H. R. 6461) for the construction of an irrigation dam on Walker River, Nev. It is an Indian matter. It was referred to the Committee

1928                    CONGRESSIONAL RECORD—HOUSE                    2463

on Irrigation. I have conferred with both the chairman of the Committee on Indian Affairs and with the chairman of the Irrigation Committee, and both are agreeable to the transfer of this bill to the Committee on Indian Affairs.

The SPEAKER. The Clerk will report the bill by title.

The Clerk read as follows:

A bill (H. R. 6461) for the construction of an irrigation dam on the Walker River, Nev.

The SPEAKER. The gentleman from Nevada asks unanimous consent that the bill referred to be transferred from the Committee on Irrigation and Reclamation to the Committee on Indian Affairs. Is there objection?

There was no objection.

FURTHER MESSAGE FROM THE SENATE

A further message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate insists upon its amendments to the joint resolution (H. J. Res. 131) entitled "Joint resolution providing for a commission to investigate and report upon the facts connected with the sinking of the submarine S–4 and upon methods and appliances for the protection of submarines," disagreed to by the House of Representatives, and agrees to the conference asked by the House on the disagreeing votes of the two Houses thereon, and had appointed Mr. HALE, Mr. ODDIE, and Mr. SWANSON to be the conferees on the part of the Senate.

ADJOURNMENT

Mr. BARBOUR. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 4 o'clock and 50 minutes p. m.) the House adjourned, pursuant to the order previously made, until Monday, February 6, 1928, at 12 o'clock noon.

COMMITTEE HEARINGS

Mr. TILSON submitted the following tentative list of committee hearings scheduled for Saturday, February 4, 1928, as reported by clerks of the several committees:

COMMITTEE ON APPROPRIATIONS

(10.30 a. m.)

Department of Agriculture appropriation bill.
District of Columbia appropriation bill.

COMMITTEE ON WORLD WAR VETERANS' LEGISLATION—SUBCOMMITTEE ON HOSPITALS

(10 a. m.)

To authorize an appropriation to provide additional hospital and out-patient dispensary facilities for persons entitled to hospitalization under the World War veterans' act, 1924, as amended (H. R. 5604).

COMMITTEE ON ROADS

(10 a. m.)

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented (H. R. 358, 383, 5518, 7343, and 8832).

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented, and authorizing appropriation of $150,000,000 per annum for two years (H. R. 7019).

COMMITTEE ON RIVERS AND HARBORS

(11 a. m.)

A meeting to consider favorable reports from the office of the Chief of Engineers on rivers and harbors projects.

COMMITTEE ON FOREIGN AFFAIRS

(10.30 a. m.)

That the use of submarines be prohibited and their construction discontinued in this and every other country (H. J. Res. 139).

COMMITTEE ON THE DISTRICT OF COLUMBIA—SUBCOMMITTEE ON POLICE AND FIREMEN

(10.30 a. m.)

To fix the salaries of officers and members of the Metropolitan police force, and the fire department of the District of Columbia (H. R. 9346).

COMMITTEE ON THE POST OFFICE AND POST ROADS—SUBCOMMITTEE NO. 8

(10.30 a. m.)

To authorize the assignment of railway postal clerks and substitute railway postal clerks to temporary employment as substitute sea post clerks (H. R. 58).

To authorize the Postmaster General to require steamship companies to carry the mail when tendered (H. R. 6864).

To prescribe more definitely the rates of compensation payable to steamships of United States registry for transportation of foreign mails (H. R. 6865).

For Monday, February 6, 1928

COMMITTEE ON AGRICULTURE

(10 a. m.)

To establish a Federal farm board to aid in the orderly marketing and in the control and disposition of the surplus of agricultural commodities in interstate and foreign commerce (H. R. 7940).

COMMITTEE ON THE DISTRICT OF COLUMBIA

(10.30 a. m.)

To regulate the employment of minors within the District of Columbia (H. R. 6685).

COMMITTEE ON NAVAL AFFAIRS

(10.30 a. m.)

To provide for the increase of the Naval Establishment (H. R. 7359).

COMMITTEE ON APPROPRIATIONS

(10.30 a. m.)

Department of Agriculture appropriation bill.

COMMITTEE ON ROADS

(10 a. m.)

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented (H. R. 358, 383, 5518, 7343, and 8832).

To amend the act entitled "An act to provide that the United States shall aid the States in the construction of rural post roads," approved July 11, 1916, as amended and supplemented, and authorizing appropriation of $150,000,000 per annum for two years (H. R. 7019).

EXECUTIVE COMMUNICATIONS, ETC.

338. Under clause 2 of Rule XXIV a letter from the Secretary of Navy, transmitting draft of a proposed bill "To provide additional pay for enlisted men of the United States Navy assigned to duty on submarine vessels of the Navy," was taken from the Speaker's table and referred to the Committee on Naval Affairs.

REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of Rule XII,

Mr. PEAVEY: Committee on Indian Affairs. H. R. 7207. A bill to appropriate treaty funds due the Wisconsin Pottawatomie Indians; with amendment (Rept. No. 553). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 8542. A bill to provide for the construction of a hospital at the Fort Bidwell Indian School, California; without amendment (Rept. No. 554). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 8543. A bill to provide for the construction of a school building at the Fort Bidwell Indian School, California; without amendment (Rept. No. 555). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 8898. A bill to provide for restoration to the public domain of certain lands in the State of California which are now reserved for Indian allotment purposes; without amendment (Rept. No. 556). Referred to the Committee of the Whole House on the state of the Union.

