# EXHIBIT K

# President Truman's Veto of the McCarran-Walter Act, June 25, 1952

Präsident Truman weigerte sich, den McCarran-Walter Act zu unterschreiben und begründete sein Veto mit der am 25. Juni 1952 an das House of Representatives gesandten Nachricht.

*To the House of Representatives:*

I return herewith, without my approval, H. R. 5678, the proposed Immigration and Nationality Act.

In outlining my objections to this bill, I want to make it clear that it contains certain provisions that meet with my approval. This is a long and complex piece of legislation. It has 164 separate sections, some with more than 40 subdivisions. It presents a difficult problem of weighing the good against the bad, and arriving at a judgment on the whole.

H. R. 5678 is an omnibus bill which would revise and codify all of our laws relating to immigration, naturalization, and nationality.

A general revision and modernization of these laws unquestionably is needed and long overdue, particularly with respect to immigration. But this bill would not provide us with an immigration policy adequate for the present world situation. Indeed, the bill, taking all its provisions together, would be a step backward and not a step forward. In view of the crying need for reform in the field of immigration, I deeply regret that I am unable to approve H. R. 5678.

In recent years our immigration policy has become a matter of major national concern. Long dormant questions about the effect of our immigration laws now assume first rate importance. What we do in the field of immigration and naturalization is vital to the continued growth and internal development of the United States—to the economic and social strength of our country—which is the core of the defense of the free world. Our immigration policy is equally, if not more important to the conduct of our foreign relations and to our responsibilities of moral leadership in the struggle for world peace.

In one respect, this bill recognizes the great international significance of our immigration and naturalization policy, and takes a step to improve existing laws. All racial bars to naturalization would be removed, and at least some minimum immigration quota would be afforded to each of the free nations of Asia.

I have long urged that racial or national barriers to naturalization be abolished. This was one of the recommendations in my civil rights message to the Congress on February 2, 1948. On February 19, 1951, the House of Representatives unanimously passed a bill to carry it out.

But now this most desirable provision comes before me embedded in a mass of legislation which would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our immigration procedures. The price is too high, and in good conscience I cannot agree to pay it. ...

In addition to removing racial bars to naturalization, the bill would permit American women citizens to bring their alien husbands to this country as non-quota immigrants, and enable alien husbands of resident women aliens to come in under the quota in a preferred status. These provisions would be a step toward preserving the integrity of the family under our immigration laws, and are clearly desirable. ...

But these few improvements are heavily outweighed by other provisions of the bill which retain existing defects in our laws, and add many undesirable new features.

The bill would continue, practically without change, the national origins quota system, which was enacted, into law in 1924, and put into effect in 1929. This quota system—

always based upon assumptions at variance with our American ideals—is long since out of date and more than ever unrealistic in the face of present world conditions.

This system hinders us in dealing with current immigration problems, and is a constant handicap in the conduct of our foreign relations. As I stated in my message to Congress on March 24, 1952, on the need for an emergency program of immigration from Europe, "Our present quota system is not only inadequate to most present emergency needs, it is also an obstacle to the development of an enlightened and satisfactory immigration policy for the long-run future."

The inadequacy of the present quota system has been demonstrated since the end of the war, when we were compelled to resort to emergency legislation to admit displaced persons. If the quota system remains unchanged, we shall be compelled to resort to similar emergency legislation again, in order to admit any substantial portion of the refugees from communism or the victims of overcrowding in Europe.

With the idea of quotas in general there is no quarrel. Some numerical limitation must be set, so that immigration will be within our capacity to absorb. But the overall limitation of numbers imposed by the national origins quota system is too small for our needs today, and the country by country limitations create a pattern that is insulting to large numbers of our finest citizens, irritating to our allies abroad, and foreign to our purposes and ideals.

The overall quota limitation, under the law of 1924, restricted annual immigration to approximately 150,000. This was about one-seventh of one percent of our total population in 1920. Taking into account the growth in population since 1920, the law now allows us but one-tenth of one percent of our total population. And since the largest national quotas are only partly used, the number actually coming in has been in the neighborhood of one-fifteenth of one percent. This is far less than we must have in the years ahead to keep up with the growing needs of our Nation for manpower to maintain the strength and vigor of our economy.

The greatest vice of the present quota system, however, is that it discriminates, deliberately and intentionally, against many of the peoples of the world. The purpose behind it was to cut down and virtually eliminate immigration to this country from Southern and Eastern Europe. A theory was invented to rationalize this objective. The theory was that in order to be readily assimilable, European immigrants should be admitted in proportion to the numbers of persons of their respective national stocks already here as shown by the census of 1920. Since Americans of English, Irish and German descent were most numerous, immigrants of those three nationalities got the lion's share—more than two-thirds—of the total quota. The remaining third was divided up among all the other nations given quotas.

The desired effect was obtained. Immigration from the newer sources of Southern and Eastern Europe was reduced to a trickle. The quotas allotted to England and Ireland remained largely unused, as was intended. Total quota immigration fell to a half or a third-and sometimes even less-of the annual limit of 154,000. People from such countries as Greece, or Spain, or Latvia were virtually deprived of any opportunity to come here at all, simply because Greeks or Spaniards or Latvians had not come here before 1920 in any substantial numbers.

