**Appendix A**

Flores argues that "the criminalization of illegal entry in 1929 reveals a disturbing truth: that racism and eugenics were not only a 'motivating factor' in the legislature's passage of this law[] . . . [t]hey were *the primary factor*." Def. Mot. 8 (emphasis added). Flores's recitation of the legislative history is marred by numerous inaccuracies and consists of a hodgepodge presentation of evidence aimed at giving the impression that the 1929 unlawful reentry statute was the product of impermissible racial animus. Below, the government addresses point-by-point Flores's evidence and explains why it falls well short of the mark.

- **Point**: "Prominent restrictionists 'spoke increasingly of 'racial indigestion,' and the 'contamination' of Anglo-American society." Def. Mot. 8.
  - **Counterpoint**: The study cited for the first point does not cite a source or identify which restrictionists spoke increasingly of "racial indigestion," or if these restrictionists were even legislators. The study also does not characterize these restrictionists as "prominent." The quote referencing the "contamination of Anglo-American society" is drawn from a discussion of discrimination in the early 1900s against Italians, Poles, and Slovaks. The study then goes on to discuss the National Origins Act of 1924, an act that introduced nationality-based quota systems (inapplicable to south and central America) and reaffirmed the exclusion of Asians from the U.S.
- **Point**: "The decade also brought a flood of immigration legislation fueled by fears of 'nonwhite' immigration. At the start of the decade, Congress passed the first numerical restriction on immigration in the United States." Def. Mot. 8–9 (citing Emergency Immigration Act of 1921, Pub. L. 67-5, 42 Stat. 5 (1921)).
  - **Counterpoint**: The study cited to support the first proposition deals entirely with the Act of 1924 and its impact on Jews, Italians, and other European immigrants. The study does not address the unlawful reentry statute or immigration from south or central America. As to the first numerical restrictions on immigration, the Emergency Immigration Act of 1921 did not apply to south and central America.
- **Point**: "During the remainder of the decade, *legislators* aimed for 'America [to] cease to be the melting pot." Def. Mot. 9 (emphasis added).
  - **Counterpoint**: The study cited for this proposition quotes one Senator and says nothing about other "legislators" or what they "aimed for" "during the remainder of the decade[.]" The cited quotation also references the Act of 1924. The very next line goes on to say that "for the next forty years a small number of lawmakers, activists, and presidents worked relentlessly to abolish the 1924 law and its quotas."
- **Point**: "Relying heavily on these [Dr. Laughlin's eugenics] theories, Congress would anchor its immigration legislation in eugenics and racial inferiority for the remainder of the decade." Def. Mot. 10.
  - **Counterpoint**: The study cited does not support the above proposition. The study never references eugenics or Dr. Laughlin. The cited pages do not say anything about Congress relying heavily on eugenics to "anchor" its immigration legislation.
- **Point**: "The quotas created by the National Origins Act were skewed to keep the nation's 'racial strains' predominantly Anglo-Saxon. The law on its face did not count 'nonwhite people residing in the United States' toward the quotas it established. Indeed, its newly-

1

- created 'Quota Board' interpreted this provision to exclude all Black people; all East and South Asians (including those who had American citizenship by birth); and all citizens in Hawai'i, Puerto Rico, and Alaska." Def. Mot. 11.
    - o **Counterpoint**: The 1924 Act also established quotas on European immigration.
- **Point**: "So, despite passing the most sweeping immigration law in years, legislators were not happy. Representative Madden grumbled that the bill 'leaves open the doors for perhaps the worst element that comes into the United States—the Mexican peon.' Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that 'the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel.'" Def. Mot. 12–13 (internal citations omitted).
    - o **Counterpoint**: Representative Martin Madden died in April 1928. Representative Patrick O'Sullivan was a member of the 69th Congress (March 4, 1923–March 3, 1925). Neither was in Congress in March 1929, when the unlawful reentry statute became law, or even in December 1928, when the unlawful reentry bill was introduced to the Senate.
- **Point**: "Secretary Davis was nevertheless torn between his belief in eugenics and his responsibility to maintain a large labor supply for the railroad and agriculture industries. So together with devout racist (and suspected Ku Klux Klan member) Senator Coleman Blease, Davis developed a compromise—Congress would criminalize border crossing after the fact, rather than prevent it in the first place. That way, they reasoned, authorities could expel Mexicans through a criminal prosecution after the growing season was over, thereby avoiding resistance from businesses that depended on Mexican labor." Def. Mot. 13.
    - o **Counterpoint**: The authority cited for the final proposition is a Propublica article which itself cites no legislative material. The article cites *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, 1771-1965 (UNC Press, 2017). The discussion in *City of Inmates* relevant to this point can be found on pp. 137-38 and cites no relevant authority to support its theory.
- **Point**: "Representative John C. Box from Texas had long characterized the goal of immigration law as "the protection of American racial stock from further degradation or change through mongrelization." In one speech at an immigration conference, Rep. Box had explained that:

    [t]he Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction but submitted and multiplied as serfs. Into that was fused much negro slave blood . . . . The prevention of such mongrelization and the degradation it causes is one of the purposes of our [immigration] laws.

