# Exhibit B

The present law allows that, but it is proposed to change that practice and to say, "Unless you can read and write English, you cannot come in at all."

Mr. HUMPHREY. Under the McCarran bill not only must they read and write English, but their application is made to the American consul, who rules as to whether a visa shall be issued, and from whose ruling there is no appeal.

Mr. PASTORE. Mr. President, consider for a moment section 222 (a), which requires that an application for an immigrant visa may be filed "only with the consular officer in whose district the applicant shall have established his residence." In general this provision is supposed to insure that a thorough investigation of the alien will take place in the area in which he actually has lived. Specifically, the provision is intended to abolish preexamination, a method of extending clemency in worthy cases now within the discretion of the Attorney General.

The practice under existing law is to examine an otherwise deportable immigrant, who wishes to remain, to determine the merit of his request, and if such preexamination is favorable to the alien, he may then go to Canada and there obtain a visa from the American consul for reentry as an ordinary immigrant.

At this time I do not wish to debate the desirablity of these objectives, except to mention my grave doubts as to the wisdom of eliminating preexamination procedures. I do wish, however, to call the attention of the Senate to the effect of the section, as presently worded, upon an entirely different problem in the immigration field.

Briefly stated, section 222 (a) automatically would bar a refugee from a totalitarian nation, who had fled or been forced to flee his homeland, from applying for admission into the United States. A short illustration will demonstrate the validity of this point. Mr. A, an active anti-Communist living behind the iron curtain, is anxious to come to America. To apply for a visa in his native Prague would mean almost certain death, so Mr. A escapes to Paris. Under the proposed provision, however, this action would leave him worse off than before, since he no longer could file his papers in the district of his residence. It will be argued, I assume, that this construction would be an unreasonable interpretation of the language of the section. In response to such a contention, I assert that if an alien from the United States cannot quickly establish a residence in Canada for purposes of readmission, then a refugee from Prague is similarly restricted in establishment of a residence in Paris. This thesis finds ample support in the proposed definition of "residence" in section 101 (a) (33) as one's "principal, actual dwelling place in fact, without regard to intent."

In place of the present preexamination techniques, section 245 of S. 2550 substitutes a procedure known as "adjustment of status" which drastically curtails the authority of the Attorney General to grant relief in deserving cases. Where pre-examination is available to aliens who did not legally enter as nonimmigrants or who lost their nonimmigrant status, adjustment of status is limited to legally admitted and bonafide nonimmigrants who at all times preserved their original status. Thus, an alien who lost his nonimmigrant status for reasons beyond his control would be barred from relief regardless of the merits of his case. In addition, for the alien to qualify for adjustment of status, a quota immigrant visa must be immediately available to him both at the time of his application and at the time the application is approved. In the case of oversubscribed quotas, these requirements are obviously impossible to meet.

I wish my colleagues would bear me out on this next point, because I think it is a rather important phase which should be discussed.

A second unreasonable provision of S. 2550 is section 212 (a) (25), which, for purposes of immigration, abolishes the present exemption from literacy requirements accorded the victims of foreign religious persecutions, and also accorded close relatives of legally admitted aliens and citizens of the United States. The proposed restrictions would adversely affect only our friends, those who have ties in the United States and look to us for sympathy because they are being hounded in totalitarian lands. At this time, when we are seeking to assist oppressed peoples throughout the world, I do not understand why we are asked to eliminate a provision which is founded upon a noble and wholesome humanitarian philosophy.

A third major provision of S. 2550, which I believe worthy of condemnation, is section 101 (a) (26) (F), which drops college and university professors from the class of nonquota immigrants. Actually, the educators who have chosen America as their home have made invaluable contributions to our national economy and culture; indeed, without them we would never have been able to achieve the tremendous advances in technology which have characterized our production in recent years. When we strive by selective immigration to increase American strength, we should not erect new barriers against those who could do most to accomplish that end.

Mr. LEHMAN. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. LEHMAN. As I understand, a professor can now come in to the United States regardless of quota restrictions; but under the McCarran bill he would have to come in under the quota, as the Senator has already stated.

The McCarran bill goes further and recites that he may not come in unless he proves that he is a man of exceptional ability whose services are urgently needed for the welfare of the United States. That would certainly bar a great many physicists and others who have helped so much in developing our preparedness program. But also it would seem to me to bar a great many persons who have great value in the humanities and the classics. Under that provision I wonder how a professor of Italian literature could qualify, or a professor of Greek, or of art. Probably they could not prove that they were urgently needed, and yet they would certainly add to the culture of this country, and should be made very welcome.

Mr. PASTORE. The Senator from New York is absolutely correct, and I thank him for his contribution. The next paragraph of my address is more or less confined to the very subject discussed by the Senator from New York.

In an attempt to justify the elimination of professors from non-quota status, it has been contended that such persons henceforth would qualify as first preference quota immigrants. This assumption is essentially untrue. Professors would so qualify under the proposed bill only if they could prove to the satisfaction of the Attorney General that their services were needed urgently in the United States. Most professors, like other immigrants, come to this country not because an official of the Government has decided that they would be useful, but because conditions in their native lands have become intolerable or distasteful. Such ordinary professors, under S. 2550, would have to wait their turn as ordinary quota immigrants. The fact that admission of educators under a preference would, in any event, postpone the entry of other worthy immigrants is, presumably, beneath notice.

These three sections which I have mentioned are but a few of the provisions of S. 2550 which would prevent the admission of immigrants who would be particularly valuable additions to our population. The harmful effects such restrictions would have upon American unity, upon the national economy, and upon the role of the United States as the moral leader of the world can readily be predicted. If nothing else, enlightened self-interest demands that the proposed provisions be wholly rejected.

I could go on and on taking apart many other sections in the bill which I believe would have an over-all harmful effect. But to me the distribution of quotas under the Immigration Act of 1924, as continued in effect by the pending bill, is a shocking display of a discredited theory of racial superiority. I respectfully submit that if we are to tinker at all with our present immigration laws, then one of our primary objectives should be to erase that obvious blot upon our national shield as quickly as possible. Yet, despite the gross injustices of its provisions, S. 2550 would make no material change in the operation of the 1924 statute.

Ostensibly, the 1924 Quota Act had as its sole purpose the reduction of immigration to a point consonant with the ability of the United States to absorb this new population. If such control over admissions were the only real goal, however, it seems logical to me that a study of either recent or all immigration statistics would have been made and an across-the-board cut upon the figures so determined would have been the technique upon which immigration quotas were fixed. Such a formula, or any modified version thereof, would have reflected the then current pattern of entry for each nationality group, and would have given appropriate weight to the influx of settlers from areas which had not made substantial contributions