# Exhibit C

categories which the Senator has suggested. That would place half of the quota total into this special pool. Some people might feel that, after all, there might not be that many scientists needed, or there might not be that many hardship cases. I do not know enough about the specific immigration figures to be sure, but I think it might be reasonable to say that of the unused quota, 10,000 might be assigned to the special pools which the Senator suggests. That would be 2,500 for each of the categories. That certainly would take care of the number of urgently needed scientists, doctors, technicians, or experts in other fields, and it would take care of a great many hardship cases. It seems to me that an amendment of that sort might have considerable appeal. But when the Senator suggests 75,000, I do not know.

Mr. PASTORE. I am not suggesting the figure of 75,000. There might be no one in the pool. If tomorrow Great Britain should decide to exercise its rights and send over 66,000 out of 150,000, and if Ireland should take up its quota of 18,000 out of 150,000, there would be no pool at all. We must admit that, as a philosophy, the McCarran bill goes so far as to say that we can conveniently and comfortably absorb in this country about 150,000 immigrants a year.

Mr. CASE. Provided they come from backgrounds which we think would lend themselves to adjustment to American institutions. That is essential.

Mr. PASTORE. Does the Senator from South Dakota presume for a moment that a proper background of the American pattern of society is indicated by allowing Great Britain 66,000 and Portugal perhaps 400? I do not know where we get the background we talk about.

Mr. CASE. If we were to go back and debate the original principles involved in any immigration law whatsoever, we might get back to a discussion of that question. I see in the Senator's amendment a possible contribution to our immigration policy and laws. But it seems to me that if we are to go back and debate the entire question of national origins, we get away from the amendment. The Senator has already suggested that he would not be opposed to having his amendment clarified, if it needs clarification, by saying that this pool shall not carry over cumulatively, but only from one year to the next. If the Senator would go further and say that of the unused quotas not to exceed 10,000 might be placed in a pool, 25 percent of which could be assigned to the various categories, I think the Senator might have an amendment which would command considerable support.

Mr. PASTORE. Something of that kind might be worked out in conference, but I do not think it is fair to ask me to take what I consider a very restrictive compromise and restrict it still further. As I have previously said, there is nothing in the amendment which takes away any rights from anyone. All it does is to create the pool system, whereby, in cases where the interest of the United States was concerned, we could go to a pool system in the event certain countries did not exercise their full rights.

Mr. LEHMAN. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. LEHMAN. I do not know how the Senator from Rhode Island was impressed, or how my other colleagues were impressed, by one statement made by the distinguished Senator from South Dakota, but I thought it was most illuminating when he said that he had no objection to 150,000 immigrants coming into the country provided they had the proper background. Is not that exactly the thing which we are fighting at this time, in the philosophy of the McCarran bill? What makes an immigrant from Great Britain, Ireland, or certain other countries which have unused quotas any more desirable than an immigrant from some other country? What constitutes in him a better background than that of an immigrant from Italy, Austria, Greece, or some other country? It seems to me that the statement made by the distinguished Senator from South Dakota discloses the whole philosophy of the McCarran bill. We recognize the people of so-called Nordic strain. We are going to turn thumbs down on people from southern or eastern Europe.

Mr. PASTORE. I completely agree with the Senator from New York. I have said this so often that it has become rather stale. It strikes me that if we are talking about the pattern of racial strains in this country in the year of 1952, after two cataclysmic wars, we should take the roster of the American Army in World War II and look at the racial strains and, upon the basis of those racial strains, judge our immigration law.

But that is not good enough. We go back to 1920, when the situation was so rigged that certain people were considered undesirable immigrants to this country. Where would we all have been—where would the McCarrans and the Pastores have been—if it had not been for the liberal immigration which was permitted in the case of Ireland, Italy, Portugal, and Greece? Where would the boys have come from who wore the American uniform and won the war in 1945 if it had not been for the sons of immigrants who fought and died for the United States? Now, in this day and age, we hear about the proper racial background. What is so sacred about the census of 1920?

Mr. CASE. Mr. President, will the Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. CASE. The Senator from South Dakota did not use the word "racial." The Senator from South Dakota on the floor of the Senate has defended the people of Hawaii, who include many races. He would join completely with the Senator from Rhode Island in paying tribute to the people of various racial backgrounds which have made such great contributions to our Armed Forces in World War II and in other wars.

What the Senator from South Dakota was trying to do was to ascertain whether an agreement could be reached on the desirable goal in the Senator's amendment, namely, with respect to a provision for the relief of some hardship cases and to permit some people with scientific skills to come into the United States. If the Senator from Rhode Island wishes to go back and debate the original concept of the bill, he may do so, but in that way we are getting away from the issue before us.

