# Exhibit G



Explore our Websites

MENU

# Special Message to the Congress on the Employment of Agricultural Workers from Mexico

July 13, 1951

To the Congress of the United States:

I have approved S. 984, an Act relating to the recruitment and employment of agricultural workers from Mexico.

If promptly followed up by other needed measures, this Act can be a first step toward a comprehensive program to bring badly needed improvements in the living and working conditions of migratory farm workers, both foreign and domestic. At the same time, this Act can help to assure an adequate supply of labor to meet the needs of American agriculture. On the other hand, if enactment of this legislation becomes an excuse for delay on these other measures, it will hamper our efforts to meet more basic problems-including the pressing problem of illegal immigration.

For that reason, I could not have given my approval to this Act had I not been assured by Congressional leaders that supplementary legislation and appropriations would receive prompt consideration at this session.

For many years, the Mexican Government, by agreement with the United States, has allowed its citizens to come into this country on contracts with agricultural employers to assist in harvesting vital crops--principally cotton, sugar beets, citrus fruits, and vegetables-and mostly in the southwestern part of the United States.

During and since the last war, the recurrent shortages of farm labor in the United States have made the addition of contract workers from Mexico a vital factor in bringing in the crops. Last year, for example, 70,000 Mexican workers were legally admitted to this country for contract work during the harvesting season.

However, both this Government and the Mexican Government have become

increasingly concerned about violations of the contract terms under which Mexican citizens are employed in this country. We must make sure that contract wages will in fact be paid, that transportation within this country and adequate reception centers for Mexican workers will in fact be provided. It is necessary, therefore, that this Government be able to stand behind all contracts and guarantee performance in the future, if any more Mexican citizens are to be legally recruited for work in the United States. Until this can be done, Mexico has taken steps to terminate the agreement under which her citizens were brought to this country in the past and will make a new agreement only if these guarantees are given.

It is the purpose of S. 984 to give this Government the authority needed to make a mutually satisfactory new agreement with Mexico, which would include these guarantees. Under the terms of this Act, the United States Government, subject to a fixed reimbursement by the employer, will be able to recruit and transport Mexican workers to reception centers in this country, to house and care for these workers until they are employed, to help them make arrangements with American employers, and to guarantee performance by employers of the terms of their employment contracts.

With this authority, it should be possible to reach a new agreement with Mexico. This Act will thus take care of one immediate problem, the harvesting of crops this year. It will also undoubtedly improve the situation of Mexican workers brought into this country for contract work. A government-to-government guarantee of wages and work standards for these workers will be a real step forward.

But this is very limited progress, which hardly touches our basic farm labor problems. The really crucial point, which this Act scarcely faces, is the steady stream of illegal immigrants from Mexico, the so-called "wetbacks", who cross the Rio Grande or the western stretches of our long border, in search of employment. These people are coming into our country in phenomenal numbers--and at an increasing rate. Last year 500,000 illegal immigrants were apprehended and returned to Mexico. In 1949, less than 300,000 were returned.

There are many thousands of these people who have escaped detection and remain in this country today. Thousands more will find their way here before the year is out. Since these unfortunate people are here illegally, they are subject to deportation if caught by our immigration authorities. They have to hide and yet must work to live. They are thus in no position to bargain with those who might choose to exploit them.

And many of them are exploited, I regret to say, and are left in abject poverty. They live always under the threat of exposure and deportation. They are unable, therefore, to protest or to protect themselves.

The presence of these illegal workers has a seriously depressing effect on wages and working conditions in farm areas throughout the southwest. The standards of living and job opportunities of American farm workers are under constant downward pressure. Thousands of our own citizens, particularly those of Latin descent, are

displaced from employment or forced to work under substandard conditions because of the competition of these illegal immigrants.

