# Exhibit J

early in our history, but whose contributions were constantly on the increase.

This procedure, of course, would have resulted in relatively large quotas for the peoples from southern Europe and consequently was completely intolerable to the racially biased framers of the 1924 act. Instead of an equitable quota system, based upon actual prior immigration figures, therefore, the draftsmen instituted a formula based upon the composition of the American population at the arbitrary cut-off date of 1920, which, in effect, placed severe restrictions upon immigration from southern, central, and eastern Europe in favor of the countries in the northern and western portions of that Continent. As a few comparative figures will illustrate, this formula took into account not only how many individuals from a particular nationality group had ever entered the United States, but also how long those individuals or their descendants had been in this country, thus objectively discriminating against those who were newcomers.

In the period from 1789 to 1924, for example, Great Britain sent to this country no more than 7,000,000 immigrants. For this contribution, that nation was accorded 65,721 quota numbers, of which, incidentally, it uses merely a fraction. In the same period, Italy sent to this country approximately 4,400,000 immigrants; yet, for this great contribution that nation was accorded only 5,802 quota numbers, for which, I might add, there has always been a heavy demand.

At this point let me say parenthetically that I hope the sponsors of the McCarran bill will ascertain how the descendants of those immigrants compare with the number who were in the American Army in the last World War, and how many of those boys were the sons of Italian immigrants.

Mr. DOUGLAS. Mr. President, will the Senator yield for a question?

Mr. PASTORE. I yield.

Mr. DOUGLAS. If the Senator will permit me, I should like to give a little personal testimony on this point. One can never be quite certain about one's ancestors; but so far as I can tell, my people came to this country in 1700. So far as I can trace my genealogy, there is not a drop of blood in my veins that is not English, Scotch, or Scotch-Irish.

I grew up in a Yankee community, where the only person who was not a Yankee was a fruit dealer. I went to a college where I think 95 percent of the students were Yankees. I then went to the city of New York and did graduate work, following which I went to Chicago. I then became acquainted with the populations of southern and eastern Europe. I am proud of my own ancestry, but let me say that these other groups are as fine American citizens as the old Yankee stock.

As I grew older I became acquainted with the history, traditions, and achievements of the Italian people. Probably the greatest genius who ever lived was Michelangelo. Next to him was Leonardo da Vinci. Michelangelo was the most breath-taking painter and sculptor

in the history of art, and one of the great architects. Leonardo was a great painter who also tried his hand at sculpture. He was also a great scientist and engineer. In the world of art great achievements were made in the period of the Rennaissance by Italian painters, Italian sculptors, and Italian architects. One of the greatest literary men of all time was Dante. Then there were Boccaccio and Ariosto, and the other great Italians.

The Italian people have a heritage as great as that of the English people. The blood of Michelangelo, of Leonardo and of Dante still flows in Italian veins. Greek art was perhaps superior to Italian art, and the philosophers of Greece, Plato and Aristotle; and the tragic playwrights of Greece, Aeschylus, Sophocles, and Euripedes, set a standard in literature which certainly has never been surpassed. That blood has not stopped flowing. That blood still flows in the Greek people today.

Therefore, without being self-conscious about this matter I am proud to pay tribute to the simple fact that the people of southern and southeastern Europe are as fine as there are on the face of this globe. They have made a splendid contribution to America as their circumstances, the time they have been here, and the difficulties under which they have labored have all made possible.

Mr. PASTORE. Does not the Senator from Illinois agree with me that we should recognize the wrong that was done by the adoption as a basis of the Census of 1920? At the time it may have been necessary to use the 1920 census. Perhaps when the law was written in 1924 all Congress could go by was the 1920 census, but here we are writing a law in 1951. By deliberately readopting the Census of 1920 we are insulting the boys of the racial stocks of which we talk who wore the American uniform and lie today under white crosses in some American cemetery. If we did nothing else we ought to remove that horrible connotation that is being perpetrated by this bill.

Mr. HUMPHREY. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. HUMPHREY. The Senator is making the point that because of the census basis being 1920 for immigration purposes there is discrimination against immigration by southern and southeastern European stock to the United States. I think that is documented by statistical evidence which the Senator has placed in the RECORD.

Is it not correct to say that some countries, such as Bulgaria, Hungary, Roumania, and Czechoslovakia, are behind the iron curtain? Is it not also correct to say that the real liberty-loving people and the most passionately liberty-loving people have gotten out of those countries, have moved across the borders and are known as expellees or refugees, and are now seeking entrance to the haven of freedom which is the United States as well as other countries? By reason of the fact that we are utilizing the 1920

base and the fact that we have the preference clause system in the use of the immigration quotas, is it not true that we are literally locking the door upon those who would seek entrance and who are so devoted to freedom that they have taken their very lives into their hands in order to seek freedom? Yet we immeasurably block the gates to their entrance into the United States.