Mr. ENGLEBRIGHT: Committee on Indian Affairs. H. R. 9037. A bill to provide for the permanent withdrawal of certain lands in Inyo County, Calif., for Indian use; without amendment (Rept. No. 557). Referred to the Committee of the Whole House on the state of the Union.

Mr. WASON: Committee on the Disposition of Useless Executive Papers. A report on the disposition of useless executive papers in the Department of State. (Rept. No. 558). Ordered printed.

Mr. HAUGEN: Committee on Agriculture. H. J. Res. 26. A joint resolution authorizing the Secretary of Agriculture to dispose of real property, located in Hernando County, Fla., known as the Brooksville Plant Introduction Garden, no longer required for plant introduction purposes; without amendment

(Rept. No. 568). Referred to the Committee of the Whole House on the state of the Union.

Mr. HAUGEN: Committee on Agriculture. H. J. Res. 89. A joint resolution authorizing the Secretary of Agriculture to dispose of real property, located in Loudoun and Clarke Counties, Va., known as Mount Weather, no longer required for observatory and laboratory purposes; without amendment (Rept. No. 569). Referred to the Committee of the Whole House on the state of the Union.

Mr. HAUGEN: Committee on Agriculture. H. R. 405. A bill providing for horticultural experiment and demonstration work in the southern Great Plains area; with amendment (Rept. No. 570). Referred to the Committee of the Whole House on the state of the Union.

Mr. SNELL: Committee on Rules. H. Res. 107. A resolution amending paragraph 34 of Rule XI of the Rules of the House of Representatives; without amendment (Rept. No. 571). Referred to the House Calendar.

Mr. GILBERT: Committee on the District of Columbia. H. R. 49. A bill to amend the Code of Law for the District of Columbia in relation to descent and distribution; with amendment (Rept. 572). Referred to the House Calendar.

## REPORTS OF COMMITTEES ON PRIVATE BILLS AND RESOLUTIONS

Under clause 2 of Rule XIII,

Mr. JAMES: Committee on Military Affairs. H. R. 1631. A bill for the relief of Vanrenslear VanderCook, alias William Snyder; with amendment (Rept. No. 551). Referred to the Committee of the Whole House.

Mr. HOFFMAN: Committee on Military Affairs. H. R. 7708. A bill for the relief of John M. Brown; with amendment (Rept. No. 552). Referred to the Committee of the Whole House.

Mr. PEAVEY: Committee on War Claims. H. R. 4229. A bill for the relief of Jennie Wyant and others; without amendment (Rept. No. 559). Referred to the Committee of the Whole House.

Mr. HARE: Committee on War Claims. H. R. 4258. A bill to authorize credit in the disbursing accounts of certain officers of the Army of the United States and for the settlement of individual claims approved by the War Department; with amendment (Rept. No. 560). Referred to the Committee of the Whole House.

Mr. HOOPER: Committee on War Claims. H. R. 4267. A bill for the relief of Ernest J. Hiscock; without amendment (Rept. No. 561). Referred to the Committee of the Whole House.

Mr. HOOPER: Committee on War Claims. H. R. 4268. A bill for the relief of Charles Caudwell; without amendment (Rept. No. 562). Referred to the Committee of the Whole House.

Mr. PEAVEY: Committee on War Claims. H. R. 5225. A bill for the relief of Frank W. Tucker; without amendment (Rept. No. 563). Referred to the Committee of the Whole House.

Mr. HOOPER: Committee on War Claims. H. R. 4257. A bill for the validation of the acquisition of Canadian properties by the War Department and for the relief of certain disbursing officers for payments made thereon; without amendment (Rept. No. 564). Referred to the Committee of the Whole House.

Mr. HAUGEN: Committee on Agriculture. H. R. 4068. A bill for the relief of the Majestic Hotel, Lake Charles, La., and of Lieut. R. T. Cronau, United States Army; without amendment (Rept. No. 565). Referred to the Committee of the Whole House.

Mr. HAUGEN: Committee on Agriculture. H. R. 8968. A bill to allow credit in the accounts of William A. Schoenfeld; without amendment (Rept. No. 566). Referred to the Committee of the Whole House.

Mr. ROWBOTTOM: Committee on Claims. H. R. 9385. A bill for the relief of the estate of L. Gordon Leech, bankrupt; without amendment (Rept. No. 567). Referred to the Committee of the Whole House.

## CHANGE OF REFERENCE

Under clause 2 of Rule XXII, committees were discharged from the consideration of the following bills, which were referred as follows:

A bill (H. R. 3946) for the relief of Hugo Koehn; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 3949) for the relief of Frank F. Moore; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 4656) for the relief of John E. Dolan; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 4657) for the relief of Glenn S. Fortner; Committee on the Post Office and Post Roads discharged, and referred to the Committee on Claims.

A bill (H. R. 10381) granting an increase of pension to Louise W. Koch; Committee on Pensions discharged, and referred to the Committee on Invalid Pensions.

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of Rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. COLTON: A bill (H. R. 10473) to establish the Bear River migratory-bird refuge, Great Salt Lake, Utah, and for other purposes; to the Committee on Agriculture.