The idea behind this discriminatory policy was, to put it baldly, that Americans with English or Irish names were better people and better citizens than Americans with Italian or Greek or Polish names. It was thought that people of West European origin made better citizens than Rumanians or Yugoslavs or Ukrainians or Hungarians or Balts or Austrians. Such a concept is utterly unworthy of our traditions and our ideals. It violates the great political doctrine of the Declaration of Independence that "all men are created equal." It denies the humanitarian creed inscribed beneath the Statue of Liberty proclaiming to all nations, "Give me your tired, your poor, your huddled masses yearning to breathe free."

It repudiates our basic religious concepts, our belief in the brotherhood of man, and in the words of St. Paul that "there is neither Jew nor Greek, there is neither bond nor free, ... for ye are all one in Christ Jesus."

The basis of this quota system was false and unworthy in 1924. It is even worse now. At the present time, this quota system keeps out the very people we want to bring in. It is

incredible to me that, in this year of 1952, we should again be enacting into law such a slur on the patriotism, the capacity, and the decency of a large part of our citizenry. ...

The time to shake off this dead weight of past mistakes is now. The time to develop a decent policy of immigration—a fitting instrument for our foreign policy and a true reflection of the ideals we stand for, at home and abroad—is now. In my earlier message on immigration, I tried to explain to the Congress that the situation we face in immigration is an emergency—that it must be met promptly. I have pointed out that in the last few years, we have blazed a new trail in immigration, through our Displaced Persons Program. Through the combined efforts of the Government and private agencies, working together not to keep people out, but to bring qualified people in, we summoned our resources of good will and human feeling to meet the task. In this program, we have found better techniques to meet the immigration problems of the 1950's.

None of this fruitful experience of the last three years is reflected in this bill before me. None of the crying human needs of this time of trouble is recognized in this bill. But it is not too late. The Congress can remedy these defects, and it can adopt legislation to meet the most critical problems before adjournment. ...

I now wish to turn to the other provisions of the bill, those dealing with the qualifications of aliens and immigrants for admission, with the administration of the laws, and with problems of naturalization and nationality. In these provisions too, I find objections that preclude my signing this bill.

The bill would make it even more difficult to enter our country. Our resident aliens would be more easily separated from homes and families under grounds of deportation, both new and old, which would specifically be made retroactive. Admission to our citizenship would be made more difficult; expulsion from our citizenship would be made easier. Certain rights of native born, first generation Americans would be limited. All our citizens returning from abroad would be subjected to serious risk of unreasonable invasions of privacy. Seldom has a bill exhibited the distrust evidenced here for citizens and aliens alike—at a time when we need unity at home and the confidence of our friends abroad. ...

I am asked to approve the reenactment of highly objectionable provisions now contained in the Internal Security Act of 1950—a measure passed over my veto shortly after the invasion of South Korea. Some of these provisions would empower the Attorney General to deport any alien who has engaged or has had a purpose to engage in activities "prejudicial to the public interest" or "subversive to the national security." No standards or definitions are provided to guide discretion in the exercise of powers so sweeping. To punish undefined "activities" departs from traditional American insistence on established standards of guilt. To punish an undefined "purpose" is thought control.

These provisions are worse than the infamous Alien Act of 1798, passed in a time of national fear and distrust of foreigners, which gave the President power to deport any alien deemed "dangerous to the peace and safety of the United States." Alien residents were thoroughly frightened and citizens much disturbed by that threat to liberty.

Such powers are inconsistent with our democratic ideals. Conferring powers like that upon the Attorney General is unfair to him as well as to our alien residents. Once fully informed of such vast discretionary powers vested in the Attorney General, Americans now would and should be just as alarmed as Americans were in 1798 over less drastic powers vested in the President.

Heretofore, for the most part, deportation and exclusion have rested upon findings of fact made upon evidence. Under this bill, they would rest in many instances upon the "opinion" or "satisfaction" of immigration or consular employees. The change from objective findings to subjective feelings is not compatible with our system of justice. The result would be to restrict or eliminate judicial review of unlawful administrative action. ...

Many of the aspects of the bill which have been most widely criticized in the public debate are reaffirmations or elaborations of existing statutes or administrative procedures. Time and again, examination discloses that the revisions of existing law that would be made by the bill are intended to solidify some restrictive practice of our immigration authorities, or to overrule or modify some ameliorative decision of the Supreme Court or other Federal courts. By and large, the changes that would be made by the bill do not depart from the basically restrictive spirit of our existing laws—but intensify and reinforce it.

These conclusions point to an underlying condition which deserves the most careful study. Should we not undertake a reassessment of our immigration policies and practices in the light of the conditions that face us in the second half of the twentieth century? The great popular interest which this bill has created, and the criticism which it has stirred up, demand an affirmative answer. I hope the Congress will agree to a careful reexamination of this entire matter. ...

                                                        HARRY S TRUMAN.

**Quelle:**
**Truman, Harry S., ed.,**
*Public Papers of the President of the United States: Harry S. Truman, Containing the Public Messages, Speeches, and Statements of the President, January 1, 1952, to January 20, 1953*,
**(Washington, D.C.: G.P.O., 1966), 441-446.**