Box believed this importation was "raising a serious race question" because Mexicans were "essentially different from us in character, in social position." Def. Mot. 13–14 (citations omitted).
    - o **Counterpoint**: Box's remarks were made in reference to the quota provisions of the 1924 Act or the possible expansion of these quotas to apply to Mexico. He did not make these remarks in reference to the 1929 unlawful reentry law.
- **Point**: "Within two years of the 1924 Act, Chairman Johnson turned to legislation that would exclude the 'Mexican race,' explaining that while the argument for immigration restriction had previously been economic, now 'the fundamental reason for it is biological.'" Def. Mot. 14–15.

- - **Counterpoint**: The page cited in support of this proposition does not include the phrase "Mexican race." The book only includes the following quote: "the fundamental reason for it is biological." Furthermore, the book sources the quote to 1923, not "[w]ithin two years of the 1924 Act."
- **Point**: "In February 1928, for instance, Representative Robert A. Green of Florida delivered a speech (read into the congressional record by Representative Lankford) that advocated for Western Hemisphere quotas. He asserted that countries south of the U.S. are 'composed of mixture blood of White, Indian, and negro.' Immigration from these countries, he believed, created a 'very great penalty upon the society which assimilates,' and put it at a disadvantage to countries that have 'kept their blood white and purely Caucasian.'" Def. Mot. 15 (citations omitted).
  - **Counterpoint**: Representative Green's speech concerned quotas, not the 1929 unlawful reentry law.
- **Point**: "Chairman Johnson had convened hearings on new immigration legislation. At the first hearing, in January 1926, Chairman Johnson admitted into the record a letter from a constituent in El Paso who urged the legislators to keep out 'the scoff and scum, the mongrel, the bootlegger element, from Mexico.' In response to this letter, Commissioner General of Immigration Harry Hull stated, 'I think he is right.' Rep. Box added, 'I have some letters, Mr. Chairman, just like that.'" Def. Mot. 15 (citations omitted).
  - **Counterpoint**: These hearings concerned a pending deportation bill addressing various grounds for deportation, not the criminalization of unlawful reentry. The 1926 hearing obviously could not have dealt with the unlawful reentry provision, which was only introduced in 1928.
- **Point**: "In April 1926, the same House committee held a hearing entitled, 'The Eugenical Aspects of Deportation,' where the principal witness was the well-known eugenicist Dr. Laughlin. Early in the hearing, Chairman Johnson praised Dr. Laughlin's prior reports to Congress on race crossing, mate selection, and fecundity, describing one as a 'priceless' resource that would '***bear intimately upon on immigration policy***.' (emphasis added). Dr. Laughlin testified about his latest eugenics report, the goal of which was to 'protect American blood from alien contamination.' When Dr. Laughlin encouraged the committee to conduct future research on the effect of 'race crossing within the United States,' Chairman Johnson replied that such a study would 'be of great use to the committee in its deliberations.'" Def. Mot. 15–16 (citations omitted).
  - **Counterpoint**: These hearings related to deportation, not the unlawful reentry statute. Again, the unlawful reentry law was introduced to the Senate in December 1928.
- **Point**: "Though Chairman Johnson's initial legislation failed, the compromise with the agricultural industry brokered by Secretary Davis and Senator Blease soon made a breakthrough. On January 18, 1929, Senator Blease, on behalf of the Senate Committee on Immigration, submitted a report to the full Senate recommending passage of a law that would penalize 'aliens who have been expelled from the United States and who reenter the country unlawfully.'" Exhibit G (Report No. 1456). Def. Mot. 17–18.
  - **Counterpoint**: Flores provides no support for the alleged correlation between the failure of Johnson's undescribed legislation and the introduction of the unlawful reentry provision. Moreover, Senator Blease introduced the unlawful reentry provision on December 22, 1928, not on January 18, 1929. *See* S. 5094 (1928).

3

- **Point**: "***During debate on the bill***, Rep. Thomas L. Blanton complained that Mexicans 'come into Texas by hordes' and that 'my friend Judge Box has been making a just fight against this situation for years.' Rep. Blanton urged the House to 'apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there.' Rep. Schafer added that '[t]hese Mexicans also come into Wisconsin in droves,' and Rep. Blanton challenged others to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back.' Rep. Fitzgerald then added that from a 'moral standpoint,' Mexicans were 'poisoning the American citizen' because they are 'of a class' that is 'very undesirable.'" Def. Mot. 18–19 (citations omitted) (emphasis added).
    - **Counterpoint**: Representatives Blanton, Fitzgerald, and Schafer made these remarks in the context of a debate on a proposed amendment to Section 6 of the bill, which addressed deportation, not the unlawful reentry provision. Moreover, Section 6 never made it into the law as enacted by Congress.