I did not use the word "racial." I referred to background in relation to institutions and to the adaptability of persons to American customs. It may be that people can come to this country and in time be just as good citizens as the Senator from Rhode Island and the Senator from South Dakota. It may be that the digestive processes of the American system can take only so many at a time. I do not know. I did not write the 1924 act. I did not fix the quota system. That is what we are dealing with as a base.

I thought the Senator from Rhode Island was trying to improve the bill by provisions affecting some special situations. The Senator from South Dakota sought to help him. He does not like to have it suggested on the floor of the Senate that he used the word "racial." He did not use that term. He would oppose the use of the term "racial background" as much as would the Senator from Rhode Island.

Mr. PASTORE. I am not accusing the Senator of anything. The Senator did infer that the basis that we have here is the historical and traditional basis of a tested racial strain in this country, when he defended the 1920 census.

Mr. CASE. The Senator from South Dakota is not defending the 1920 census. Perhaps the 1950 census would be better. However, that is not the issue which is involved in the Senator's amendment. I thought he was trying to meet some special situations and the Senator from South Dakota sought to help him. If the Senator from Rhode Island wishes to go back to the basis of the bill, I shall not press the point.

Mr. PASTORE. If the Senator from South Dakota will read the RECORD tomorrow morning he will discover that he defended the census of 1920 as being the historical and traditional policy of our immigration law.

Mr. CASE. No. Background on the basis of sympathy or experience and understanding with constitutional government and principles of free enterprise.

Mr. PASTORE. We are in 1952.

Mr. CASE. The Senator from South Dakota stated that as a fact. He did not go into the merits.

Mr. PASTORE. What is so holy and sanctifying about the 1920 census that it must be defended in the year 1952?

Mr. CASE. Does the Senator's amendment propose that we change from the 1920 census to the 1950 census? No. I did not understand that that issue was involved.

Mr. PASTORE. We did talk about it, but it was of no avail.

Mr. CASE. That is not the pending amendment.

will permeate our whole Catholic life, and that it will give our Church an opportunity of taking its proper place as the strongest Church in the world at the present time. It is our hope, too, that in promoting this Christian and democratic approach to immigration on the international level we shall be able to join forces with other religious groups with which we have worked so successfully in the resettlement of displaced persons.

Every Catholic should feel proud of the great contribution of war relief services of the National Catholic Welfare Conference in the resettlement of 120,000 displaced persons in the United States. No voluntary organization in all history can register such an achievement. It is our hope that this work may be continued as an evidence of the continuing international leadership of our Church in these revolutionary times.

The VICE PRESIDENT. The bill is open to further amendment.

Mr. McCARRAN. Mr. President, if there are no further amendments to be offered, I ask unanimous consent that the Senate proceed to the consideration of Calendar No. 1416, House bill 5678.

The VICE PRESIDENT. The clerk will state the bill by title.

The LEGISLATIVE CLERK. A bill (H. R. 5678) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes.

The VICE PRESIDENT. Is there objection to the request of the Senator from Nevada?

There being no objection, the Senate proceeded to consider the bill.

Mr. McCARRAN. Mr. President, I move as an amendment that all after the enacting clause of the House bill be stricken out, and that there be substituted the text of Senate bill 2550, as amended.

The amendment was agreed to.

The VICE PRESIDENT. The question is on the engrossment of the amendment and the third reading of the bill.

The amendment was ordered to be engrossed, and the bill to be read a third time.

The bill (H. R. 5678) was read the third time, and passed.

Mr. McCARRAN. Mr. President, I move that the Senate insist upon its amendment, request a conference thereon with the House of Representatives, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to; and the Vice President appointed Mr. McCARRAN, Mr. EASTLAND, Mr. O'CONOR, Mr. SMITH of North Carolina, Mr. WILEY, Mr. FERGUSON, and Mr. JENNER conferees on the part of the Senate.

The VICE PRESIDENT. Without objection, Senate bill 2550 will be indefinitely postponed.

Mr. McCARRAN. Mr. President, I would not be true to my thoughts and my feelings at this moment were I not to give credit where credit is due. The chairman of the Committee on the Judiciary has been sitting here for days with members of his staff about him. I refer to the able and splendid assistance rendered to the chairman, in writing the bill just passed, by Mr. Drury H. Blair, who sits two from my left, Miss Ethel L. Johnson, an expert on naturalization, who has been at my command on the floor of the Senate, and last, but not least, the head of the staff having immigration in hand, who has for years worked diligently on the bill, Mr. Richard Arens, who sits next to me.