Everyone suffers from the presence of these illegal immigrants in the community. They themselves are hurt, first of all. Our own workers--as well as the legal contract workers from Mexico-are hurt by the lowering of working and living standards. And the farmers are hurt, too. Instead of a well trained, reliable supply of workers, they are increasingly dependent on a rapidly-shifting, ill-trained domestic labor force, supplemented legally or illegally from foreign sources. They face a crisis in their labor supply at every season. They are forced, year after year, to makeshift last minute measures to save their crops.

The President's Commission on Migratory Labor, in its recent report on the situation throughout the Nation,1 put the issue this way:

1The report of the President's Commission on Migratory Labor is entitled "Migratory Labor in American Agriculture" (Government Printing Office, 1951, 188 pp.).

"Shall we continue indefinitely to have low work standards and conditions of employment in agriculture thus depending on the underprivileged and the unfortunate at home and abroad to supply and replenish our seasonal and migratory work force? Or shall we do in agriculture what we already have done in other sectors of our economy-create honest-to-goodness jobs which will Offer a decent living so that domestic workers, without being forced by dire necessity, will be willing to stay in agriculture and become a dependable labor supply? Just as farm employers want able and willing workers when needed, so do workers want reliable jobs which yield a fair living. Neither is being satisfied."

S. 984 does not face up to that basic issue. The Act does, it is true, provide that Mexican workers may not legally be brought in unless the Secretary of Labor certifies a real shortage of domestic workers. The Act also provides that employment of Mexican contract labor must not adversely affect wages or working conditions of domestic workers. But these safeguards have little meaning so long as illegal immigration continues--so long as illegal workers are in fact used by American employers to take the place of other workers.

If we are to begin to meet the basic problem, we must do two things right away. First, we must put a stop to the employment of illegal immigrants. Second, we must improve the use of our domestic labor force. These steps will require more sanctions than our laws now provide and more administrative machinery and services than are now available. Therefore, I recommend that the Congress take the following action:

First, legislation should be enacted providing punishment for the offense of harboring or concealing aliens who have entered this country illegally. While we have a law on the books purporting to make this an offense, that law is not enforceable, because no penalty was adequately provided. This should be remedied at once. In addition, to

help discourage the smuggling of aliens, the existing provisions of law punishing transportation of illegal immigrants must be strengthened. While such legislation will be very useful in bringing illegal immigration from Mexico under control, it will also be a valuable addition to our general immigration laws.

Second, legislation should be enacted to clearly establish the authority of personnel of the Immigration and Naturalization Service to inspect places of employment, without a warrant, where they have reason to believe that illegal immigrants are working or quartered. Immigration inspectors are able to cope with known illegal immigrants by obtaining warrants for their arrest. But where there are places of employment, consisting of many acres of land on which many workers are employed and quartered, inspection is necessary to find out whether illegal immigrants are among those workers. The inspections would involve no more, and probably a good deal less, than inspections of mines or factories by public authorities to assure compliance with accident prevention laws. Of course, a farmer's dwelling should be safe from search without a warrant. But there is no reason why other premises which serve as places of employment should not be open for inspection to aid in the enforcement of our immigration laws.

Third, a supplemental appropriation should be made available immediately to the Immigration and Naturalization Service to expand its personnel in the southwest so that all types of enforcement work can be stepped up--including apprehension, investigation, and deportation of illegal entrants. I shall shortly send a budget estimate for this purpose to the Congress.

It is absolutely impossible, without the expenditure of very large amounts of manpower and money, to seal off our long land borders to all illegal immigration. But these three actions by the Congress will give us the tools we need to find and deport illegal immigrants once here and to discourage those of our own citizens who are aiding and abetting their movement into the country.

In this connection, I am glad to report that the Government of Mexico is contemplating more stringent measures on its own account to help curtail illegal crossings of our border.

As a fourth measure for immediate Congressional action, I shall shortly forward to the Congress a supplemental budget estimate for the Farm Placement Service of the Labor Department.