Mr. PASTORE. My distinguished colleague is absolutely correct.

Mr. HUMPHREY. Mr. President, I wish to pursue this thought a little further.

I heard the very eloquent words and accurate description of the greatness of the Italian people, the Greek people, and the other people who made great contributions to the culture of the world.

Let me bring this point down to a parochial level. In the northern area of my State of Minnesota are the great iron mines. Iron ore comes from the great Mesabi, Cayuna, and Vermilion iron-ore ranges. Nearly 90 percent of the iron ore upon which our industrial establishments depend comes from those mines. The men who go into those pits come from Serbia, Croatia, Bulgaria, Hungary, and Rumania. They are Slavic people. They constitute in a way small united nations. Thirty-nine different racial groups live in St. Louis County alone. There are people of Finnish extraction, as well as of Norwegian, English, Spanish, Portuguese, and French extraction. They are all there. We have Negroes and Indians. There are also Moslems.

As I say, it is a little world unto itself. I want the RECORD in the Senate to be absolutely clear that as parents, many of them first generation Americans, those men have contributed to America some of the finest sons and daughters this great country has ever known.

I should like my colleagues to know that a greater percentage of the sons and daughters of these immigrants from south and southeast Europe go forward and obtain university educations and enter professional life than from any other stock in our State. These people seek a better life. They build good schools and have fine homes. They build beautiful churches and cathedrals and synagogues. They are good citizens.

I cannot understand how anyone in good common sense can write an immigration bill which in the face of that demonostrable evidence and living testimony—not theory—discriminates against such people, against their blood and against their stock and national origin. It does not make any sense. There is plenty of room in this country for more Italians. There is plenty of room for more Greeks. There is plenty of room for more Hungarians, Austrians, Bulgarians, and Rumanians. There is plenty of room for them if they make good citizens and work in behalf of themselves and a new country.

I would ask the authors of the pending immigration bill to go to the great Statue of Liberty and look at its extending, welcoming arms. I would ask them to read the plaque on the base of the statue. The words were written by an immi-

grant, Emma Lazarus. The plaque reads:

Keep ancient lands, your storied pomp!
    Cries she
With silent lips, "Give me your tired, your
    poor,
Your huddled masses yearning to breathe
    free.
The wretched refuse of your teeming shore.
Send these, the homeless, tempest-tost to me.
I lift my lamp beside the golden door!

Mr. President, we do not mean it any more, apparently. If we do mean it, we are not codifying it into law. We are saying in effect: "Take the trip if you want to, but we will send you back. You are not welcome. We welcome only a few elite."

Mr. President, there is no such thing as the elite. There is no privilege, except the privilege of ability, not privilege of race or national origin. The sooner we get rid of the nonsensical, outmoded, and aristocratic notion that some blood is better than other blood, that some skin is better than other skin, we will be better off. That is the curse of this generation, and it is driving us to a very unfortunate position in world affairs.

Mr. PASTORE. I thank the Senator.

Mr. LEHMAN. Mr. President, will the Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. LEHMAN. The Senator, no doubt, will emphasize the fact that in proposing to use unused quotas, we are not minimizing or belittling the very great contributions that have been made to this country by Anglo-Saxon stock. We never fail to express our deep sense of gratitude toward that contribution. In our bill we are not in any way reducing the number of that stock that may come into the United States. As someone has so well said this afternoon, our invitation to Great Britain and Northern Ireland to send 65,000 people still remains. The invitation is a hearty one; it comes from the depths of our souls. We want that immigration. All we are saying is, "If you do not accept our invitation to come to our country, let us issue that invitation to people of other stocks, people from Italy, Greece, and other countries of southern or eastern Europe."

We are not in any way proposing to reduce the number of persons who can enter the United States from England or from Northern Ireland, but we are simply saying to them, "If you do not accept, for reasons which may seem to you to be sound, and which probably are sound, our invitation to enter the United States, let us issue that invitation to other peoples."

(At this point Mr. PASTORE yielded to Mr. LEHMAN, who requested and obtained unanimous consent to address certain questions to Mr. MCCARRAN. Upon request of Mr. PASTORE, and by unanimous consent, the ensuing colloquy was ordered to be printed in the RECORD at the conclusion of Mr. PASTORE'S remarks.)

Mr. PASTORE. Mr. President, to proceed with my remarks, let me say that these facts sharply emphasize that in terms of contributions, in terms of need, and in terms of waste, the present operation of the quota system based on national origin is as out of balance as a ping-pong ball measured against a steel ingot.