By Mr. GILBERT: A bill (H. R. 10474) to amend the Code of Law for the District of Columbia in relation to descent and distribution; to the Committee on the District of Columbia.

By Mr. MORROW: A bill (H. R. 10475) to authorize the Secretary of the Interior to issue a patent to the Bureau of Catholic Indian Missions for a certain tract of land on the Mescalero Reservation, N. Mex.; to the Committee on Indian Affairs.

By Mr. HAWLEY: A bill (H. R. 10476) for a fish hatchery on the Rogue River in Jackson County, Oreg.; to the Committee on the Merchant Marine and Fisheries.

By Mr. HUDSPETH: A bill (H. R. 10477) to amend the tariff act of 1922; to the Committee on Ways and Means.

By Mrs. KAHN: A bill (H. R. 10478) providing retirement for persons who hold licenses as navigators or engineers who have reached the age of 64 years and who have served 25 or more years on seagoing vessels of the Army Transport Service; to the Committee on Military Affairs.

By Mr. KNUTSON: A bill (H. R. 10479) granting double pensions to dependents under existing pension laws in all cases where an officer, warrant officer, or enlisted man or student flyer of the United States Army dies or is disabled due to aircraft accident; to the Committee on Pensions.

By Mrs. LANGLEY: A bill (H. R. 10480) to extend the provisions of the pension act of May 11, 1912, and May 1, 1920, to the officers and enlisted men of all State militia and other State organizations that rendered service to the Union cause during the Civil War for a period of 90 days or more, and providing pensions for their widows, minor children, and dependent parents, and for other purposes; to the Committee on Invalid Pensions.

By Mr. MORROW: A bill (H. R. 10481) to authorize the erection of a Veterans' Bureau hospital at Albuquerque, N. Mex., and to authorize the appropriation therefor; to the Committee on World War Veterans' Legislation.

By Mrs. ROGERS: A bill (H. R. 10482) to provide double pensions for personnel of the Army, Navy, Marine Corps, or Coast Guard who are killed or disabled as the result of accidents in the military, naval, or Coast Guard service; to the Committee on Pensions.

By Mr. SINNOTT (by departmental request): A bill (H. R. 10483) to revise the boundary of a portion of the Hawaii National Park on the island of Hawaii, in the Territory of Hawaii; to the Committee on the Public Lands.

By Mr. NELSON of Missouri: A bill (H. R. 10484) for the erection or enlargement of a Federal building at Columbia, Mo.; to the Committee on Public Buildings and Grounds.

Also, a bill (H. R. 10485) to provide for the erection of a public building in the city of Centralia, Mo.; to the Committee on Public Buildings and Grounds.

Also, a bill (H. R. 10486) for the erection or enlargement of a Federal building at Jefferson City, Mo.; to the Committee on Public Buildings and Grounds.

By Mr. GREEN of Iowa: A bill (H. R. 10487) to amend the World War adjusted compensation act, as amended; to the Committee on Ways and Means.

By Mr. WAINWRIGHT: A bill (H. R. 10488) to amend section 3, act of May 31, 1924 (43 Stat. L. 251); to the Committee on Military Affairs.

By Mr. SMITH: A bill (H. R. 10489) for the relief of Army nurses; to the Committee on Military Affairs.

By Mr. WINTER: A bill (H. R. 10490) to authorize the purchase of a site and the erection and completion of a building thereon for a post office at Worland, Wyo.; to the Committee on Public Buildings and Grounds.

By Mr. WILLIAMSON: A bill (H. R. 10491) to provide for aided and directed settlement on Federal reclamation projects; to the Committee on Irrigation and Reclamation.

By Mr. BUTLER: A bill (H. R. 10492) to provide additional pay for enlisted men of the United States Navy assigned to duty on submarine vessels of the Navy; to the Committee on Naval Affairs.

By Mr. TAYLOR of Tennessee: A bill (H. R. 10493) to relieve persons in the military and naval services of the United States during the war emergency period from claims for overpayment at that time not involving fraud; to the Committee on Military Affairs.

By Mr. ROMJUE: Joint resolution (H. J. Res. 190) calling upon the President of the United States to reduce the tariff on materials and commodities essential to and generally used by the agricultural population of the United States in carrying on the farming industry, and for lessening the burdens now imposed upon agriculture; to the Committee on Ways and Means.

By Mr. HOGG: Joint resolution (H. J. Res. 191) to amend the Constitution of the United States; to the Committee on Ways and Means.

By Mr. TILSON: Joint resolution (H. J. Res. 192) to provide for the coinage of a medal in commemoration of the achievements of Col. Charles A. Lindbergh; to the Committee on Coinage, Weights, and Measures.

By Mr. CASEY: Resolution (H. Res. 109) to investigate conditions in the coal fields of Pennsylvania, West Virginia, and Ohio; to the Committee on Rules.

MEMORIALS

Under clause 3 of Rule XXII, memorials were presented and referred as follows:

Memorial of the Legislature of the State of Wisconsin, memorializing the Congress of the United States to create a special committee to investigate the coal strike in all its phases; to the Committee on Rules.

Memorial of the Legislature of the State of Wisconsin, memorializing the Congress of the United States to make a full survey of the Wisconsin-Fox Rivers waterway and to enact such legislation as will result in the completion of such waterway; to the Committee on Rivers and Harbors.

PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of Rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. ANDRESEN: A bill (H. R. 10494) for the relief of the Oscar and John Soberg Post, No. 210, of the Veterans of Foreign Wars, Lakeville, Minn.; to the Committee on Claims.

By Mr. ARNOLD: A bill (H. R. 10495) granting an increase of pension to Drusilla Ward; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10496) granting a pension to James O. Guinn; to the Committee on Pensions.

Also, a bill (H. R. 10497) granting an increase of pension to Sarah A. Lovelady; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10498) granting a pension to Mary J. Burris; to the Committee on Pensions.

By Mr. BRIGHAM: A bill (H. R. 10499) granting an increase of pension to Clara A. Cobb; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10500) granting an increase of pension to Mary S. Walker; to the Committee on Invalid Pensions.

By Mr. BULWINKLE: A bill (H. R. 10501) to erect a marker to Maj. William Chronicle, a soldier of the Revolutionary War, who was killed at Kings Mountain; to the Committee on the Library.

Also, a bill (H. R. 10502) for the relief of J. B. Holder, to the Committee on Claims.

Also, a bill (H. R. 10503) for the relief of R. P. Washam, postmaster; F. A. Slate, former postmaster; W. H. Sanders, W. A. McGinnis, J. E. Lindsay, and J. T. Pearson; to the Committee on Claims.

By Mr. CORNING: A bill (H. R. 10504) granting an increase of pension to Elizabeth Evans; to the Committee on Invalid Pensions.

By Mr. FLETCHER: A bill (H. R. 10505) granting an increase of pension to Sarah Dearth; to the Committee on Invalid Pensions.

By Mr. GARDNER of Indiana: A bill (H. R. 10506) granting a pension to Mary C. Ingle; to the Committee on Pensions.

By Mr. GRAHAM: A bill (H. R. 10507) for the relief of Benjamin Franklin, alias William Hart; to the Committee on Naval Affairs.

By Mr. HAWLEY: A bill (H. R. 10508) for the relief of T. P. Byram; to the Committee on Naval Affairs.

By Mr. HICKEY: A bill (H. R. 10509) granting a pension to Emma M. Oberlin; to the Committee on Invalid Pensions.

By Mr. HOUSTON of Delaware: A bill (H. R. 10510) granting an increase of pension to Ruth A. Hazzard; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10511) for the relief of Horace G. Knowles; to the Committee on Claims.

By Mr. JENKINS: A bill (H. R. 10512) granting an increase of pension to Jennie Porter; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10513) granting a pension to Agnes Folger; to the Committee on Invalid Pensions.

By Mr. JOHNSON of South Dakota: A bill (H. R. 10514) granting an increase of pension to Sylvia S. Felmly; to the Committee on Invalid Pensions.

By Mrs. LANGLEY: A bill (H. R. 10515) granting an increase of pension to John Breeding; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10516) for the relief of estate of Martin Preston, deceased; to the Committee on War Claims.

Also, a bill (H. R. 10517) granting a pension to Bascom Prater; to the Committee on Pensions.

Also, a bill (H. R. 10518) granting a pension to Camillus Arnett; to the Committee on Pensions.

By Mr. MAGRADY: A bill (H. R. 10519) to correct the military record of Levi Beaver; to the Committee on Military Affairs.

By Mr. MANLOVE: A bill (H. R. 10520) granting a pension to Maud E. McFadden; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10521) granting a pension to Jacob Louis; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10522) granting an increase of pension to Caroline Owen; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10523) granting an increase of pension to Mary R. Gorham; to the Committee on Invalid Pensions.

By Mr. MERRITT: A bill (H. R. 10524) to correct the military record of Egbert L. Bennett; to the Committee on Military Affairs.

By Mr. MOORE of Virginia: A bill (H. R. 10525) for the relief of Anna Volker; to the Committee on Claims.

By Mr. PARKER: A bill (H. R. 10526) granting an increase of pension to Ann Taylor; to the Committee on Invalid Pensions.

By Mr. PURNELL: A bill (H. R. 10527) granting an increase of pension to Lucetta Hayes; to the Committee on Invalid Pensions.

By Mr. ROBINSON of Iowa: A bill (H. R. 10528) granting an increase of pension to Mary L. Jarvis; to the Committee on Invalid Pensions.

By Mr. RATHBONE: A bill (H. R. 10529) for the relief of Bernard McGlave; to the Committee on Naval Affairs.

By Mr. SCHAFER: A bill (H. R. 10530) for the relief of Harry Cinq-Mars; to the Committee on Military Affairs.

By Mr. STRONG of Pennsylvania: A bill (H. R. 10531) granting an increase of pension to Nancy Wolford; to the Committee on Invalid Pensions.

Also, a bill (H. R. 10532) granting a pension to Sarah E. Barr; to the Committee on Invalid Pensions.

By Mr. TAYLOR of Tennessee: A bill (H. R. 10533) granting an increase of pension to Florence Witt; to the Committee on Invalid Pensions.

By Mr. UNDERHILL: A bill (H. R. 10534) for the relief of Glacier County, Mont.; to the Committee on Claims.

By Mr. WELCH of California: A bill (H. R. 10535) granting a pension to Maude E. West; to the Committee on Invalid Pensions.

By Mr. WHITTINGTON: A bill (H. R. 10536) granting six months' pay to Anita W. Dyer; to the Committee on Naval Affairs.