Mr. FERGUSON. Mr. President, I wish to join in the remarks of the Senator from Nevada, and to say to the Senate that on all occasions the Senator from Michigan, a member of the minority on the Senate Committee on the Judiciary, has received the cooperation of Miss Johnson, Mr. Arens, and Mr. Blair. They have worked tirelessly, and have been of great aid and assistance in perfecting the bill which has been under consideration, and which has just been passed by the Senate.

Mr. McCARRAN. Mr. President, at this time I wish to say to the Members of the Senate who have remained in attendance long hours while the bill has been under consideration, and have shown unusual interest in the bill, that I am exceedingly grateful to them, and very happy because they had sufficient confidence in the chairman of the Committee on the Judiciary and in the committee, and in the work which it has been engaged for three long years, to remain in attendance and assist in the adoption of some amendments and the rejection of others and in the passage of the bill.

Mr. LEHMAN. Mr. President, for more than a year now I have been working, studying, writing, and speaking on the subject of immigration.

For the past 2 weeks I have spoken often in the course of the prolonged debate we have had on the subject of the McCarran omnibus immigration bill.

I have felt that no measure of greater significance and scope has been before the Congress since I have been a Member. I felt that the passage of the McCarran bill in substantially the form in which it has passed would be a development of the gravest consequences. I have felt that, should this measure or one roughly similar to it become law, the very meaning of America, as most of us know it, would be radically affected, that hundreds of thousands of aliens in this country, and hundreds of thousands of naturalized and even native-born citizens, would be seriously affected.

I did not contest and do not now contest the fact that there are some desirable and useful provisions in the bill. I, too, would like to see those provisions enacted. But I feel more keenly now than ever that we cannot afford the price of those provisions if we must also buy the rest of the McCarran bill, with all its incipient dangers to our ideals of justice and equity, with all its built-in prejudices and suspicion of foreigners, with all its revalidation of the discredited theory of racial origins.

I do not think we can afford to pay such a price; I do not think we can afford to see enacted into law so many mischievous and trouble-making provisions just in order to get partial lifting of certain racial restrictions, however desirable that may be.

We must bear in mind that the McCarran bill, as passed, reflects a basic discrimination against peoples from eastern and southern Europe; it reflects a basic discrimination against Negroes. It has the potentialities of slamming the door shut upon all but a trickle of immigration into this country. It makes easy the deportation of thousands of people who should not be deported. It makes denaturalization an everyday possibility for naturalized citizens. It creates a great class of second-class citizens in our country.

I am proud of the part I have been able to play in helping lead the fight against this measure, in bringing the incipient evils in the bill to the attention of the Senate and of the public. I hope that we have made a record which the President can study in arriving at his decision on whether to sign or veto this iniquitous measure.

The debate has brought out a basic difference of philosophy between those who support and those who have opposed the McCarran bill. Those of us who have opposed the bill believe in America, in what it has been and in what it will be. We believe that America has become great under the leavening influence of the broad streams of freedom-loving and freedom-seeking immigrants who have come from many lands. We have no fear of and no prejudices against the foreigner as such. We believe that Americanism is in the air here—not in the blood.

I shall not delay the Senate more. I still trust and hope that this measure will not become law. I can speak for myself, and I think for my associates in this fight, in pledging to continue our efforts to liberalize and humanize our present immigration laws as reflected in the Humphrey-Lehman bill, S. 2842. We shall never give up our fight against such proposals as the McCarran bill, with its overtones or prejudice and discrimination.

Mr. HUMPHREY. Mr. President, I wish to associate myself with the remarks of my colleague [Mr. LEHMAN] with regard to the struggle in connection with the immigration bill. I want the RECORD to be perfectly clear. On several occasions the majority leader has pointed out that a good deal of time has been spent on the bill; but the time has been well spent, and it will have been well spent for the future welfare of our country. I have that feeling as we come to the conclusion of the consideration of the bill, after two initial votes, the vote on recommittal and the vote on the substitute. Our task as opponents of the McCarran bill was precisely to point up the RECORD with a series of amendments. It was for that reason that we brought up the amendments. We resorted only to voice votes. It was obvious that we did not have a majority of votes, in terms of adopting the amendments. However, it is equally obvious that there was considerable support for the amendments, for the substitute measure, and for recommittal.

I believe that the bill should not become law. I shall do everything within my power to persuade the people to appeal to the President to veto the bill. I think it should be vetoed, in terms of our national interest and national security, and in terms of the status and respect of the American people in the eyes of the world.