It is not enough to take strong action against the stream of illegal immigrants. If we are to make real progress toward solving our basic farm labor problem, we must improve the utilization of our own citizens in the farm labor force, and reduce to a minimum our dependence on foreign sources. As a first step, we need at once to strengthen the machinery of the Department of Labor for surveying labor market needs and recruiting workers to fill these needs. This will be essential if we are to do an effective job under S. 984, in deciding how many contract workers to bring across

the border and where they ought to be employed. It will be essential if we are to make this importation of foreign workers truly supplemental to our own resources of farm labor and give the fullest opportunity to those of our citizens who seek employment on the farm.

The additional funds for the Farm Placement Service will be used to expand labor market studies which will be undertaken in cooperation with the Department of Agriculture. These funds will also permit an expansion of the field staff in rural areas, where large-scale employment of farm labor is required. The aim in these areas will be to find out exactly what workers are needed and find the right workers to do the job.

Finally, these funds will be used to expand the Government's operations in the manner required under S. 984, including transportation and reception of Mexican workers, inspection of contract operations and handling of complaints.

Unless all of these activities of the Farm Placement Service can be built up quickly and effectively, orderly operations under S. 984 will be impossible and we will lose the chance to make full use of our domestic supply of farm workers or to determine on a realistic basis our need for workers from abroad.

These four measures, supplementing the provisions of S. 984, will give us a real program with which to tackle the basic problems of farm labor in the southwest. They will help us also to make a start in other areas where agriculture is dependent on large-scale use of migratory workers.

There is one provision of S. 984 which could interfere quite seriously with our efforts to maintain labor standards in this country. This is the provision which so defines agricultural employment as to allow the Secretary of Labor to bring in Mexican workers for employment in food processing trades as well as on the farm. It is essential that we keep the importation of Mexican workers from reducing the job opportunities or working conditions of our own citizens employed in these trades. To that end, I believe the Congress should repeal this provision. In the meantime, it will be necessary for the Secretary of Labor to use his discretion with great care and to authorize the employment of Mexican workers in these trades only in case of some genuine, unmistakable emergency.

The measures which I am now recommending to the Congress will not take care of all our problems by any means. The president's Commission on Migratory Labor, a group of distinguished citizens, recently completed an extensive investigation of migratory labor problems throughout the country.. The Commission's report was submitted two months ago and is being intensively studied within the Executive Branch. It is a very useful and constructive document and it emphasizes, among other things, that the migratory workers in this country will need specially adapted programs to improve housing conditions and health, education, and social security. They will need these things if they are to develop into the kind of labor force so badly

needed in agriculture today--a labor force which really meets the long-run requirements of large-scale "industrialized" farm production.

From time to time, therefore, as the report of this Commission is studied and appraised, I intend to send further recommendations to the Congress, looking toward more improvements in the working conditions and living standards of our migrant workers. Meanwhile, it is my earnest hope that the Congress will lose no time in acting on the recommendations outlined in this message.
HARRY S. TRUMAN

NOTE: As enacted, S. 984 is Public Law 78, Bad Congress (65 Stat. 119).

On August 16 the President approved H.J. Res. 311, making interim appropriations to the Department of Labor to begin the task of bringing Mexican farm workers into the United States under the terms of Public Law 78. For the statement by the President upon signing the bill see Item 192.

On March 20, 1952, the President approved S. 1851, an act giving immigration officers additional authority to prevent Mexican farm workers from entering or remaining in the United States illegally (Public Law 283, 82d Cong.; 66 Stat. 26).

**Harry S. Truman Library & Museum**

500 W US Hwy 24

Independence, MO 64050

816-268-8200 | 800-833-1225

Fax: 816-268-8295

**Museum Hours**

The museum has just finished a massive renovation of the museum and its exhibitions, the first major renovation in more than 20 years and the largest since the museum opened its doors in 1957.

View our museum hours here.

**Stay in Touch**

Privacy Statement | Contact | Donate



  The Harry S. Truman Library and Museum is part of the Presidential Libraries system administered by the National Archives and Records Administration, a federal agency.