I do not ask that the entire national-origins quota system be repealed. I do request, however, contrary to the provisions of S. 2550, that we take immediate steps to rectify the injustices which it has fostered. One method of so acting would be adoption of the plan for pooled quotas, which I have already mentioned. A second alternative, though of lesser effect, would be to modernize our law by substituting the 1950 census for that of 1920 as the base for the computation of nationality quotas. To retain the 1920 census base, as the proposed legislation does, is to discriminate against those nationality groups whose proportionate contribution to our population has increased during the past 30 years.

Again I refer to the remarks of the four dissenting members of the Committee on the Judiciary in stating:

When it is understood that recent immigration has reflected (a) love of freedom on the part of the alien, and (b) forces of oppression or intolerable economic pressure in the country involved, the implications of the discrimination must soon become apparent. To discriminate against the immigrants of the past 30 years, at a time when we are battling to win the minds and hearts of the peoples of Europe, is to ignore our friends, to help our enemies, and to intensify population pressures and resentments that endanger the peace.

Mr. HUMPHREY. Mr. President, will the Senator yield at that point?

Mr. PASTORE. I yield.

Mr. HUMPHREY. The Senator from Rhode Island makes reference to the minority views of the Committee on the Judiciary. Is that correct?

Mr. PASTORE. That is correct.

Mr HUMPHREY. Am I correct in my understanding that there were four members of the Judiciary Committee who signed the minority views?

Mr. PASTORE. That is correct; and three of them were of the majority party.

Mr. HUMPHREY. Am I correct in my understanding that those who signed the minority views vigorously opposed the passage of Senate bill 2550?

Mr. PASTORE. Precisely; and upon more or less the same grounds we are giving this afternoon.

Mr. HUMPHREY. Since everybody seems to be under suspicion nowadays as to whether he has read this document, would one be fair in assuming that the four members of the Judiciary Committee who signed the minority views possibly had read the bill?

Mr. PASTORE. They must have read not only the bill itself, but the report of the committee, in order to write the minority views.

Mr. HUMPHREY. Is the Senator familiar with the fact that in the minority views the following statement appears?

The importance of this legislation certainly merited a section-by-section discussion by the committee before final committee action.

I read that from the first page.

Mr. PASTORE. I cannot answer that, but it should speak for itself.

Mr. HUMPHREY. Would it be logical, I may ask the Senator, in view of the statement in the views of the minority that "the importance of this legislation certainly merited a section-by-section discussion by the committee before final committee action," to say that I am correct in deducing that there was no such section-by-section analysis?

Mr. PASTORE. I should say so.

Mr. HUMPHREY. I may remind the distinguished chairman of the committee that last night I read the minority views twice. I have had that privilege, since I understood that I, too, was brought in as one of the nonreaders. I have also had the distinction of having read the document known as S. 2550, which is, of course, supposed to simplify the immigration laws and to codify them. If, however, it is an example of simplification, then I may say that a cross-word puzzle would be but a straight line. So we may set the record straight, I have also had the privilege of reading the majority report.

Finally, I ask the Senator from Rhode Island whether he feels that organizations such as the National Council of Catholic Women, the War Relief Services, National Catholic Welfare Conference, the National Council of Catholic Charities, the National Council of Jewish Women, the Order of the Sons of Italy in America, the American Jewish Committee, and a dozen or more other outstanding citizens' committees who have opposed major aspects of the McCarran bill may have read it and that their reading of it may be the basis of their opposition?

Mr. PASTORE. Again, I cannot speak for them, but I should assume that they have read it.

Mr. HUMPHREY. At least, if they have not read it to the satisfaction of certain of the committee members, they have read it to the satisfaction of themselves that they found something wrong with it.

Mr. PASTORE. Knowing of the character and integrity of the organizations mentioned by the distinguished Senator from Minnesota, I know that before they would make any comment regarding legislation pending in the Congress of the United States, they, of course, would not only read the proposed legislation, but would study it thoroughly.

Mr. HUMPHREY. Mr. President, will the Senator from Rhode Island yield for but one further observation?

Mr. PASTORE. I yield.

Mr. HUMPHREY. Does the Senator believe that the San Diego Council of Churches, for example, which opposes this bill, might even have taken a fleeting glance at it? Indeed, would it be fair to assume that, before an organization such as the San Diego Council of Churches expressed its opposition, it would have read the bill? Would that be a fair conclusion?

Mr. PASTORE. I think the Senator may state that as an assertion, rather than as a question to me; because I think that is so.