By Mr. WILLIAMS of Missouri: A bill (H. R. 10537) granting an increase of pension to Josephine Sullivan; to the Committee on Invalid Pensions.

By Mr. WYANT: A bill (H. R. 10538) granting an increase of pension to Alice A. Ferguson; to the Committee on Invalid Pensions.

PETITIONS, ETC.

Under clause 1 of Rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

3078. Petition of the Antinational Origins Clause League, Detroit, Mich., protesting against the national origins method of determining quotas and urging Congress to eliminate this clause from the immigration act of 1924; to the Committee on Immigration and Naturalization.

3079. By Mr. ALMON: Petition of H. B. Miller, of Florence, Ala., and 28 other citizens, asking for an increase in the pension of needy and suffering veterans of the Civil War and their widows; to the Committee on Invalid Pensions.

CONGRESSIONAL RECORD—HOUSE

3080. By Mr. BACHMANN: Petition of Lena Vance and other citizens of Elm Grove, Ohio County, W. Va., protesting against the passage of the Lankford compulsory Sunday observance bill (H. R. 78) or any other compulsory Sunday observance bills; to the Committee on the District of Columbia.

3081. By Mr. BURTON: Resolution adopted by Massachusetts Council for International Cooperation, protesting against the proposed naval building program and urging an effort substantially to reduce it; to the Committee on Naval Affairs.

3082. Also, memorial signed by citizens of the State of Ohio, remonstrating against the passage of legislation providing for compulsory Sunday observance in the District of Columbia; to the Committee on the District of Columbia.

3083. By Mr. CARTER: Petition of Carrie Jackson and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3084. Also, petition of Al Erle and many others, of Oakland, Calif., protesting against passage of House bill 78; to the committee on the District of Columbia.

3085. Also, petition of Emma Wickstrom, M. D., and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3086. Also, petition of Emmanuel Browne and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3087. Also, petition of L. Thompson and others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3088. Also, petition of Sena Hill and 52 others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3089. Also, petition of Alice Galer and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3090. Also, petition of Fred Fritman and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3091. Also, petition of Joseph Burry and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3092. Also, petition of Pauline C. Roberts and many others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3093. Also, petition of P. N. Harris and others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3094. Also, petition of Henry H. Nodruff and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3095. Also, petition of C. B. Secord and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3096. Also, petition of Ida N. Peoples and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3097. Also, petition of Mrs. L. C. Morgan and others, protesting against passage of House bill 78; to the Committee on the District of Columbia.

3098. Also, petition of H. M. Monroe and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3099. Also, petition of C. E. Brown and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3100. Also, petition of Marcus C. McKeller and others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3101. Also, petition of August Glatt and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3102. Also, petition of L. E. Bake and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3103. Also, petition of W. Rimnell and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3104. Also, petition of Mary A. Halcom and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3105. Also, petition of James Harvey and many others, of Oakland, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3106. Also, petition of John H. Easterly and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3107. Also, petition of Bjornstjerne Bjornson Lodge, No. 14, Sons of Norway, of Oakland, Calif., urging that the present quota for Scandinavian countries be retained; to the Committee on Immigration and Naturalization.

3108. Also, petition of Charles I. Harrison and others, of Alameda County, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3109. Also, petition of Ted Staffee and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3110. Also, petition of Frederick C. Johnson and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3111. Also, petition of D. Halland and many others, of Oakland, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3112. Also, petition of Charles W. Small and others, of Alameda County, Calif., protesting against the passage of House bill 78; to the Committee on the District of Columbia.

3113. Also, petition of H. C. Groger and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3114. Also, petition of San Leandro Chamber of Commerce, of San Leandro, Calif., protesting any action on the Box bill until after a thorough investigation has been had of the Mexican immigration question; to the Committee on Immigration and Naturalization.

3115. Also, petition of Santa Barbara Post, No. 49, American Legion, Department of California, urging the passage of an appropriation for the holding of the national rifle matches of 1928; to the Committee on Military Affairs.

3116. Also, petition of General Harrison Gray Otis Post, No. 1537, urging the passage of legislation increasing the allowances to men on the retired list of services; to the Committee on Military Affairs.

3117. Also, petition of J. Baldwin and others, of Alameda County, Calif., protesting against passage of House bill 78; to the Committee on the District of Columbia.

3118. Also, petition of Martha K. Baril and many others, of Oakland, Calif., urging that legislation be passed granting increased pensions to veterans of the Civil War and their widows; to the Committee on Invalid Pensions.

3119. Also, petition of Kalman Rubenstein and 55 others, of Oakland, Calif., urging the passage of legislation increasing the pensions of veterans of the Civil War and their widows; to the Committee on Invalid Pensions.

3120. By Mr. CHAPMAN: Petition of Laura Tolliver, of Lexington, Ky., in support of legislation increasing pensions to Civil War veterans and widows of Civil War veterans; to the Committee on Invalid Pensions.

3121. Also, petition of S. G. Sharp, Pruitt Berryman, Meredith Fox, R. R. Hampton, Ernest Howard, Martin Fort, and 12 other citizens, of Clark County, Ky., protesting against the passage of any compulsory Sunday observance law or any bill giving preference to one religion over another; to the Committee on the District of Columbia.

3122. Also, petition of L. E. Morris, Joe Sibley, C. N. Crawford, G. E. Morris, J. S. Moore, Stephen Logan, and other citizens, of Sulphur, Henry County, Ky., in support of legislation increasing pensions to Civil War veterans and widows of Civil War veterans; to the Committee on Invalid Pensions.

3123. By Mr. CHRISTOPHERSON: Petition urging vote on Civil War pension bill, signed by numerous residents of Artesian, S. Dak.; to the Committee on Invalid Pensions.

3124. By Mr. COOPER of Wisconsin: Memorial of the Wisconsin Legislature, memorializing the Congress of the United States to enact necessary legislation for a survey of the Wisconsin-Fox Rivers waterway; to the Committee on Rivers and Harbors.

3125. Petition of citizens of Bristol, Kenosha County, Wis., and vicinity, protesting against passage of H. R. 78, or any other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3126. By Mr. CURRY: Petition of citizens of third district of California, against House bill 78; to the Committee on the District of Columbia.

3127. By Mr. EATON: Petition of Mrs. Lillie Headley, 225 Somerset Street, Bound Brook, N. J., and 180 other residents of Bound Brook, protesting against the passage of any compulsory Sunday observance legislation for the District of Columbia; to the Committee on the District of Columbia.

3128. By Mr. ELLIOTT: Petition of Paul Green and 500 others, of Richmond, Ind., remonstrating against the passage of the Lankford Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3129. By Mr. ESTEP: Petition of the Rose Building and Loan Association, Pittsburgh, Pa., Jacob H. Erbe, secretary, urging the passage of the Dale-Lehlbach bill; to the Committee on the Civil Service.

3130. Also, petition of Joint Association of Postal Employees, J. F. Callagher, president, urging the passage of the Dale-Lehlbach bill; to the Committee on the Civil Service.

3131. By Mr. FENN: Petition of citizens of Hartford, Conn., and surrounding towns, protesting against the passage of House bill 78, or any other legislation providing for a compulsory observance of Sunday; to the Committee on the District of Columbia.

3132. By Mr. FRENCH: Petition of citizens of Lapwai, Idaho, urging enactment of legislation increasing pensions for Civil War veterans and for widows; to the Committee on Invalid Pensions.

3133. By Mr. GALLIVAN: Petition of William C. Adams, director department of conservation, Commonwealth of Massachusetts, recommending early and favorable consideration of House bill 15, providing for an appropriation of $150,000 to purchase certain land to be added to the Absaroka and Gallatin National Forests; to the Committee on the Public Lands.

3134. By Mr. GARBER: Letter of P. P. Claxton, superintendent city schools, Tulsa, Okla., in support of Senate bill 1731, providing for the further development of agriculture and home economics under the terms of the Federal vocational education act; to the Committee on Agriculture.

3135. Also, Letter of Union Machine Co., of Bartlesville, Okla., by Samuel T. Steel, secretary and treasurer, in protest to House bill 8125, introduced by Mr. Berger; to the Committee on Interstate and Foreign Commerce.

3136. By Mr. GARDNER of Indiana: Petition of Floyd H. Rainey and 22 other citizens, of Washington County, Ind., protesting against the enactment into law of the compulsory Sunday observance bill (H. R. 78), or any similar measure; to the Committee on the District of Columbia.

3137. Also, petition of Helen L. Stepp and nine other citizens, of Washington County, Ind., protesting against the enactment into law of the compulsory Sunday observance bill (H. R. 78), or any similar measure; to the Committee on the District of Columbia.

3138. By Mr. HALL of North Dakota: Petition of 17 citizens living at Rolette, N. Dak., against the passage of any bill to cripple the corner-card stamped envelope and their sale and distribution by the Government; to the Committee on the Post Office and Post Roads.

3139. Also, petition of four citizens living at Rolette, N. Dak., against the enactment of House bill 78, or any other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3140. By Mr. HADLEY: Petition of residents of Clallam County, Wash., protesting against the Lankford Sunday closing bill; to the Committee on the District of Columbia.

3141. By Mr. HARRISON: Petition of Sam T. Kite and others, against compulsory Sunday observance; to the Committee on the District of Columbia.

3142. By Mr. HASTINGS: Petition of citizens of Bunch, Checotah, and Muskogee Counties, Okla., urging legislation in behalf of Civil War veterans and their widows; to the Committee on Invalid Pensions.

3143. By Mr. HOPE: Petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3144. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3145. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3146. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3147. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3148. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage

of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3149. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3150. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3151. Also, petition of numerous citizens of the seventh congressional district of Kansas, protesting against the passage of the Lankford bill (H. R. 78), or other compulsory Sunday observance legislation; to the Committee on the District of Columbia.

3152. By Mr. JOHNSON of Texas: Petition of Robert Nicholson Seed Co., of Dallas, Tex., favoring reduction on present postage rates; to the Committee on the Post Office and Post Roads.

3153. By Mr. HOOPER: Petition of C. H. Anderson and one other resident of Augusta, Mich., protesting against the enactment of compulsory Sunday observance legislation for the District of Columbia; to the Committee on the District of Columbia.

3154. By Mr. LEATHERWOOD: Petition of sundry citizens of Salt Lake City, Utah, protesting against compulsory Sunday observance, and especially against House bill 78; to the Committee on the District of Columbia.

3155. Also, petition of Catherine Shanklin, of Clinton, Iowa, urging that immediate steps be taken to bring to a vote a Civil War pension bill; to the Committee on Invalid Pensions.

3156. By Mr. LINDSAY: Petition of council of Brooklyn Chapter of the Reserve Officers' Association of the United States, protesting against the injustice to the Organized Reserves of charging the cost of developing the Army Air Corps against any appropriations made for carrying on the work of the Organized Reserves; to the Committee on Appropriations.

3157. By Mr. LINTHICUM: Petition of Emory, Beeuwkes, Skeen & Oppenheimer, of Baltimore, requesting favorable action on House bill 25, amendments to the present retirement act; to the Committee on the Civil-Service.

3158. Also, petition of Griffith & Turner Co., and the Meyer Seed Co., of Baltimore, Md., requesting favorable action on House bill 9296, reduction of postal rates; to the Committee on the Post Office and Post Roads.

3159. By Mr. LOZIER: Petition of 73 citizens of Laredo, Mo., urging enactment of pension legislation; to the Committee on Invalid Pensions.

3160. By Mr. McDUFFIE: Petition of 13 citizens of Mobile, Ala., favoring an increase of pension to Civil War veterans and their widows; to the Committee on Invalid Pensions.

3161. By Mr. MOORE of Kentucky: Petition signed by Erma Covington, Austin Davis, E. L. Merideth, and 100 other citizens, of Warren County, Ky., urging that immediate steps be taken to bring to a vote a Civil War pension bill in order that relief may be accorded to needy and suffering veterans and widows; to the Committee on Invalid Pensions.

3162. By Mr. MOORE of Virginia: Petition of citizens of Accotink and Alexandria Counties, Va., against the compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3163. By Mr. O'CONNELL: Petition of the Antinational Origins Clause League, of Michigan, protesting against the national origins method of determining quotas; to the Committee on Immigration and Naturalization.

3164. Also, petition of council of Brooklyn Chapter of the Reserve Officers' Association of the United States, protesting against the injustice of the organized reserves of charging the cost of developing the Army Air Corps against appropriation made for the carrying on the work of the organized reserves; to the Committee on Appropriations.

3165. Also, petition of the Kee Lox Manufacturing Co., Rochester, N. Y., favoring the passage of a bill relative to the Cuban parcel post legislation; to the Committee on the Post Office and Post Roads.

3166. By Mr. ROBINSON of Iowa: Petition urging the passage of a Civil War widows pension bill, signed by about 30 citizens of Waterloo, Black Hawk County, Iowa; to the Committee on Invalid Pensions.

3167. By Mr. ROMJUE: Petition of C. W. Sitton, George L. Cameron, et al., of Hannibal, Mo., against passage of House bill 78; to the Committee on the District of Columbia.

3168. Also, petition of W. H. Turner, Dick Burnham, et al, of Macon County, Mo., against passage of House bill 78; to the Committee on the District of Columbia.

3169. By Mr. STEELE: Petition of 105 citizens of Atlanta, Fulton County, Ga., protesting against the passage of the Brookhart bill pertaining to motion pictures; to the Committee on Interstate and Foreign Commerce.

3170. Also, petition of 61 citizens of Campbell County, Ga., protesting against the passage of legislation enforcing compulsory Sunday observance; to the Committee on the District of Columbia.

3171. By Mr. STRONG of Kansas: Petitions of 62 citizens of Minneapolis, Kans., protesting against the passage of the Lankford compulsory Sunday observance bill (H. R. 78); to the Committee on the District of Columbia.

3172. By Mr. STRONG of Pennsylvania: Petition of citizens of Blairsville, Pa., urging that immediate steps be taken to bring to a vote a Civil War pension bill for veterans and widows; to the Committee on Invalid Pensions.

3173. By Mr. TEMPLE: Petition of True Blue Commandery, Knights of Malta, and Chartiers Valley Lodge, No. 77, Amalgamated Iron and Steel Workers, of Canonsburg, Pa., in support of House bill 25 and Senate bill 1727, known as the Dale-Lehlbach retirement bill; to the Committee on the Civil Service.

3174. By Mr. WINTER: Resolution adopted by Sheridan Commercial Club, protesting against further restriction of Mexican immigration; also resolution adopted by the Kiwanis Club, of Douglas, Wyo., protesting against the further restriction of Mexican immigration; to the Committee on Immigration and Naturalization.

3175. Also, petition against compulsory Sunday observance, signed by residents of Weston County, Wyo., and the citizens of Sheridan, Wyo.; to the Committee on the District of Columbia.

3176. By Mr. WYANT: Resolution of Council of Associated Building Trades of Philadelphia and vicinity, favoring legislation to appropriate $750,000,000 for increasing the strength and efficiency of the United States Navy; to the Committee on Appropriations.

3177. Also, petition of State Council of Pennsylvania, Junior Order of United American Mechanics, indorsing House bill 3; to the Committee on Immigration and Naturalization.

3178. Also, resolution of New Kensington (Pa.) Chamber of Commerce, favoring passage of Dale-Lehlbach bill (H. R. 25 and S. 1727); to the Committee on the Civil Service.

3179. Also, resolution of the Antinational Origins Clause League, protesting against national origins method of determining immigration quotas; to the Committee on Immigration and Naturalization.

3180. Also, petition of employees of Parnassus, Pa., post office, indorsing Senate bill 2108, House bills 7473, 9058, 9059, and House Joint Resolution 159; to the Committee on the Post Office and Post Roads.

3181. Also, resolution of directors of New Kensington, Pa., Kiwanis Club, indorsing Dale-Lehlbach bill (H. R. 25 and S. 1727); to the Committee on the Civil Service.

3182. Also, petition of I. N. Simon & Son, advocating legislation for the relief of farmers and others in some classes of mail matter; to the Committee on the Post Office and Post Roads.

---

## SENATE

SATURDAY, *February 4, 1928*

(*Legislative day of Wednesday, February 1, 1928*)

The Senate reassembled at 12 o'clock meridian, on the expiration of the recess.

ROBERT W. STEWART—RECUSANT WITNESS

The Sergeant at Arms (David S. Barry) appeared and said: Mr. President, acting under instructions of a warrant issued to the Sergeant at Arms by the President of the Senate, Robert W. Stewart was taken into the custody of the Senate. He has applied for and obtained a writ of habeas corpus, which is returnable Tuesday, February 7.

Mr. WALSH of Montana. Mr. President, I offer the following resolution.

The VICE PRESIDENT. The clerk will read the resolution.

The Chief Clerk read the resolution (S. Res. 133), as follows:

*Resolved,* That the Committee on Public Lands and Surveys be, and it hereby is, authorized in its discretion to employ counsel to represent the Senate in any proceedings taken by Robert W. Stewart to secure his release from the custody of the Sergeant at Arms in any court.

Mr. SMOOT. Mr. President, the resolution will have to go to the Committee to Audit and Control the Contingent Expenses of the Senate.

Mr. WALSH of Montana. I trust that the Committee to Audit and Control will be able to take the matter under immediate consideration.

I submit a further resolution, in the form of a motion. I move that the President of the Senate be directed to certify to the district attorney for the District of Columbia the report made on yesterday by the Committee on Public Lands and Surveys for appropriate action by that officer.

The VICE PRESIDENT. Without objection, the motion is agreed to. Does the Senator from Montana ask for the immediate consideration of the resolution submitted by him?

Mr. WALSH of Montana. It will have to go to the Committee to Audit and Control the Contingent Expenses of the Senate.

The VICE PRESIDENT. The resolution will be so referred.

Mr. FESS subsequently said: I ask leave to report Senate Resolution 133 from the Committee to Audit and Control the Contingent Expenses of the Senate with an amendment in the nature of a substitute, and I call the attention of the Senator from Montana [Mr. WALSH] to the report.

The PRESIDING OFFICER (Mr. BINGHAM in the chair). Without objection, the report will be received and the substitute resolution will be read.

The CHIEF CLERK. Strike out all after the word "*Resolved*" and insert:

That the Committee on Public Lands and Surveys be, and it hereby is, authorized to employ counsel at a cost of not to exceed $2,500, to be paid out of the contingent expenses of the Senate, to represent the Senate in any proceedings taken by Robert W. Stewart to secure his release from the custody of the Sergeant at Arms in any court.

Mr. WALSH of Montana. I ask unanimous consent for the immediate consideration of the resolution.

The resolution was considered by unanimous consent.

The amendment was agreed to.

The resolution as amended was agreed to.

Mr. HEFLIN obtained the floor.

Mr. KING. Mr. President, may I have the attention of the Senator from Montana?

The VICE PRESIDENT. Does the Senator from Alabama yield to the Senator from Utah?

Mr. HEFLIN. I yield for a question.

Mr. KING. I just came into the Chamber and I was wondering whether the last resolution which the Senator offered contemplates the abandonment of any policy of procedure which would bring Mr. Stewart before the Senate?

Mr. WALSH of Montana. Not at all. I am very glad that question has been asked.

Mr. KING. It looks as though it might be inconsistent.

Mr. WALSH of Montana. Not at all. Under the procedure which was contemplated, should Colonel Stewart appear here he would be relieved from the custody of the Senate at any time he would signify a willingness to answer the questions which were propounded to him. Thereupon the power of the Senate is gone; we could not hold him for a moment.

But, Mr. President, this is an offense, a grave offense, punishable by imprisonment. I think that the time has come when the dignity of the Senate of the United States ought to be recognized and it ought to be appreciated that it is no trifling affair to defy its authority, however high the recusant witness may stand. I am not content at all to excuse Colonel Stewart if he should now agree to testify. His offense is properly punishable, as was the offense of Mr. Harry F. Sinclair, who was sentenced to 90 days in the common jail.

Mr. CARAWAY. Mr. President, may I ask the Senator from Montana a question?

The VICE PRESIDENT. The Senator from Alabama has the floor. Does he yield to the Senator from Arkansas?

Mr. HEFLIN. I yield just for a question. I do not want the Senator to hold the floor, however.

Mr. CARAWAY. I just came into the Chamber. I understood a motion was made to certify the matter to the district attorney of the District of Columbia. Is that the plan?

Mr. WALSH of Montana. Yes.

Mr. CARAWAY. Have we ever had anything but delay in any matter that went down to the courts? Sinclair is out, and they have been pretending to try a contempt case before Judge Siddons since the memory of man runneth not to the contrary. It seems to me that anything which is certified down there we might as well say is merely off our hands and that the parties involved are in no danger of being punished.

Mr. GEORGE. Mr. President——

Mr. HEFLIN. I yield to the Senator from Georgia.